IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

United States Courts
Southern District of Texas
FILED

MAY 2 1 2008

Michael N. Milby, Clerk

| | | |
|---|---|---|
| GILMAR ALEXANDER GUEVARA | § | |
| Petitioner | § | |
| | § | |
| V. | § | Misc. Action |
| NATHANIEL QUARTERMAN, | § | No. H-06-441 |
| Texas Department of Criminal Justice | § | |
| Correctional Institutions Division Director, | § | |
| | § | |
| Respondent | § | |

# H-08 -1604

## PETITION FOR WRIT OF HABEAS CORPUS
### 28 U.S.C. § 2254 - DEATH PENALTY

TO THE HONORABLE DISTRICT COURT:

COMES NOW, Petitioner Gilmar Alexander Guevara, by and through his attorney of

record, Jani J. Maselli, and presents this Application for Writ of Habeas Corpus pursuant to

28 U.S.C. § 2254. In support, petitioner shows the following:

**I.**

Mr. Guevara, the petitioner, was charged by indictment with the offense of capital

murder, proscribed by *Texas Penal Code § 19.03*. The indictment alleged:

> In the name and by the authority of the State of Texas: The duly organized
> grand jury of Harris County, Texas, presents in the District Court of Harris
> County, Texas, that in Harris County, Texas, Gilmar Alexander Guevara,
> hereafter styled the defendant, heretofore on or about June 2nd, 2000, did then
> and there unlawfully, during the same criminal transaction, intentionally and
> knowingly cause the death of Tae Youk by shooting Tae Youk with a deadly
> weapon, to-wit, a firearm, and intentionally and knowingly cause the death of
> Gerardo Yaxon by shooting Gerardo Yaxon with a deadly weapon, to-wit, a
> firearm.

It is further presented that in Harris County, Texas, Gilmar Alexander Guevara, hereafter styled the defendant, heretofore on or about June 2nd, 2000, did then and there unlawfully while in the course of committing and attempting to commit the robbery of Tae Youk, intentionally cause the death of Tae Youk by shooting Tae Youk with a deadly weapon, to-wit, a firearm.

It is further presented that in Harris County, Texas, Gilmar Alexander Guevara, hereafter styled the defendant, heretofore on or about June 2nd, 2000, did then and there unlawfully while in the course of committing and attempting to commit the robbery of Gerardo Yaxon, intentionally cause the death of Gerardo Yaxon by shooting Gerardo Yaxon with a deadly weapon, to-wit, a firearm.

(R.R. 14 - 9-10). A jury found petitioner guilty of capital murder and the special issues in a manner resulting in a punishment of death. (R.R. 16 - 31-32; R.R. 19 - 28-29).

The conviction and sentence were affirmed on direct appeal to the Texas Court of Criminal Appeals on May 23, 2000. *See Guevara v. State*, 97 S.W. 3d 579 (Tex. Crim. App. 2003). Robert Morrow represented petitioner at the state habeas level pursuant to *Texas Code Crim. Proc. art. 11.071*. In *Ex parte Guevara*, the Court of Criminal Appeals explained the procedural posture of the cases:

> Applicant filed an initial application for a writ of habeas corpus challenging the merits of his conviction and resulting sentence in the trial court on December 23, 2002, and the trial court forwarded that application to this Court on February 9, 2006. On January 12, 2006, applicant filed another application in the trial court and the trial court forwarded that application as a subsequent writ to this Court on January 17, 2006. Because the subsequent application was forwarded to this Court before the initial application, the subsequent application is numbered -01 and the initial application is numbered -02.

*Ex parte Guevara*, 2007 WL 1493152, 1 (Tex.Crim.App.2007). On May 23, 2007, the Texas Court of Criminal Appeals denied relief, holding:

This Court has reviewed the record with respect to the allegations made by applicant. We decline to adopt findings Nos. 44 and 69 and conclusions Nos. 7, 13, and 27 because either they are not supported by the record or they are contrary to the law. We adopt the trial court's remaining findings of fact and conclusions of law. Based upon the trial court's findings and our own review, the relief sought is denied.

This Court has also reviewed the record with respect to the application which was forwarded to this Court as a subsequent writ. On January 13, 2006, the trial court entered an order finding that said application was filed after the time period specified under Texas Code of Criminal Procedure, Article 11.071 § 4(a) or 4(b). We agree with the trial court's determination. Further, we find that the application fails to meet one of the exceptions provided for in Section 5 of Article 11.071 and, thus, dismiss this subsequent application as an abuse of the writ. See *Ex parte Blue,* S.W.3d, AP-75,254 (Tex.Crim.App. March 7, 2007).

*Ex parte Guevara* 2007 WL 1493152, at *1. Undersigned counsel was appointed to represent the petitioner in this federal proceeding.

## II.
## JURISDICTION

Petitioner invokes the jurisdiction of this Court pursuant to 28 U.S.C. § 2254.

## III.
## CUSTODY

Petitioner is a citizen of El Salvador and a resident of the State of Texas. He is presently in the respondent's custody at the Polunsky Unit in Livingston Texas pursuant to a judgment of conviction and sentence of death.

## IV.
## STANDARD OF REVIEW

### Standard of Review: § 2254(e)(1) & § 2254(d)

AEDPA provides standards for the review of the merits of Mr. Guevara's claims

through the provisions of 28 U.S.C. §§ 2254(d) & 2254(e)(1):

> 28 U.S.C. § 2254(d) provides that:
> (d) An application for a writ of habeas corpus . . . shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>> (1) resulted in a decision that was contrary to or involved an unreasonable application of clearly established Federal law . . . ; or
>> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

***It is important to note that § 2254(d) is a bar to the grant of habeas relief, rather than to the Court's review.***

Therefore, for the Court to apply § 2254(d), it must first determine whether Mr. Guevara's claims merit relief when reviewed *de novo*. Only then does the Court examine whether relief is barred under § 2254(d). *See Ramdass v. Angelone*, 530 U.S. 156 (2000) and *Weeks v. Angelone*, 528 U.S. 225 (2000) (each thoroughly discussing the merits of the claims prior to discussing the applicability of § 2254(d)).

> 28 U.S.C. § 2254(e)(1) provides that:
> (e)(1) In a proceeding instituted by an application for a writ of habeas corpus . . . a determination of a factual issues made by a State court shall be presumed to be correct. That applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

The AEDPA's presumption of correctness is similar to that in previous law. Prior to the passage of the AEDPA, the law also provided that the federal courts were to presume state court fact findings correct, absent convincing evidence. *See Sumner v. Mata*, 440 U.S. 539, 550 (1981); *Bell v. Lynaugh*, 663 F.Supp. 405, 411 (E.D. Tex. 1987). The statute appears to be a codification of the Supreme Court's habeas jurisprudence in *Sumner*, and §

2254(e)(1) places no greater burden on a petitioner than existed prior to the enactment of the AEDPA.

## Mr. Guevara

*Every man has a story.*

Gilmar Alexander Guevara's story is as worthy of consideration as any petitioner before this court. Mr. Guevara grew up in El Salvador, where he suffered a terrifying childhood. He was born in an impoverished environment in El Salvador. (Exhibit A - Llorente affidavit at 15-16). The childbirth was difficult, he was reportedly underweight and had difficulty feeding. *Id.* He was born with chicken pox and often sick with high fevers and received no medical attention. *Id.* In infancy he had constant diarrhea, and his skin was continually broken and bleeding from scabs. As a result, Mr. Guevara became very dependent on his mother. (Exhibit B, Affidavit of Investigator Gina Vitale, hereinafter "Vitale" at 2-3) He had no friends.

Mr. Guevara's father was a frightening presence in the household, frequently yelling at the children, throwing things, and having other angry outbursts. (Vitale affidavit, pages 3-4.) Life was very difficult economically. Mr. Guevara had to leave school after merely four years of education and go to work at the age of nine.(Vitale at 4; Llorente affidavit at 9). For his brief time in school, he was a good, quiet student, but slow to learn. "[H]e did not have intelligence." (Vitale at 4).

Most significantly, during the time young Mr. Guevara was growing up, constant war

presented dangers to everyone in El Salvador, including Alex and his family. Two of his siblings in the attached affidavit describe years of being exposed every day to violent death, mutilation, and the fear of being abducted into one army or another. The village in which the Guevara family lived was continually overrun by either the government troops or guerrilla fighters, so that everything was destroyed and life was extremely difficult. (Vitale at 4-7).

During that time in El Salvador, normal life was impossible. (Exhibit C, Affidavit of Dr. Richard Cervantes, hereinafter, "Cervantes.") Some 30,000 people were killed by the war between 1979 and 1986. (Cervantes at 30). The structure of society broke down. Unemployment rose to forty percent, and sixty percent of the population was illiterate. (Cervantes at 39).

Mr. Guevara was exposed to violent death almost every day of his life. His sister Sonia described daily life: "The most horrifying part for me was to go out to the street and see mountains of dead bodies. They would put them one on top of the other forming a mountain and then burn them right there, sometimes there were people we knew burning at the end, there would be left over members and the dogs would eat them." (Vitale at 5).

Mr. Guevara grew up in the midst of constant sudden death, and the fear of being taken away by either the military or the guerrillas. His brother Benjamin remembered: "As kids we were terrorized of being seen by either of the sides because they would take us away and if we resisted they would kill us. I have seen my friends dead in the streets and people burned alive. Alex and I have seen the parents and brothers of my best friend, who had the

shop where we went to learn mechanics, dead; killed in front of us." (Vitale at 5).

Guevara's younger brother Marvin described similar atrocities: "I remember once Alex and I visited an aunt, mother's sister, and from the window we watched the guerrilla making people dig holes in the ground, next donkeys would come loaded with bodies that they would throw in those holes. I was 14 and Alex was 17, we would see how guerrilla would fill up trucks with dead bodies and take them away. Everybody had fear." (Cervantes at 50).

Mr. Guevara himself said, "I could not open the door because the guerrilla was outside and they were going to kill us. Many times I really thought I was going insane. I would hear the airplanes come and I would see the bombs falling on top of our heads and exploding everywhere around us. I could not even eat due to the terror I felt. We would all hide under the beds in the floor and start crying. We all had sleep problems." (Cervantes at 41).

The fear was not only of being violently murdered, but of being conscripted into one of the warring armies. Alex Guevara's brother Marvin remembers both warring factions coming into houses looking for children to take, to join in the fighting. The Guevara children would hide inside their well to escape these armed men. (Cervantes at 51).

As a teenager, when danger to Guevara's life reached its peak, he became desperate to leave the country, as had so many other young men. According to Guevara's aunt, life had become impossible for children like him in El Salvador: "The children were very nervously affected, they would hear shootings right next to them and they would have nervous

breakdowns. We did not have a life. Children would cry a lot, they would throw bombs anywhere and they would fall next to you and that would be a total destruction." (Cervantes at 58).

So Mr. Guevara made the wrenching decision to leave his mother, on whom he was so dependent, and come to America, as his older brother Benjamin already had.

Even people who escaped the war, though, did not escape its traumatic effects. Survivors describe continuing to be frightened all the time, being startled by slight disturbances of modern life, or of having deadened feelings. (Vitale at 7).

Dr. Richard Cervantes is a clinical psychologist and director of Behavioral Assessment, Inc., in Los Angeles, as well as a Senior Research Fellow at California State University. His qualifications are set out in his attached affidavit. Dr. Cervantes was available to the defense as an expert witness.[1]

If Dr. Cervantes had been called, he would have testified that he had investigated Mr. Guevara's background by interviewing Guevara and two of his brothers, and by studying investigator reports which included interviews with other family members. (Cervantes at 10). He concluded that Guevara suffered from both Post-Traumatic Stress Disorder and from immigration-related stress.

---

[1]
. He was not called as such a witness, of course, since the defense conducted only the most minimal investigation and so did not discover any expert witnesses (or any other witnesses) to present to the jury.

Mr. Guevara was only 14 when he came to America by himself. The boy who had been extremely attached to his mother had to leave her behind, along with most of his family, in order to save his life. He lived for a year with his older brother Benjamin and worked in his auto shop, but did not attend school. So he did not develop peer relationships or have parental guidance or any substitute for parents, such as teachers. According to Dr. Cervantes, this combination of circumstances severely undermined Guevara's adjustment to life in America. It also hindered his development to adulthood.

Furthermore, he lived in a part of Houston called Las Americas, an area heavily populated by other immigrants from Central America, and also a high-crime area. (Cervantes at 67; Vitale at 8-9). Guevara had moved from one war zone to another.

After a year, at the age of 15, Guevara moved out of his brother's home into an apartment with friends. He was working but still unschooled, and now had no supervision at all. Almost inevitably, he was taken up by what Dr. Cervantes calls "negative peers." (Cervantes at 72).

Guevara displayed a strong work ethic, first at his brother's shop and then as a bus boy at a restaurant. He was later promoted to cook. He was not known to drink or use drugs. (Cervantes at 73 and 74).

He did become peripherally associated with a gang, but did not seem to be a leader or hard-core member of the gang. (Cervantes at 71, Vitale at 9). His contacts were occasional, and in fact in 1994 he attempted to separate himself from gang activity by

moving to Texas City, a safer suburb of Houston. By this time, Mr. Guevara was married to his wife, Nancy. (Cervantes at 80).

Mr. Guevara's early life resulted in his suffering from Post Traumatic Stress Disorder as well as immigrant trauma. (Cervantes at 6-8). The symptoms of these traumas, particularly when a child has been exposed to war, include irrational thinking and violent outbursts.

Dr. Cervantes concludes that in his expert opinion, Guevara's early exposure to the trauma of war prevented his developing normal human relationships. (Cervantes at 83). Guevara's horrifying childhood was compounded by post-immigration trauma and the loss of any sort of parental supervision. (Cervantes at 84 and 89).

These factors led to the place where Mr. Guevara finds himself today - on death row, subsequent to a trial where this information was not investigated nor presented to the jury that decided he should die for his crimes.

The facts of the offense are secondary to the issues that Mr. Guevara presents today. This application for writ of habeas corpus rests upon who he is as a person and the deficits he suffers from and the representation that he did not receive at the trial or appellate court.[2]

---

[2]     The CCA detailed the facts of the offense as follows:

Around 12:10 a.m. on June 2, 2000, officers responded to a reported burglary and shots fired at a convenience store on Ranchester Street in Houston. Upon arrival, they discovered the bodies of Tae Youk and Gerardo Yaxon lying inside the store. Both had been shot and were dead. On June 10, the police arrested appellant in Texas City pursuant to a warrant. Shortly thereafter, they obtained his consent to search his Texas City apartment and his vehicle. Officers also obtained appellant's wife's consent to search the apartment.

**Issue Number One: Mr. Guevara is mentally retarded and his sentence must be commuted to life.**

This issue was not properly considered by the Texas Court of Criminal Appeals, who rejected it as procedurally defaulted. *See Ex parte Guevara,* 2007 WL 1493152, at *1. However, there was not an independent and adequate state ground for this rejection, thus this federal court can consider the issue. In *Ex parte Guevara,* the CCA rejected the claim determining that Mr. Guevara had failed to make the appropriate standard for a "subsequent" writ. *Id.* The CCA based it decision on their previous opinion in *Ex parte Blue,* which held:

> We conclude that through Article 11.071, Section 5(a)(3), the Legislature has provided a mechanism whereby a subsequent habeas applicant may proceed with an *Atkins* claim if he is able to demonstrate to this Court that there is evidence that could reasonably show, to a level of confidence by clear and

---

During the search of appellant's car, officers recovered three pullover masks. FN2 From appellant's apartment, officers recovered a .40-caliber Smith & Wesson pistol, a .380-caliber Bersa pistol, a box of .40-caliber ammunition, and a box of .380-caliber ammunition. The firearms examiner testified that the Smith & Wesson pistol recovered at appellant's apartment fired the bullets recovered at the crime scene. The examiner also testified that the manufacturer who made the .40-caliber ammunition recovered from appellant's residence also made the bullets recovered at the crime scene. DNA samples recovered from one of the masks matched both appellant's and one of his co-defendant's DNA samples.

FN2. In an audiotaped statement to the police, appellant explained that he and two co-defendants were wearing masks at the time of the alleged offense.

Appellant subsequently gave an audiotaped statement to the authorities explaining the events on the evening of the murders. In his statement, appellant stated that he was riding around in his van with some friends that evening when someone said, "[L]et's go to the store there." Appellant and two others approached the store to "get the money." When appellant first entered the store, one of the store attendants hit him. At that time, one of his co-defendants told him to "shoot, shoot, shoot," and appellant shot at the attendant. Appellant claimed that he did not remember how many shots he fired but that he did not want to hurt anyone. Appellant and his accomplices left the store without taking anything.

*Guevara v. State,* 97 S.W.3d 579, 580 -581 (Tex.Crim. App.2003)

convincing evidence, that no rational finder of fact would fail to find he is mentally retarded. However, because we find that the applicant in this case has failed to satisfy this heightened-threshold burden, we deny him leave to proceed.

*Ex parte Blue*, 230 S.W.3d 151, 154 (Tex.Crim.App. 2007). Even taking *Blue* as a correct interpretation of the Texas Legislature's intent on mandating procedures for subsequent writs, Mr. Guevara met the statutory requirements for a subsequent writ and the *Blue* standard, as well. The evidence of Mr. Guevara's mental retardation is so compelling and further, dovetails into the claims he raised on his initial application regarding the failure of his trial attorneys to properly investigate his mitigation case.

Mr. Guevara suffers from mental retardation. The Fifth Circuit has required:

In *Atkins,* the Supreme Court held that the Constitution prohibits executing the mentally retarded. "The Court ... left 'to the State[s] the task of developing appropriate ways to enforce the constitutional restriction upon [their] execution of sentences,' but cited with approval the American Association on Mental Retardation ('AAMR') definition of mental retardation."[FN9] The Texas courts have adopted a test for mental retardation that mirrors the AAMR definition, and thus require an applicant claiming mental retardation to demonstrate (1) significantly subaverage general intellectual functioning; (2) accompanied by related limitations in adaptive functioning; and (3) onset prior to the age of eighteen.[FN10] "To state a successful claim, an applicant must satisfy all three prongs of this test. (Footnotes omitted).

*Moore v. Quarterman,* 517 F.3d 781, 783 (5th Cir. 2008).

### The Eighth and Fourteenth Amendment Imperative

In *Atkins v. Virginia*, 536 U.S. 304, 319, 122 S.Ct. 2242, 2251 (2002), the Supreme Court held that the execution of mentally retarded defendants violates the Eighth and Fourteenth Amendments to the United States Constitution. As a majority of the Court

-12-

reasoned, "[t]he Eighth Amendment succinctly prohibits 'excessive' sanctions. It provides: 'Excessive bail should not be required, nor excessive fines imposed, nor cruel and unusual punishment inflicted,' " citing *Weems v. United States*, 217 U.S. 349, 30 S.Ct. 544 (1910). *Atkins, at 310.* "'[I]t is a precept of justice that punishment for crimes should be graduated and proportional to the offense.'" *Weems, supra, at 367.*

Whether a punishment is excessive, in violation of the Eighth Amendment, is judged by the standards "that currently prevail." *Atkins, at 310.* The *Atkins* Court found that "the large number of States prohibiting the execution of mentally retarded persons (and the complete absence of States passing legislation reinstating the power to conduct such executions) provides powerful evidence that today our society views mentally retarded offenders as categorically less culpable than the average criminal. *Id. at 315.* The practice of executing the mentally retarded for the commission of state crimes "has become truly unusual, and it is fair to say that a national consensus has developed against it." *Id.* Moreover, the Federal Death Penalty Act, 1994, 18 U.S.C. § 3596(c), strictly prohibits any individual with mental retardation from being sentenced to death or executed.

Although mentally retarded persons may well know the "difference between right and wrong" and, in fact, be competent to stand trial, "they have diminished capacities to understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand the reactions of others." *Id. at 316.* While finding "no evidence that they are more likely to

engage in criminal conduct than others," the Court found "abundant evidence that they often act on impulse rather than pursuant to a premeditated plan, and that in group settings they are followers rather than leaders. *These deficiencies do not warrant any exemption from criminal sanctions, but they do diminish their personal culpability*." *Id*. (Emphasis added).

The "social purposes served by the death penalty" have been identified as "retribution and deterrence of capital crimes by prospective offenders,'" *id*., quoting, *Gregg v. Georgia*, 428 U.S. 153, 183, 96 S.Ct. 2909 (1976). With respect to *retribution – "the interest in seeing that the offender gets his 'just deserts' – the severity of the appropriate punishment necessarily depends on the culpability of the offender*." *Atkins, at 319*. Because imposition of the death penalty, consistent with the Eighth Amendment, is confined to or reserved for, "a narrow category of the most serious crimes," excluding the mentally retarded from the ultimate penalty is appropriate "to ensure that only the most deserving of executions are put to death ..." *Id*. As to *deterrence*, defined as "the interest in preventing capital crimes by prospective offenders," the death penalty "'can serve as a deterrent only when murder is the result of premeditation and deliberation.'" *Id*., quoting *Enmund v. Florida*, 458 U.S. 782, 799, 102 S.Ct. 3368 (1982). As the *Atkins* Court reasoned:

> Exempting the mentally retarded from that punishment will not affect the 'cold calculus that precedes the decisions' of other potential murderers. (Citation omitted). Indeed, that sort of calculus is at the opposite end of the spectrum from behavior of mentally retarded offenders. The theory of deterrence in capital sentencing is predicated upon the notion that the increased severity of the punishment will inhibit criminal actors from carrying out murderous conduct. Yet it is the same cognitive and behavioral impairments that make these defendants less morally culpable – for example, the diminished ability

to understand and process information, to learn from experience, to engage in logical reasoning, or to control impulses – that also make it less likely that they can process the information of the possibility of execution as a penalty and, as a result, control their conduct based upon that information. Nor will exempting the mentally retarded from execution lessen the deterrent effect of the death penalty with respect to offenders who are not mentally retarded. Such individuals are unprotected by the exemption and will continue to face the threat of execution. Thus, executing the mentally retarded will not measurably further the goal of deterrence.

*536 U.S. at 319.*

Finally, the reduced capacity of the mentally retarded provides an additional justification for a "categorical rule making such offenders ineligible for the death penalty." *Atkins* at 319. "[T]he possibility of false confessions, ... the lesser ability of mentally retarded defendants to make a persuasive showing of mitigation," the fact that mentally retarded defendants "may be less able to give meaningful assistance to their counsel and are typically poor witnesses, and their demeanor may create an unwarranted impression of lack of remorse for their crimes," present unacceptable "risks 'that the death penalty will be imposed in spite of factors which may call for a less severe penalty.'" *Id.*, quoting *Lockett v. Ohio*, 438 U.S. 586, 605, 98 S.Ct. 2954 (1978). And, of course, because "reliance on mental retardation as a mitigating factor can be a two-edged sword that may enhance the likelihood that the aggravating factor of future dangerousness will be found by the jury," *see, Penry v. Lynaugh*, 492 U.S. 302, 323-325, 109 S.Ct. 2934 (1989), "[m]entally retarded defendants in the aggregate face a special risk of wrongful execution." *Atkins* at 319.

The Court concluded that the Eighth Amendment "'places a substantive restriction on

the State's power to take the life' of a mentally retarded offender" and that such punishment

is "excessive." *Id., quoting, Ford v.Wainwright*, 477 U.S. 399, 405, 106 S.Ct. 2595 (1986).

**2.      Mental Retardation Defined**

The American Association of Mental Retardation (AAMR) defines mental retardation

as follows:

> Mental retardation refers to substantial limitations in present functioning. It is characterized by significantly subaverage intellectual functioning, existing concurrently with related limitations in two or more of the following applicable adaptive skill areas: communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure, and work. *Mental retardation manifests before age 18.*

Mental Retardation: *Definition, Classification, and Systems of Supports*, p. 5 (9th ed. 1992).

(Emphasis added).

The American Psychiatric Association's definition is similar:

> The essential feature of Mental Retardation is significantly subaverage general intellectual functioning (Criterion A) that is accompanied by significant limitations in adaptive functioning in at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety (Criterion B). *The onset must occur before age 18 years* (Criterion C).
>
> Mental Retardation has many different etiologies and may be seen as a final common pathway of various pathological processes that affect the functioning of the central nervous system.

American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders*

*41* (4th ed. 2000). (Emphasis added). "Mild" mental retardation is typically used to describe

people with an IQ level of 50—55 to approximately 70. Id., at 42—43. *Atkins*, footnote 3.

Mild Mental Retardation is roughly equivalent to what used to be referred to as the educational category of "educable."

> This group constitutes the largest segment (about 85%) of those with the disorder. As a group, people with this level of Mental Retardation typically develop social and communication skills during the preschool years (ages 0-5 years), have minimal impairment in sensorimotor areas, and often are not distinguishable from children without Mental Retardation until a later age. By their late teens, they can acquire academic skills up to approximately the sixth-grade level. During their adult years, they usually achieve social and vocational skills adequate for minimum self-support, but may need supervision, guidance, and assistance, especially when under unusual social or economic stress. With appropriate supports, individuals with Mild Mental Retardation can usually live successfully in the community, either independently or in supervised settings

American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* (4th ed. 2000), at 41.

The 2002 AAMR's definition of mental retardation is as follows:

> Mental retardation is a disability characterized by significant limitations both in intellectual functioning and in adaptive behavior as expressed in conceptual, social and practical adaptive skills. This disability originates before age 18.

*Definition, Classification, and Systems of Supports*, p. 8 (10th ed. 2002). The 2002 definition "like AAMR definitions of mental retardation of the recent past, includes the three broad elements of significant limitations in intellectual functioning, concurrent with and related to significant limitations in adaptive behavior, and manifested in the developmental period." *Id.* at 9.

While the 1992 (9th) AAMR definition of mental retardation imposed an IQ "cut off" of an "IQ standard score of approximately 70 to 75 or below based on assessment that

includes one or more individually administered general intelligence scores," the 2002 (10[th])

"cutoff" is based on "[p]erformance that is at least two *SDs* (Standard Deviations)[3] below the

*M* (mean) of an appropriate assessment instrument, considering the standard error of

measurement for the specific assessment instruments used and the instrument's strengths and

limitations." *Id.* at 22-23.

In the final analysis, however, "[t]he mental retardation construct is useful in that it

allows mostly deserving individuals to get services and supports they often desperately need.

*It is fiction in that there is no justification for the idea that there is a magical line (let alone*

---

[3]

The assessment of intellectual functioning through the primary reliance on intelligence tests is fraught with the potential for misuse if consideration in not given to possible errors in measurement. An obtained IQ standard score must always be considered in terms of the accuracy of its measurement. Because all measurement, and particularly psychological measurement, has some potential for error, obtained scores may actually represent a range of several points. This variation around a hypothetical 'true score" may be hypothesized to be due to variations in test performance, examiner's behavior, or other undetermined factors. Variance in scores may or may not represent changes in the individual's actual or true level of functioning. Errors of measurement as well as true changes in performance outcome must be considered in the interpretations of test results. This process is facilitated by considering the concept of standard error of measurement (*SEM*), which has been estimated to be three to five points for well-standardized measures of general intellectual functioning. This means that if an individual is retested with the same instrument, the second obtained score would be within one *SEM* (i.e., ± 3 to 4 IQ points) of the first estimates about two-thirds of the time. Thus an IQ standard score is best seen as bounded by a range that would be approximately three to four points above and below the obtained score. This range can be considered as a 'zone of uncertainty' (Reschly, 1987). Therefore, an IQ of 70 is most accurately understood not as a precise score, but as a range of confidence with parameters of at least one *SEM* (i.e., scores to about 66 to 74; 66 % probability), or parameters of at least two *SEMs* (i.e. scores of 62 to 78; 95 % probability) (Grossman, 1983). This is a critical consideration that must be part of any decision concerning a diagnosis of mental retardation. *Id. at 57.*

one determinable by a test score) *dividing those who have or do not have the condition.*" *Id.* at 35. (Emphasis added).

Simply put, "a fixed cutoff for diagnosing an individual having mental retardation was not intended (in the 2002 AAMR definition), and cannot be justified psychometrically ..." *Id.* at 58.

*Mr. Guevara's evidence of mental retardation*

In his supplemental writ to the Court of Criminal Appeals, there is numerous evidence presented regarding the mental retardation of Mr. Guevara.

Dr. Llorente's evaluation details his conclusions regarding Mr. Guevara. He personally interviewed Mr. Guevara and participated in other interviews, as well as working with the state habeas investigator and her colleagues. Dr. Llorente affirms that he believes, based upon his evaluation of the case and the AAMR definitions, that Mr. Guevara suffers from mental retardation. (Llorente at 10). Mr. Guevara relies fully on the attached affidavits, but would highlight these points to demonstrate to the court the evidence of mental retardation:

1.  Deficient range of intellectual skills placing Mr. Guevara in the .4 percentile of people of similar age, meaning he is mentally deficient within the range of intellectual skills. (Llorene at 5,6)

2.  Difficulties in performing complex tasks (Llorente at 4).

3.  Reading and understanding at a fourth grade level. (Llorente at 6).

4.  Because of his limited intellectual capabilities, Dr. Llorente could not use the typical MMPI-2 test, but instead gave Mr. Guevara the "Draw-A-{Person" test. Dr. Llorente concluded that the drawing was remarkable in that it revealed a great deal of cognitive immaturity. (Llorente at 9).

5.  Overall, Mr. Guevara fell in the mentally deficient range, and these types of scores are often seen in people suffering from organic brain disorders including mental retardation. (Llorente at 9).

6.  Mr. Guevara suffered from serious deficits in adaptive skills, as well. (Llorente at 15-16).

7.  Ghe was unable to achieve academically in school. (Llorente at 15).

8.  He dropped out of school in the fourth grade because he could not learn. (Llorente at 15).

9.  He was "different" than his siblings and could not understand simple instructions or even remember the score of a game. (Llorente at 15).

10. He was unable to learn basic tasks as a teen-ager in order to hold down a job. (Llorente at 15).

11. Needed to depend on others in order to function in society. (Llorente at 15).

12. His impaired scores and performance on tests and inability to abstract at levels expected for adults demonstrate deficits in cognition consistent with mental deficiency. (Llorente at 10).

Dr. Llorente noted that:

> Mr. Guevara was born in an impoverished environment. He was delivered by a midwife. He did not receive any medical attention at birth despite the noted difficulties during his delivery. He may have suffered anoxia (lack of oxygen to the brain) at birth. His vital statistics at birth are unknown, but he was reportedly underweight. He did not breastfeed well. He suffered from malnutrition. He was born with chicken pox (his mother had chicken pox during pregnancy). He was often sick with high fevers and did not receive medical attention. He suffered brain insults before the age of 18 that compromised his nervous system. He received little sensory stimulation due to the abject poverty in which he was reared.

(Llorente at 15-16).

Dr. Llorente could not exclude mental retardation based upon his examination of Mr. Guevara. The evidence presented in his report along with Ms. Vitale's affidavit support more than the clear and convincing standard that Mr. Guevara suffers from mental retardation.

The Court of Criminal Appeals rejection of this claim is in defiance of the law and the its own standard. The Fifth Circuit considered a mental retardation claim from Texas, recently, and explained:

> In response, TCCA held that defendants and petitioners must establish their mental retardation, as defined by either the American Association of Mental Retardation (AAMR)FN2 or the Texas Health and Safety Code, by a preponderance of the evidence. *Ex Parte Briseno*, 135 S.W.3d 1, 7-8, 12 (Tex.Crim.App.2004).FN3 The AAMR definition referenced in *Atkins* and *Briseno* has three requirements:
>
> > FN2. The Supreme Court cited this definition in *Atkins*, 536 U.S. at 309 n. 3, 122 S.Ct. 2242.
> > FN3. To the extent that Woods argues this allocation of the

burden of proof is inappropriate and that a jury should determine his mental retardation, we have previously rejected that argument. See In re Johnson, 334 F.3d 403, 405 (5th Cir.2003).

1) subaverage general intellectual functioning, generally defined as an IQ below 70;
2) accompanied by related limitations in adaptive functioning defined as significant limitations in an individual's effectiveness in meeting the standards of maturation, learning, personal independence, and/or social responsibility that are expected for his or her age level and cultural group, as determined by clinical assessment and, usually, standardized scales; FN4 and

FN4. The AAMR finds this prong satisfied when "limitations in two or more of the following applicable adaptive skill areas [are present]: communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure, and work." Atkins, 536 U.S. at 309 n. 3, 122 S.Ct. 2242.

3) onset prior to the age of 18.

Moreno v. Dretke, 450 F.3d 158, 163 (5th Cir.2006) (internal quotation marks omitted) (referring to the definition in the ninth edition of the AAMR's Mental Retardation: Definition, Classification, and Systems of Support).

Alternatively, the Texas Health and Safety Code succinctly defines mental retardation as "significantly subaverage general intellectual functioning that is concurrent with deficits in adaptive behavior and originates during the developmental period." Tex. Health & Safety Code § 591.003(13).

The state habeas court held an evidentiary hearing on this issue and we will summarize the evidence presented by both parties. Woods relied primarily on the testimony and written report of Dr. Richard C. Schmitt, who interviewed Woods and Woods' grandmother and reviewed Woods' records before concluding that Woods was mildly mentally retarded.

Woods v. Quarterman, 493 F.3d 580, 585 (5th Cir. 2007). Mr. Guevara meets the standard -

the difference in this case is that in *Woods*, an actual hearing was held where the evidence could be vetted. In Harris County, no hearing was held. The CCA did not remand for a hearing - instead choosing procedural default to subvert the law of the United States Supreme Court that no mentally retarded individual should be executed for their offenses. Mr. Guevara would respectfully ask for a hearing from this court on this very issue.

**Issue Number Two: Mr. Guevara's Death Sentence Violates the Sixth Amendment under *Atkins v. Virginia* and *Ring v. Arizona*, Because the Jury's Verdict Did Not Include a Determination of an Essential Element of Capital Murder – That Mr. Guevara Is Not Mentally Retarded.**

Mr. Guevara understands this issue may have been foreclosed by prior precedent. *See Schriro v. Smith*, 126 S.Ct. 7, 8-9 (2005) (stating "[t]he Ninth Circuit erred in commanding the Arizona courts to conduct a jury trial to resolve Smith's mental retardation claim" and reiterating the statement from *Atkins*, 536 U.S. at 317, 122 S.Ct. 2242, that the method for determining whether a defendant is mentally retarded is left to the States). However, he raises this claim, believing in the merit of it and were he not to raise it and waive the claim, the issue would forever be foreclosed.

Lest it be forgotten, [d]eath, in its finality, differs more from life imprisonment than a 100-year prison term differs from one of only a year or two. Because of that qualitative difference, there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case." *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976). The Constitution itself requires careful review of Mr. Guevara's death sentence. The reality is the law is ever evolving. Indeed, "[t]he genius of the Constitution resides not in any static meaning that it had in a world that was dead and gone, but in its adaptability to interpretations of its greatest principles that cope with current problems and current needs." William J. Brennan, *Constitutional Adjudication*, 40 Notre Dame Law, 559, 568 (1965).

In *Atkins v. Virginia*, the Supreme Court considered the issue of whether executing

the mentally retarded violated the Eighth Amendment. Prior to their decision, the issue was foreclosed. In reversing precedent, the Court noted:

> A claim that punishment is excessive is judged not by the standards that prevailed in 1685 when Lord Jeffreys presided over the "Bloody Assizes" or when the Bill of Rights was adopted, but rather by those that currently prevail. As Chief Justice Warren explained in his opinion in *Trop v. Dulles*, 356 U.S. 86, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958): "The basic concept underlying the Eighth Amendment is nothing less than the dignity of man. ... The Amendment must draw its meaning from the evolving standards of decency that mark the progress of a maturing society." Id., at 100-101, 78 S.Ct. 590.

*Atkins*, 122 S.Ct. at 2247. If Mr. Atkins had chosen to not present the argument, clearly foreclosed to him at the time he asserted it, he would most likely have been executed by now. The evolving standards that Mr. Chief Justice Warren wrote of in *Trop* in 1958 continue today:

> The exact scope of the constitutional phrase 'cruel and unusual' has not been detailed by this Court. But the basic policy reflected in these words is firmly established in the Anglo-American tradition of criminal justice. The phrase in our Constitution was taken directly from the English Declaration of Rights of 1688, and the principle it represents can be traced back to the Magna Carta. The basic concept underlying the Eighth Amendment is nothing less than the dignity of man. While the State has the power to punish, the Amendment stands to assure that this power be exercised within the limits of civilized standards. (footnote omitted).

*Trop v. Dulles*, 356 U.S. 86, 99-101, 78 S.Ct. 590, 597-98 (1958). The evolving standards of decency mandate Mr. Guevara present this although it may be seemingly foreclosed.

An analysis of the current legal landscape, including another case decided by the Supreme Court this term, *Ring v. Arizona*, 122 S.C.t 2428 (2002), indicates that both judge and jury have a significant role to play in resolving a postconviction *Atkins* claim. *Ring*

involved a Sixth Amendment challenge to Arizona's judge-sentencing capital punishment scheme. Relying on the constitutional principles established in *Apprendi v. New Jersey*, 530 U.S. 466 (2000) (holding that the Sixth Amendment does not permit a defendant to be exposed to a penalty exceeding the maximum he would receive if punished according to the facts reflected in the jury verdict alone), Ring argued that *Apprendi* was irreconcilable with the Court's prior decision in *Walton v. Arizona*, 497 U.S. 639 (1990), which upheld Arizona's judge-sentencing procedure. The *Ring* Court agreed, overruled *Walton*, and held that the Sixth Amendment requires that any finding of fact that makes a defendant eligible for the death penalty must be unanimously made by the jury beyond a reasonable doubt. 122 S.Ct. At 2440.

While *Ring* dealt specifically with statutory aggravating circumstances, it included "factfinding[s] necessary to ... put [a defendant] to death." *Id*. At 2443. *Atkins* held that the Eighth Amendment prohibits a mentally retarded defendant from being sentenced to death. 122 S.Ct. at 2252. Because a mentally retarded defendant is no longer constitutionally eligible for the death penalty, mental retardation now becomes a factual issue "that ... must be found by a jury beyond a reasonable doubt." *Ring*, 122 S.Ct. At 2439. In effect, the absence of mental retardation is "the functional equivalent of an element of [capital murder]." *Apprendi*, 530 U.S. at 494.

The judge still plays a very important role in this determination. Much like the current Texas practice with regard to the admissibility of a defendant's statements, eyewitness

identification, and expert testimony, the constitutionally required procedure occurs in two steps. In the first step, the judge must make an independent judicial determination that the defendant does (or does not) have mental retardation, and whether the defendant is eligible for a death sentence under *Atkins*.

The reasons for the requirement of a distinct *judicial* determination of fact and law are discussed in *Jackson v. Denno*, 378 U.S. 368 (1964), and reiterated in *Crane v. Kentucky* 476 U.S. 683: the enforcement of a federal constitutional prohibition against exposing retarded persons to a death sentence at the jury's discretion can hardly be left solely to a procedure whereby the jury makes the ultimate factual determination of the existence of the facts on which the prohibition turns. In *Jackson*, for example, the Court stated "the *requirement* that the court make a pretrial voluntariness determination does not undercut the defendant's traditional prerogative to challenge the statement's reliability during the course of the trial." 378 U.S. at 386. (Emphasis added). There is, in short, a due process mandate that the trial court make the initial determination whether the defendant's constitutional rights were violated. *Crane*, 476 U.S. at 687-688. This is especially important in the context of a jury determination regarding mental retardation. The Supreme Court created the constitutional prohibition in part as a result of recognition of the handicaps that retarded persons suffer in litigating issues in front of juries, which in turn exposes them to "a special risk of wrongful execution." 122 S.Ct. at 2252 (noting: (1) the difficulty of a mentally retarded person may have in testifying; (2) the possibility that a mentally retarded person's

"demeanor may create an unwarranted impression of lack of remorse; and (3) the possibility that evidence of mental retardation may enhance the likelihood that future dangerousness will be found by the jury).

In the second step of the process required for addressing and resolving an *Atkins* claim, the defendant who presents evidence of mental retardation has a right to insist that he not be sentenced to death unless the jury finds unanimously, beyond a reasonable doubt, that he is *not* mentally retarded. *Ring* and *Atkins*, read together, say that very clearly. *Ring* is explicit that the procedural rights guaranteed by *Apprendi* attach to elements that are added by Supreme Court interpret[ations] of the Constitution to require the addition of an ... element to the definition of a criminal offense in order to narrow its scope." *Ring*, 122 S.Ct. at 2442. It is equally clear that *Atkins* adds such an element. The *Atkins* Court stated: "Thus, *pursuant to our narrowing jurisprudence*, which seeks to ensure that only the most deserving of execution are put to death, an exclusion for the mentally retarded is appropriate." 122 S.Ct. at 2251.

**Issue Number Three: Mr. Guevara was denied ineffective assistance of counsel when his trial attorneys failed to discover his mental retardation, and thus failed to present it to the court at an appropriate time.**

**Issue Number Four: Mr. Guevara Was Denied the Effective Assistance of Counsel During the Punishment Phase of His Capital Murder Trial When His Court-appointed Attorneys Did No Investigation to Prepare for That Phase. As a Result, Crucial Mitigating Evidence Was Not Presented to the Jury, and Mr. Guevara's Only Defense to the Death Penalty Was Lost.**

**Issue Number Five: Mr. Guevara Was Denied the Effective Assistance of Counsel When His Attorneys Failed to Object to Improper Victim Impact Testimony.**

**Issue Number Six: Mr. Guevara Was Denied the Effective Assistance of Counsel in Argument of the Punishment Phase of Trial When His Attorney Failed to Offer the Jury Any Reason to Answer the Special Issues in Such a Way as to Spare Mr. Guevara's Life.**

In a case such as this - where Mr. Guevara confessed to the offense and there was little doubt regarding whether the State could achieve a guilty verdict the case rested entirely on the punishment phase of the trial. Rodriguez, the trial attorney prepared two affidavits in this case. (See Exhibits E and I). The two appear to contradict each other regarding the information received from the family of Mr. Guevara. In his four paragraph affidavit prepared for the defense, he asserts that Mr. Guevara's brother told him that he could testfiy as to some violene and atrocities perpetuated by the El Salvadoran government while Mr. Guevara was growing up. (Exhibit E). In Mr. Rodriguez's nine *page* affidavit, sworn to by a Harris County Investigator, he asserted that the brother told him that Mr. Guevara had never witnessed any violence or atrocities. (Exhibit I at page 5).

What the competing affidavits demonstrate is that Mr. Rodriguez had no idea what Mr,. Guevara suffered from. He had no idea who Mr. Guevara even was as a person. Frankly, the affidavits undermine any reliance upon eithe ro fthem because of their competing stories. And Mr. Guerinot's affidavit to the defense counsel that he pretty much agreed with everything Mr. Rodriguez asserted in his affidavit is an affront to the system. (See Exhibit F).

The evidence discovered by state habeas counsel is overwhelming in humanizing Mr. Guevara. The compelling nature of his story as he witnessed the most horrible of atrocities and sought to travel to *el norte* to seek out a better life, would have given a picture to the jury of who he was - not just the sum total of his bad acts. By not presenting anything, and trying to explain it by saying that it would have demeaned the victim, is more of an offense. (See Exhibit E). As worthy an individual as the victims were and however horribly they may have suffered at the hands of the perpetrator - just as compelling is the story of Mr. Guevara. This case was a punishment case - through and through.

Guevara's counsel failed to investigate adequately before trial, so they were unprepared to put on evidence at the punishment phase. A great deal of evidence was available, both mitigating evidence and evidence that Guevara would not be a danger to society in the future. The jury heard none of this evidence. The defense rested in the next sentence after the State did so.

Additionally, Mr. Guevara's counsel presented a final argument at punishment that

was so outrageously poor, that it actually could have been the State's argument. Individually and cumulatively, these errors were so devastating to the jury that Guevara was effectively deprived of any counsel.

These points will be argued together, because they are connected in fact and law.

*Factual Background*

In this case in which Mr. Guevara was sentenced to death, the defense presented no evidence during the punishment phase of trial. Substantial mitigating evidence was available, including proof of Guevara's horrifying childhood, his difficulty adjusting to life in America, his suffering from both Post Traumatic Stress Disorder and immigrant trauma, and his redeemable good qualities, as well as expert opinion that he would pose no danger to others if he lived in a structured environment. Guevara's defense attorneys did not investigate to discover any of this evidence, and so did nothing to try to save their client's life.

During the punishment phase of Mr. Guevara's trial for capital murder, the prosecution presented proof of Guevara's prior convictions, which was admitted. (R.R.17 - 11, 12) The State then presented evidence of Guevara's involvement in other crimes. In one, the State offered testimony that Guevara had participated in a robbery in which a victim was pistol-whipped. (R.R.17 - 77) Guevara was linked to another aggravated robbery through a showing that the bullets fired in that robbery had been fired from the same gun later recovered from Guevara's home. (R.R.17 - 77). Finally, the State offered evidence, including

a statement from Guevara, that he had been involved in the murder of a security guard at an apartment complex. (R.R.18 - 75, 76)

The State also offered substantial victim impact testimony.

Immediately after the State rested on punishment, the defense rested as well, having called no witnesses and offered no evidence. (R.R.18 - 116). The jury had absolutely no choice but to return answers to the special issues that resulted in a sentence of death for Guevara.

There was, however, significant mitigating evidence available for Guevara's defense. If Guevara's trial lawyers had conducted a proper investigation, they would have discovered the same. As presented under Mr. Guevara's story - he truly had the most horrific of upbringings. He was born with chicken pox and his family could not even nourish him properly. He was sick and had a father who was frighteningly violent. (Vitale at 2-3) he had no friends.

And what can not be underestimated is the extreme violene he suffered at the hands of the warring factions in El Salvador. Dr. Cervante's affidavit describing the war zone is compelling and makes someone wonder how anyone, let alone a poor, mentally retarded boy, could not grow up to participate in bad activities. Even people who escaped the war, though, did not escape its traumatic effects. Survivors describe continuing to be frightened all the time, being startled by slight disturbances of modern life, or of having deadened feelings. (Vitale at 7).

Dr. Cervantes *was available to the defense as an expert witness*. He was not called as such a witness, of course, since the defense conducted only the most minimal investigation and so did not discover any expert witnesses (or any other witnesses) to present to the jury.

If Dr. Cervantes had been called, he would have testified to all that was recounted above. To all the pain and turmoil that the people of El Salvador suffered. Dr. Cervantes concluded Mr. Guevara's horrifying childhood was compounded by post-immigration trauma and the loss of any sort of parental supervision. (Cervantes at 84 and 89). This led to his association with people who put him at great risk for criminal behavior.

However, in the expert's opinion, based on extensive interviews, including with Mr. Guevara himself, in a structured, institutional setting, Mr. Guevara would pose very little risk for any future violence. (Cervantes at 93).

*Argument and Authorities*

Factors that mitigate an individual defendant's moral culpability "ste[m] from the diverse frailties of humankind." *Woodson v. North Carolina*, 428 U.S. 280, 304, 96 S.Ct. 2978, 2991, 49 L.Ed.2d 944 (1976)(plurality opinion of Stewart, Powell, and Stevens, JJ.). As the Supreme Court reasoned:

> "For the determination of sentences, justice generally requires consideration of more than the particular acts by which the crime was committed and that there be taken into account the circumstances of the offense together with the character and propensities of the offender." *Pennsylvania ex rel. Sullivan v. Ashe*, 302 U.S. 51, 55, 58 S.Ct. 59, 61, 82 L.Ed. 43 (1937). Consideration of both the offender and the offense in order to arrive at a just and appropriate sentence has been viewed as a progressive and humanizing development. *See Williams v. New York*, 337 U.S., at 247-249, 69 S.Ct., at 1083-1084; *Furman*

*v. Georgia*, 408 U.S., at 402-403, 92 S.Ct., at 2810-2811 (Burger, C. J., dissenting).

*Woodson*, 428 U.S. at 304, 96 S.Ct. at 2991.

In the instant case, no evidence of mitigation, whatsoever, was presented by defense counsel for the jury's consideration in explaining who Mr. Guevara was and why he should ne be sentenced to death. None of this was lost on the prosecution when it acknowledged this shortcoming in its final argument at the sentencing phase of the trial:

> ... there isn't any sufficient mitigating evidence to warrant a life sentence versus a death penalty.

(Vol. 19 - 27).

In the case at bar, "...it is undisputed that [petitioner]... had a right--indeed, a constitutionally protected right--to provide the jury with the mitigating evidence that his trial counsel either failed to discover or failed to offer." *Williams v. Taylor*, 529 U.S. 362, 393, 120 S.Ct. 1495, 1513, 146 L. Ed. 2d 389 (2000). Additionally, evidence about the defendant's background is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse. *Penry v. Lynaugh* , 492 U.S. 302, 322-327, 109 S.Ct. 2934, 2948-52, 106 L.Ed.2d 256 (1989).

In *Austin v. Bell*, 126 F.3d 843, 848-849 (6th Cir. 1997), the Court held

> that the failure of trial counsel "to investigate and present any mitigating evidence during the sentencing phase so undermined the adversarial process

that [defendant's] death sentence was not reliable.... [G]iven that several of [defendant's] relatives, friends, death penalty experts, and a minister were available and willing to testify on his behalf, failure to present any mitigating evidence does not reflect a strategic decision, but rather an abdication of advocacy.

Case law is replete with instances where the failure to investigate and present mitigation evidence at sentencing can render counsel's performance deficient. In *Kubat v. Thieret*, 867 F.2d 351, 367 (7th Cir. 1989), defense counsel's failure to call available witnesses at sentencing deprived the defendant of effective assistance of counsel:

> At the post-conviction hearing, fifteen character witnesses testified on Kubat's behalf. None of the witnesses were members of Kubat's family; most were neighbors and coworkers; all were well-respected citizens in their community; one was a deputy sheriff; and all stated that they would have testified on Kubat's behalf at the sentencing hearing if they had been asked. Despite the availability of this impressive array of character witnesses, Kubat's counsel contacted only two of the fifteen before trial and called none of the fifteen to testify at the sentencing hearing.

*Kubat*, 867 F.2d at 366-67.

As the instant case demonstrates, Mr. Guevara had a story to tell - a story compellingly presented in his affidavits from Dr. Llorente and Dr. Cervantes, and Master Social Worker Gina Vitale. *None* of this information was presented to the jury. As the Fifth Circuit reasoned:

> The sentencing stage of any case, regardless of the potential punishment, is 'the time at which for many defendants the most important services of the entire proceeding can be performed.' " *Stanley v. Zant*, 697 F.2d 955, 963 (11th Cir.1983) (citations omitted). Where the potential punishment is 99 years imprisonment, the sentencing proceeding takes on added importance. While the legal standard of effective representation does not change from case to case, this does not mean that the severity of the sentence faced by a criminal

defendant should not be considered in determining whether counsel's performance meets this standard. *Watkins*, 655 F.2d at 1356. "[T]he number, nature, and seriousness of the charges against the defendant are all part of the 'totality of the circumstances in the entire record' that must be considered in the effective assistance calculus." Id. See Stanley, 697 F.2d at 962-63. Here, Vela was charged with perhaps the most serious of offenses; murder. "Unless a defendant charged with a serious offense has counsel able to invoke the procedural and substantive safeguards that distinguish our system of justice, a serious risk of injustice infects the trial itself." *Cuyler*, 100 S.Ct. at 1715.

*Vela v. Estelle*, 708 F.2d 954, 964, 65 (5th Cir.1983), *cert. denied*, 464 U.S. 1053, 104 S.Ct. 736, 79 L.Ed.2d 195 (1984).

"Unless a defendant charged with a serious offense has counsel able to invoke the procedural and substantive safeguards that distinguish our system of justice, a serious risk of injustice infects the trial itself." *Cuyler v. Sullivan*, 446 U.S. 335, 343, 100 S.Ct. 1708, 1715, 64 L.Ed.2d 333 (1980). The Supreme Court has held that the right to counsel guaranteed by the Constitution is a right to the "effective assistance of counsel." *See United States v. Cronic*, 466 U.S. 648, 654, 104 S.Ct. 2039, 2044, 80 L.Ed.2d 657 (1984). Absent competent counsel, ready and able to subject the prosecution's case to the "crucible of meaningful adversarial testing," there can be no guarantee that the adversarial system will function properly to produce just and reliable results. *Cronic*, at 656, 104 S.Ct., at 2045. *See Strickland v. Washington*, 466 U.S. 668, 684-687, 104 S.Ct. 2052, 2062-2064, 80 L.Ed.2d 674 (1984). In *Strickland*, the U.S. Supreme Court established a two prong test to determine whether counsel is ineffective at the guilt/innocence phase of a trial.

First, an error must be so egregious that it indicates "deficient performance" by

counsel, falling outside the "wide range of reasonable professional assistance." *Id.*, at 687, 689, 104 S.Ct., at 2064, 2065. Second, the error must be so severe that it gives rise to prejudice, defined quite clearly in *Strickland* as "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id., at 694, 104 S.Ct., at 2068. Many significant errors will not meet this "highly demanding" standard. *Kimmelman v. Morrison*, 477 U.S. 365, 381-382, 106 S.Ct. 2574, 2586, 91 L.Ed.2d 305 (1986). But those errors, such as in Petitioner's case, that do require reversal, may not be because he was insularly deprived of some discrete and independent trial right, but because, as *Strickland* demands, they reflect performance by counsel that has "so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." 466 U.S., at 686, 104 S.Ct., at 2064.

The *Strickland* standard is **clearly less than a preponderance of evidence**. As the Fifth Circuit has stated:

> "[B]oth the performance and prejudice components of the ineffectiveness inquiry are mixed questions of law and fact." *Strickland*, 466 U.S. at 698, 104 S.Ct. at 2070. We ask if there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694, 104 S.Ct. at 2068. ***Strickland* explained that "[t]he result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome."** *Id.* (emphasis supplied).

*Belyeu v. Scott*, 67 F.3d 535, 540 (5th Cir. 1995). The ubiquitous "result of the outcome would not have been different" holding in probably thousands of cases relying on *Strickland*

completely fails to acknowledge that the standard is less than a preponderance. "The right to have the assistance of counsel is too fundamental and absolute to allow courts to indulge in nice calculations as to the amount of prejudice arising from its denial." *Glasser v. United States*, 315 U.S., at 76, 62 S.Ct., at 467.

The constitutional right to counsel does not guarantee errorless counsel, therefore, the effectiveness of counsel must be determined by the entire representation.[4] However, the "severity of the sentence" should "be considered in determining whether counsel's performance meets this standard." *Vela v. Estelle*, 708 F.2d 954, 965 (5th Cir. 1983).

In *Moore v. Johnson*, 194 F.3d 586, 604 (5th Cir. 1999), the Fifth Circuit explained that even a deferential review is subject to limitations:

> The Court is, therefore, **not required to condone unreasonable decisions parading under the umbrella of strategy, or to fabricate tactical decisions on behalf of counsel when it appears on the face of the record that counsel made no strategic decision at all**. Compare *Mann v. Scott*, 41 F.3d 968, 983-84 (5th Cir.1994) (citing record evidence for the proposition that counsel made a strategic decision not to offer mitigating evidence during the punishment phase of a capital trial), with *Whitley*, 977 F.2d at 157-58, (concluding from the record that counsel's failure to offer mitigating evidence during the punishment phase of habeas petitioner's capital trial was not the result of a considered strategic decision, and therefore not entitled to deference), and *Wilson*, 813 F.2d at 672, (concluding that the existing record was inadequate for purposes of determining whether counsel made a strategic decision not to offer mitigating evidence during the punishment phase of a capital trial or whether that decision was professionally reasonable); *see also*

---

[4]    Although the entire representation must be reviewed, "the right to effective assistance of counsel ... may in a particular case be violated by even an isolated error of counsel if that error is sufficiently egregious and prejudicial." *Murray v. Carrier*, 477 U.S. 478, 106 S. Ct. 2639, 2649-2650, 91 L. Ed. 2d 397 (1986)." *Citing, United States v. Cronic*, 466 U.S. 648, 657, n.20, 104 S. Ct. 2039, 2046, n.20, 80 L. Ed. 2d 657 (1984).

*Whitley*, 977 F.2d at 158 ("The crucial distinction between strategic judgment calls and plain omissions has echoed in the judgments of this court."); *Profitt v. Waldron*, 831 F.2d 1245, 1248 (5th Cir.1987) (*Strickland* 's measure of deference "must not be watered down into a disguised form of acquiescence."); id. at 1249 (refusing to indulge presumption of reasonableness as to "tactical" decision that afforded no advantage to the defense). Rather, the fundamental legal question is whether, viewed with the proper amount of deference, counsel's performance was professionally reasonable in light of all the circumstances. *Strickland*, 104 S.Ct. at 2066.

The question becomes did Mr. Guevara receive a fair sentence resulting in a punishment verdict worthy of confidence. *cf. Kyles v. Whitley*, 514 U.S. 419 (1995).

While the Courts will not use hindsight in gauging counsel's effectiveness, the decisions made by counsel will be evaluated based upon the investigation utilized to determine the best possible strategy. "A conscious and informed decision on trial tactics and strategy cannot be the basis for constitutionally ineffective assistance of counsel unless it is so ill chosen that it permeates the entire trial with obvious unfairness." *Crane v. Johnson*, 178 F.3d 309, 314 (5th Cir. 1999)(*citing Garland v. Maggio*, 717 F.2d 199, 206 (5th Cir. 1983)(on rehearing)).

In *Silva v. Woodford*, 279 F.3d 825 (9th Cir. 2002), the Court partially granted habeas relief when a defense attorney failed to investigate his client's background, but was informed by the *client* not to proceed. *Silva*, 279 F.3d at 837-38. The Court of Appeals determined this performance deficient even given "an additional measure of deference" due to the client's wishes. *Id.* Amazingly, in this case, the record contains letters from Mr. Guevara imploring his attorneys to investigate his case. *See discussion infra.* The Court reiterated the

ABA standard that:

> ABA Standards for Criminal Justice 4-4.1 (2d ed.1980) reads as follows:
>
>> Duty to investigate
>>
>> It is the duty of the lawyer to conduct a prompt investigation of the circumstances of the case and to explore all avenues leading to facts relevant to the merits of the case and the penalty in the event of conviction. The investigation should always include efforts to secure information in the possession of the prosecution and law enforcement authorities. The duty to investigate exists regardless of the accused's admissions or statements to the lawyer of facts constituting guilt or the accused's stated desire to plead guilty.

*Silva*, 279 F.3d 825 at 840, n. 11.

In *Wiggins v. Smith*, 123 S.Ct. 2527, 2541-42 (2003), the Supreme Court reversed a capital case based on a less than thorough investigation regarding mitigation; explaining:

> In finding that Schlaich and Nethercott's investigation did not meet Strickland's performance standards, we emphasize that Strickland does not require counsel to investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing. Nor does Strickland require defense counsel to present mitigating evidence at sentencing in every case. Both conclusions would interfere with the **constitutionally protected independence of counsel** at the heart of Strickland, 466 U.S., at 689, 104 S.Ct. 2052. We base our conclusion on the much more limited principle that *"strategic choices made after less than complete investigation are reasonable" only to the extent that "reasonable professional judgments support the limitations on investigation." Id.*, at 690-691, 104 S.Ct. 2052. A decision not to investigate thus "must be directly assessed for reasonableness in all the circumstances." *Id.*, at 691, 104 S.Ct. 2052.
>
> Counsel's investigation into Wiggins' background did not reflect reasonable professional judgment. Their decision to end their investigation when they did was neither consistent with the professional standards that prevailed in 1989, nor reasonable in light of the evidence counsel uncovered in the social services records--evidence that would have led a reasonably