# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| GILMAR ALEXANDER GUEVARA, | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| VS. | § | CIVIL CASE NO. 08-1604 |
| | § | |
| RICK THALER, Director, Texas Department | § | |
| Director, Texas Department of | § | |
| Criminal Justice, Correctional | § | |
| Institutions Division, | § | |
| | § | |
| Respondent. | § | |

## MEMORANDUM AND ORDER

Gilmar Alexander Guevara, a Texas inmate sentenced to death, has filed a federal petition for a writ of habeas corpus.  (Docket Entry No. 1).  The respondent, Rick Thaler, has filed an answer. (Docket Entry No. 27).  After considering the record, the pleadings, and the applicable law – particularly the relevant provisions of the Anti-Terrorism and Effective Death Penalty Act ("AEDPA") – the court denies Guevara's habeas petition except for his claim under *Atkins v. Virginia*[1] and orders additional briefing on that claim.  The reasons are explained below.

## I.    Background

Around midnight on June 2, 2000, police officers responded to a call at a Houston convenience store and found the bodies of Tae Youk and Gerardo Yaxon.  Both had been shot. Eight days later, the police arrested Guevara on an outstanding warrant.  A search of his apartment uncovered ammunition similar to that recovered from the convenience store.  Guevara confessed to the murders.  Guevara told police that he and some friends were driving around in his van when one

---

[1]    536 U.S. 304 (2002).

suggested that they "go to the store there" to "get the money."  When Guevara and his two friends

entered the store, one of the store attendants hit him.  The codefendant then told Guevara to "shoot,

shoot, shoot."  Guevara shot both store attendants.  He claimed not to remember how many times

he fired. Guevara and his friends left the store without taking anything.  Hours after shooting Tae

Youk and Gerardo Yaxon, Guevara murdered Freddy Marroquin, an apartment security guard, to

steal his gun.  Guevara also confessed to killing Freddy Marroquin.

The State of Texas charged Guevara with capital murder.  The trial court appointed Ricardo

Rodriguez and Jerry Guerinot to represent Guevara.   Trial counsel assumed a difficult task in

accepting the appointment.  Guevara had confessed to the killings.  Guevara's previous convictions

included theft, carrying a weapon, unauthorized use of a motor vehicle, auto theft, and repeated

parole violations.  His criminal conduct included convenience-store robberies during which he had

fired shots and inflicted permanent injuries.  In short, Guevara had confessed to three murders and

these were the most recent events in a pattern of escalating violence.

A jury found Guevara guilty of the capital murder of Youk and Yaxon.  After a separate

punishment phase, the same jury answered the Texas special-issue questions.  The answers required

the death sentence.[2]  Guevara unsuccessfully challenged his conviction and sentence in the Texas

---

[2]      The jury answered the two special-issue questions required by TEX. CODE CRIM. PRO. §
37.071:

Special Issue No. 1
Do you find from the evidence beyond a reasonable doubt that there is a reasonable
probability that the Defendant, Gilmar Alexander Guevara, would commit criminal acts of
violence that would constitute a continuing threat to society?

Special Issue No. 2
Do you find from the evidence, taking into consideration all of the evidence, including the
circumstances of the offense, the defendant's character and background, and the personal
(continued...)

Court of Criminal Appeals, *see Guevara v. State*, 97 S.W.3d 579 (Tex. Crim. App. 2003), and filed

a state application for habeas corpus relief in 2002.  Three years after filing his initial state habeas

application, but before the Court of Criminal Appeals had ruled, Guevara filed a "Subsequent

Application for Art. 11.071 Writ of Habeas Corpus" in the trial-level court.  In this subsequent

application, Guevara claimed that his mental retardation precluded executing his death sentence.

The Court of Criminal Appeals entered an order denying Guevara's initial application and finding

that state procedural law prevented consideration of his successive application.[3]  This federal suit

followed.

This court appointed counsel to represent Guevara in his federal habeas proceedings.

Guevara's federal habeas petition raises the following grounds for relief:

- Mental retardation precludes the State of Texas from executing Guevara under *Atkins v. Virginia*, 536 U.S. 304 (2002).  (Claim One).

- Guevara's sentence fails to conform with constitutional requirements because a jury did not consider whether he is mentally retarded under *Atkins*.  (Claim Two).

- Trial counsel provided constitutionally ineffective representation by: (a) not investigating Guevara's mental retardation (Claim Three); (b) not presenting an adequate case to militate against a death sentence (Claim Four); (c) not

---

[2]         (...continued)
moral culpability of the defendant, Gilmar Alexander Guevara, that there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed?

Clerk's Record at 249-50.

[3]         The Court of Criminal Appeals specifically adopted the lower court's findings and conclusion except "findings Nos. 44 and 69 and conclusions Nos. 7, 13, and 27 because either they are not supported by the record or they are contrary to the law."  *Ex parte Guevara*, Nos. WR-63,926-01 and -02, 2007 WL 1493152, at *1 (Tex. Crim. App. 2007).

objecting to victim-impact testimony (Claim Five); and (d) not giving an adequate summation in the penalty phase (Claim Six).

- Appellate counsel provided ineffective assistance by failing to raise claims relating to Guevara's trial representation. (Claims Seven and Eight).

- The trial court violated Guevara's constitutional rights by neglecting to inquire into an obvious conflict between him and his trial attorneys. (Claim Nine).

- The State failed to prove beyond a reasonable doubt that Guevara would be a continuing threat to society. (Claim Ten).

- The future-dangerousness special issue is unconstitutional. (Claim Eleven).

- The Texas capital habeas procedure violates the Due Process Clause. (Claim Twelve).

- The State of Texas violated Guevara's rights under international law by not providing him access to consular officials. (Claim Thirteen).

- The prosecution's reliance on unadjudicated offenses in the punishment phase violated constitutional and international law. (Claim Fourteen).

Procedural concerns prompted this court to deny the respondent's initial summary judgment motion. (Docket Entry No. 26). The respondent has filed an amended answer, arguing that the constraints on habeas review prevent this court from reaching the merits of Claims One through Three, Nine, Ten, and Thirteen. The respondent also asserts that all of Guevara's claims lack merit. (Docket Entry No. 27). Guevara has filed a comprehensive reply. (Docket Entry No. 28). This court ordered the parties to provide additional briefing on procedural issues. (Docket Entry No. 31). Guevara's federal habeas petition is now ready to be decided.

## II.   The Applicable Legal Standards

Federal habeas corpus review limits the examination of state criminal judgments. *See Calderon v. Thompson*, 523 U.S. 538, 555-56 (1998); *Brecht v. Abrahamson*, 507 U.S. 619, 635

4

(1993); *Engle v. Isaac*, 456 U.S. 107, 128 (1982).  The Anti-Terrorism and Effective Death Penalty Act ("AEDPA") limits federal habeas review to those issues implicating a "violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  The AEDPA also prevents federal review of constitutional challenges the inmate has not first raised in state court.  *See* 28 U.S.C. §  2254(b)(1).  As a corollary to the exhaustion requirement, the federal procedural bar rule precludes claims that an inmate did not present in compliance with state procedural law.  *See* *Dretke v. Haley*, 541 U.S. 386, 392 (2004); *Lambrix v. Singletary*, 520 U.S. 518, 523 (1997); *Coleman v. Thompson*, 501 U.S. 722, 729 (1991).  A federal court may review an inmate's unexhausted or procedurally barred claims only if he shows: (1) cause and actual prejudice; or (2) that "a constitutional violation has 'probably resulted' in the conviction of one who is 'actually innocent[.].'"  *Haley*, 541 U.S. at 393 (quoting *Murray v. Carrier*, 477 U.S. 478, 496 (1986)).

The AEDPA also limits how a federal court may consider habeas claims.  After the state courts have "adjudicated the merits" of an inmate's complaints, federal review "is limited to the record that was before the state court [.]"  *Cullen v. Pinholster*, ___ U.S. ___, 131 S. Ct. 1388, 1398 (2011).  An inmate must show that the state-court decision was contrary to, or an unreasonable application of, federal law.  *See* 28 U.S.C. § 2254(d)(1), (2).  A decision is "contrary to" federal precedent when it (1) is "opposite to that reached by [the Supreme Court] on a question of law" or (2) was "decide[d] . . . differently than [the Supreme Court] has on a set of materially indistinguishable facts."  *Williams v. Taylor,* 529 U.S. 362, 413 (2000); s*ee also Bell v. Cone*, 535 U.S. 685, 698 (2002); *Early v. Packer*, 537 U.S. 3, 7-8 (2002).  An "unreasonable application" is not merely incorrect, but "unreasonable – a substantially higher threshold."  *Schriro v. Landrigan*,

550 U.S. 465, 473 (2007); *see also Pinholster*, ___ U.S. ___, 131 S. Ct. at 1403; *Waddington v. Sarausad*, 555 U.S. 179, 190 (2009).

In the present case, the Texas state courts made detailed and comprehensive fact findings on both direct appeal and habeas review.  Under 28 U.S.C. § 2254(d)(2), those decisions "will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding[.]"  *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).  A federal habeas court must presume the underlying factual determinations of the state court to be correct, unless the petitioner "rebut[s] the presumption of correctness by clear and convincing evidence."  28 U.S.C. § 2254(e)(1); *see also Miller-El*, 537 U.S. at 341.

Compliance with the AEDPA does not guarantee relief.  Other judicial doctrines, such as the harmless-error doctrine and the nonretroactivity principle, also limit federal habeas relief.  *See Thacker v. Dretke*, 396 F.3d 607, 612 n.2 (5th Cir. 2005).  Trial error cannot require habeas relief unless it "ha[d] a 'substantial and injurious effect or influence in determining the jury's verdict.'"  *Robertson*, 324 F.3d at 304 (quoting *Brecht*, 507 U.S. at 629).  The Supreme Court also forbids federal habeas courts from creating new constitutional law.  *See Horn v. Banks*, 536 U.S. 266, 272 (2002) (relying on *Teague v. Lane*, 489 U.S. 288 (1989)).

Guevara's federal habeas petition is analyzed based on the record and the governing law.

III.     **Analysis**

A.     **The Claim that Mental Retardation Precludes Execution (Claim One)**

In *Atkins v. Virginia*, 536 U.S. 304 (2002), the Supreme Court held that under the Eighth Amendment's "evolving standards of decency," "death is not a suitable punishment for a mentally retarded criminal." *Atkins*, 536 U.S. at 321. Guevara raises three claims based on *Atkins*. First, Guevara asserts that he is mentally retarded and that this court should set aside his death sentence. Second, Guevara raises a procedural complaint that only a jury should have the power to decide whether he is mentally retarded. Finally, Guevara claims that his trial attorneys provided ineffective representation by not uncovering his mental impairment before trial. This court considers the last two arguments separately.

The procedural posture of Guevara's *Atkins* claim that his mental retardation prevents his execution raises difficult questions about the availability of federal review. The Supreme Court decided *Atkins* six months before Guevara filed his state habeas application on December 23, 2002. Guevara waited three years before raising an *Atkins* claim.[4] Texas law essentially confines state habeas review to the claims identified and briefed in an inmate's initial habeas application. Texas treats a pleading or amendment submitted outside the initial filing period as a new habeas action. *See* TEX. CODE CRIM. PRO. art. 11.071 § 5(f). Under Texas law, Guevara could litigate claims based on *Atkins* only in a successive habeas action.

_____

[4]     The Court of Criminal Appeals appointed habeas counsel on September 24, 2001. The State filed its appellate brief on August 12, 2002. Guevara filed his successive state habeas application years after any opportunity to amend his pleading. By then, his initial state habeas litigation had nearly run its course. The parties had both already filed proposed findings of fact and conclusions of law. In fact, only one week after Guevara first raised his *Atkins* claim, the trial-level court issued its own detailed opinion recommending that the Court of Criminal Appeals deny habeas relief.

7

Texas law imposes strict limits on successive habeas proceedings.  Under TEX. CODE CRIM. PRO. 11.071 § 5, an inmate can proceed on a successive habeas action only if he shows applicable new law or facts (§ 5(a)(1)); actual innocence of his conviction (§ 5(a)(2)); or actual innocence of the death penalty (§ 5(a)(3)).  Guevara made three arguments to justify successive habeas review.  First, Guevara argued under § 5(a)(1) that the State's delay in adopting standards to implement *Atkins* justified his late reliance on the new law.  Second, Guevara argued that equity should allow him to insert an *Atkins* claim into his ongoing state habeas proceedings.  Third, Guevara argued that mental retardation made him actually innocent of his death sentence, permitting review under § 5(a)(3).

Without considering contrary evidence or any response from the State, the state habeas court found that Guevara had raised his *Atkins* claim too late under TEX. CODE CRIM. PRO. 11.071 § 4 to insert it into his initial habeas action.  Following Texas procedure, *see* TEX. CODE CRIM. PRO. 11.071 § 5(b)(3), the lower court forwarded Guevara's successive application to the Court of Criminal Appeals.  In a brief order, the Court of Criminal Appeals found that Guevara's default required dismissal of the subsequent application:

> This Court has also reviewed the record with respect to the application which was forwarded to this Court as a subsequent writ. On January 13, 2006, the trial court entered an order finding that said application was filed after the time period specified under Texas Code of Criminal Procedure, Article 11.071 § 4(a) or 4(b). We agree with the trial court's determination.  Further, *we find that the application fails to meet one of the exceptions provided for in Section 5 of Article 11.071 and, thus, dismiss this subsequent application as an abuse of the writ.  See Ex parte Blue*, S.W.3d, AP-75,254 (Tex. Crim. App. March 7, 2007).

*Ex parte Guevara*, 2007 WL 1493152, at *1 (Tex. Crim. App. 2007) (emphasis added).

8

Guevara included the claims from his successive state habeas action in his federal petition. The parties have advanced different views on how to interpret the succinct order of the Court of Criminal Appeals. The characterization of the order as either procedural or merits-based affects this court's review. A merits ruling allows full review, while possibly affording the State the benefit of the AEDPA's highly deferential § 2254(d) standards. A procedural ruling creates a high hurdle to review, but, if the necessary showing is made, AEDPA deference does not apply. Recent cases have debated how the Texas Court of Criminal Appeals addresses successive habeas applications, particularly when that court only issues a terse dismissal order. The question is whether the state court "need[ed] to consider or decide the merits of [the inmate's] constitutional claims in reaching its decision to dismiss" or whether the "perfunctory dismissal of the claims suggests that it actually considered or ruled on the merits." *Hughes v. Quarterman*, 530 F.3d 336, 342 (5th Cir. 2008). If the procedural ruling "fairly appear[ed] to rest primarily on federal law, or to be interwoven with federal law," the federal habeas court may address the defaulted claim on the merits. *Michigan v. Long*, 463 U.S. 1032, 1040-41 (1983); *see also Coleman*, 501 U.S. at 735. Guevara argues that the Court of Criminal Appeals has intertwined federal law into the dismissal of successive habeas application, allowing this court to review the merits of his claims.

This court denied the respondent's initial summary judgment motion because of uncertainty about the operation of Art. 11.071 § 5(a) as an adequate and independent state procedural rule. (Docket Entry No. 26). The parties have provided extensive briefing, (Docket Entry Nos. 27, 28, 32, 33), but legal subsequent developments in the Fifth Circuit have not wholly clarified whether Texas state law prevents federal consideration of the merits of Guevara's *Atkins* claim.

9

The Court of Criminal Appeals issued a boilerplate order stating "that the application fails to meet one of the exceptions provided for in Section 5 of Article 11.071." The order does not make it clear whether Guevara failed to meet one of the subsections or all of them. When the Court of Criminal Appeals "does not identify the subsection on which it relied in dismissing the application," federal courts "look to the application itself to determine the subsection the petitioner relied on in presenting his subsequent application [.]" *Adams v. Thaler*, 421 F. App'x 322, 330 (5th Cir. 2011) (citing *Balentine v. Thaler*, 626 F.3d 842 (5th Cir. 2010)). Based on Guevara's pleadings, the Court of Criminal Appeals "must have dismissed his successive application because it did not satisfy the requirements of either § 5(a)(1) or § 5(a)(3)." *Rocha v. Thaler*, 626 F.3d 815, 838 (5th Cir. 2010).[5] The issue is whether § 5(a)(1) or § 5(a)(3) bars federal review in this case.

### 1.     Subsection 5(a)(1)

Subsection 5(a)(1) allows judicial consideration of a subsequently filed habeas claim if "the current claims and issues have not been and could not have been presented previously in a timely initial application or in a previously considered application . . . because the factual or legal basis for the claim was unavailable on the date the applicant filed the previous application." In practice, a two-part process is involved in deciding whether a successive application complies with Art. 11.071 § 5(a)(1). The Court of Criminal Appeals "first examines whether the factual or legal basis of the claim was unavailable at the time of the original application. Only if the applicant can surmount the unavailability hurdle does the [Court of Criminal Appeals] proceed to ask whether the application

---

[5]     Guevara also asked the Court of Criminal Appeals to find that equity should allow him to insert a new claim into his ongoing initial habeas action. That argument did not invoke a specific exception to Art. 11.071 § 5(a), but instead asked the Texas courts not to apply the Art. 11.071 § 4(a) timeliness requirements. Guevara has not made any convincing argument that the time calculation involved in determining a default under § 4 would not be independent of federal law.

makes out a claim that is prima facie meritorious." *Rocha*, 626 F.3d at 834; *see also Ex parte Campbell*, 226 S.W.3d 418, 422 (Tex. Crim. App. 2007). The Court of Criminal Appeals looks at a "two-step inquiry—unavailability, then merits[.]" *Rocha*, 626 F.3d at 833.

The Court of Criminal Appeals did not specify on which step it based its dismissal of Guevara's successive application. When a state court issues an ambiguous order – as in this case – the federal courts must look at the state-court pleadings to determine which of § 5(a)(1)'s steps prompted the dismissal. *See Rocha*, 626 F.3d at 837; *Balentine*, 626 F.3d at 854. If the state courts could have stopped at the first step, then a procedural bar forecloses federal habeas review. If the circumstances would have caused the state courts to proceed to the second step, then they applied federal law and a federal court may reach the merits.

The respondent argues that "[b]ecause an *Atkins* claim was both factually and legally available by 2002 when Guevara filed his initial writ . . . the [Court of Criminal Appeal's] Section 5(a)(1) assessment stopped at unavailability. The [state court] dismissal here constitutes a state procedural ruling that bars the merits to federal habeas review." (Docket Entry No. 33 at 8). This court agrees. If, as here, the record shows that an inmate should have brought his disputed claim in his first habeas action, then the Court of Criminal Appeals would not need to proceed to § 5(a)(1)'s second step. The Supreme Court issued the *Atkins* decision six months before Guevara filed his initial state habeas application. He waited three years before advancing his *Atkins* claim. Guevara has not identified any underlying legal or factual component of the *Atkins* inquiry that was not ripe when he filed his first habeas action. *See* TEX. CODE CRIM. PRO. art. 11.071 § 5(d). The Court of Criminal Appeals would have no reason to use federal law in considering § 5(a)(1) because Guevara's *Atkins* claim was available to him when he filed his initial state habeas application. *See*

11

*Ex parte Blue*, 230 S.W.3d 151, 156 (Tex. Crim. App. 2007) (finding that the Court of Criminal Appeals does not need to proceed to § 5(a)(1)'s second step when an inmate has filed his initial application after the Supreme Court issued the *Atkins* decision).  This court concludes that § 5(a)(1) is an independent and adequate ground for the Court of Criminal Appeals to dismiss Guevara's *Atkins* claim.

Guevara argues that because Texas had not yet decided how to handle *Atkins* claims when he filed his initial application, the claim was unavailable to him.  Pointing to *Moore v. Quarterman*, 533 F.3d 338 (5th Cir. 2008), Guevara asserts that the State's delay in adopting standards to implement the *Atkins* decision should forgive his failure to include a mental-retardation claim in his initial application.  The *Moore* court found that the inmate "had cause for misunderstanding the state's *successive writ procedures* because, when he filed his *Atkins* petition on December 26, 2002, the [Court of Criminal Appeals] had published no opinion explaining the factual criteria that must be pled in an *Atkins* petition, nor had such criteria become evident in practice, arising from the unpublished disposition of similar petitions."  *Id.* at 341 (emphasis added).  This case is fundamentally different from *Moore*.  While Texas did not decide how to handle *Atkins* claims in the successive habeas context until early 2003 and had not yet crafted its two-step procedure under § 5(a)(1) when Guevara filed his successive application, no such impediment affected *Atkins* claims in *initial* petitions.  *See Mathis v. Thaler*, 616 F.3d 461, 476 (5th Cir. 2010) (finding in the context of the AEDPA's abuse-of-the-writ provisions that an *Atkins* claim was "previously available" to an inmate immediately after the Supreme Court decided that case even though he had already sought state habeas review).  In other words, the impediment that prevented the inmate in *Moore* from filing a successive application did not preclude Guevara from including an *Atkins* claim in his initial

application.  Guevara has not credibly shown that uncertainty about *Atkins* jurisprudence caused him

to file his claim in a procedurally faulty manner.

### 2.     Subsection 5(a)(3)

Because Guevara "did not avail himself of the opportunity and resources available to him

at trial or in an initial writ to raise his claim of mental retardation," he also relied on § 5(a)(3), which

"impos[es] . . . higher burdens upon the subsequent applicant[.]"  *Blue*, 230 S.W.3d at 162.  The

third exception to the Texas successive-application bar requires an inmate to show "by clear and

convincing evidence, but for a violation of the United States Constitution no rational juror would

have answered in the state's favor one or more of the special issues that were submitted to the jury

in the applicant's trial[.]"  TEX. CODE CRIM. PRO. art. 11.071 § 5(a)(3).  The Court of Criminal

Appeals interprets § 5(a)(3) as an actual-innocence exception to its abuse of the writ doctrine.  *See*

*Rocha*, 619 F.3d at 402–03(quoting *Blue*, 230 S.W.3d at 159–60).  This review mirrors that

performed by the federal courts in looking at actual innocence of the death penalty under *Sawyer*

*v. Whitley*, 505 U.S. 333, 348 (1992).  *See Rocha*, 626 F.3d at 822-23.[6]  The *Blue* court explicitly

interpreted § 5(a)(3) as intentionally adopting the *Sawyer* showing of actual innocence of the death

penalty.  The petitioner must show "by clear and convincing evidence that but for constitutional

error, no reasonable juror would have found him eligible for the death penalty under [state] law."

*Blue*, 230 S.W.3d at 158 n.29 (quoting *Sawyer*, 505 U.S. at 348).

---

[6]     Under *Sawyer v. Whitley*, 505 U.S. 333, 336 (1992), a petitioner who claims to be actually innocent of the death penalty to which he has been sentenced "must show by clear and convincing evidence that, but for a constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty under the applicable state law."  The inmate must show that it is more likely than not that no reasonable juror would have convicted him in light of new evidence of his actual innocence.  *See Schlup v. Delo*, 513 U.S. 298, 327 (1995).

In denying summary judgment, this court noted uncertainty as to whether the Court of Criminal Appeals wove federal law into its procedural decision under § 5(a)(3).  (Docket Entry No. 26 at 10).  Since then, the Fifth Circuit has held that, as a general rule,

> when the [Court of Criminal Appeals] determines that a successive state habeas application does not satisfy § 5(a)(3), it does so because it has concluded that the habeas applicant cannot establish that he is actually innocent of the death penalty.  To arrive at that conclusion, the [Court of Criminal Appeals] need not, and does not, consider the merits of the underlying federal constitutional claim.

*Rocha*, 626 F.3d at 819; *see also Adams*, 421 F. App'x at 331 (clarifying that subsection 5(a)(3) may serve as an "independent and adequate state-law procedural grounds" that would "prevent[] [federal courts] from reviewing the claims in the dismissed application because they were procedurally defaulted").  In most cases, when the state court applies a *Sawyer* analysis, that does not implicate the merits of the inmate's claim.

Nevertheless, the Fifth Circuit has questioned whether the special circumstances presented by *Atkins* claims require the state courts to interweave federal law onto the § 5(a)(3)/*Sawyer* analysis.  The Fifth Circuit has stated that:

> [a]n *Atkins* claim is a claim that the petitioner is ineligible for the death penalty. . . .  In such cases, the inquiry into the gateway innocence claim will substantially overlap with the inquiry into the merits of the underlying constitutional claim.  Our panel opinion's holding does not implicate this limited class of cases . . . [involving a] categorical ineligibility for the death penalty.

*Rocha*, 626 F.3d at 826-27 (footnotes omitted).[7]  In the *Blue* decision, the Texas Court of Criminal Appeals also acknowledged this problem.  "But what if it is the constitution itself that prohibits

---

[7]     The Fifth Circuit sandwiched that statement between footnotes stating that (1) the majority of other circuits had found that similar state-law exceptions "may require a glance at the merits," but "do[] not open up the merits to plenary consideration by the federal court" and (2) the inquiry under § 5(a)(3) was "not entirely identical" to adjudicating the merits.  *Rocha*, 626 F.3d at 826, nn. 44, 50.

execution, rather than a constitutional error that affects the statutory criteria for eligibility for the death penalty?  In other words, what if the applicant is constitutionally ineligible for the death penalty, rather than statutorily ineligible?"  *Blue*, 230 S.W.3d at 161.

The Texas courts have struggled "trying to force the square peg of an *Atkins* claim into the round hole of the actual innocence framework[.]"  *Henderson v. Thaler*, 626 F.3d 773, 785 (5th Cir. 2010) (Wiener, J., dissenting).  The Court of Criminal Appeals in *Blue* carefully tried to differentiate its § 5(a)(3) analysis from a merits review in *Atkins* cases.[8]  The Court of Criminal Appeals stated that under § 5(a)(3), it "review[ed] the adequacy" of an *Atkins* claim without making any "determination of the merits."  *Blue*, 230 S.W.3d at 163; *see also Ex parte Woods*, 296 S.W.3d 587, 606 (Tex. Crim. App. 2009) (treating section 5(a)(3) as a threshold review).  The Court of Criminal Appeals has clarified this review as deciding whether the petitioner made "a threshold presentation of evidence that, if true, is sufficient to show that no rational factfinder would fail to find that he is mentally retarded."  *Ex Parte Sorto*, 2011 WL 1533377, at *1 (Tex. Crim. App. 2011) (unpublished); *Blue*, 230 S.W.3d at 163.[9]

The predicate for that threshold review, however, is federal law.  Unlike a standard factual-innocence-of-the-death-penalty argument that operates independent from the underlying successive

---

[8]     In doing so, the *Blue* court held that "*some* threshold of proof of mental retardation is appropriate" to the section 5(a)(3) inquiry and adopted an "evidence of a sufficiently clear and convincing character" standard.  *See Blue*, 230 S.W.3d at 159 n.36, 62; *see also Ex parte Woods*, 296 S.W.3d 587, 606 (Tex. Crim. App. 2009) (following *Blue*).

[9]     This type of assessment is not unfamiliar to the federal courts.  For instance, a federal appellate court has no jurisdiction over an inmate's claims when considering under 28 U.S.C. § 2253(c)(2) whether an inmate has shown "the denial of a constitutional right" in order for a certificate of appealability to issue.  This process "requires an overview of the claims in the habeas petition and a general assessment of their merits . . . [but] does not require full consideration of the factual or legal bases adduced in support of the claims. In fact, the statute forbids it."  *Miller-El*, 537 U.S. at 336.  The § 5(a)(3) review anticipated by *Blue* generally weighs the character of a still-undeveloped *Atkins* claim without resolving the merits.

habeas claim, deciding whether an inmate has made a threshold showing that mental retardation

prevents his execution inescapably involves *Atkins*.  As the Fifth Circuit has explained:

> An actual-innocence claim is not a claim of constitutional error.  It is
> a procedural device that authorizes the adjudication of a federal
> constitutional claim that would otherwise be procedurally defaulted.
> However, the federal constitutional claim of a habeas petitioner who
> argues that the Constitution renders him ineligible for the death
> penalty is, in substance, a claim that the petitioner is actually
> innocent of the death penalty.  In cases presenting such claims, the
> gateway issue and the underlying constitutional issue largely merge
> into a single inquiry.

*Rocha*, 626 F.3d at 819 n.3.  "This is not to say that the two inquires become entirely identical."  *Id*.

at 827 n.50.  The successive habeas applicant must bring a "threshold showing of evidence that

would be at least sufficient to support an ultimate conclusion, by clear and convincing evidence, that

no rational factfinder would fail to find mental retardation."  *Blue*, 230 S.W.3d at 163.  But

ultimately the courts apply a preponderance-of-the-evidence standard.  *Ex parte Briseño*, 135

S.W.3d 1, 12 (Tex. Crim. App. 2004).  The § 5(a)(3) analysis inserts a state-law requirement of a

threshold evidentiary showing, but mingles that with the federal *Atkins* standard.  *See Balentine*, 626

F.3d at 853 (recognizing a similar commingling of federal and state standards under § 5(a)(1));

*Rivera v. Quarterman*, 505 F.3d 349, 359 (5th Cir. 2007) (same).  The basis for both the § 5(a)

review and any merits review is the *Atkins* decision; there is no distinction between the gateway

innocence claim and the underlying constitutional ground for relief.  In the *Atkins* context, § 5(a)(3)

overlaps with the constitutional claim.[10]

---

[10]    As an example of this overlap, the respondent's amended answer mingles the *Sawyer* and *Atkins* inquiries.  The respondent merges the procedural and substantive questions raised by Guevara's *Atkins* clam into one section addressing how his "mental retardation claim does not prove his actual innocence of the death penalty, nor does it entitle him to habeas relief."  (Docket Entry No. 27 at 32-49).

"[W]here the threshold a state sets turns on a merits determination of federal law . . . that decision is reviewable." *Rivera*, 505 F.3d at 359. This court concludes that no adequate and independent procedural bar forecloses federal consideration of the *Atkins* claim raised in the successive habeas application and addressed under the *Blue* framework.[11] Guevara has not procedurally defaulted his *Atkins* claim.

### 3. The Remaining Questions

In his successive habeas application, Guevara argued that he brought forth "abundant evidence to make out a prima facie case that [he] was and is a person with mental retardation." Guevara based his *Atkins* claim almost entirely on an affidavit from a psychologist, Dr. Antolin M. Llorente. Guevara sought Dr. Llorente's assistance "for [a] neuropsychological examination in an attempt to assess his present level of neuropsychological and cognitive functioning" and "a *rule-out* of mental retardation was requested[.]" Dr. Llorente performed a battery of neuropsychological tests, reviewed various records, examined Guevara, and interviewed three other individuals by telephone. From that review, Dr. Llorente not only could not rule out mental retardation, he opined

---

[11]     If the state-court action was a procedural dismissal, Guevara most strongly emphasizes the exception for a fundamental miscarriage of justice, but he also makes two arguments for cause. "[T]he existence of cause for a procedural default must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488 (1986). First, Guevara alleges that the dismissal of his *Atkins* claim violated his right to due process and effective representation by counsel. But "alleged infirmities in state habeas proceedings are not grounds for federal habeas relief." *Brown v. Dretke*, 419 F.3d 365, 378 (5th Cir. 2005); *see also Elizalde v. Dretke*, 362 F.3d 323, 331 (5th Cir. 2004); *Beazley v. Johnson*, 242 F.3d 248, 271 (5th Cir. 2001); *Trevino v. Johnson*, 168 F.3d 173, 180 (5th Cir. 1999); *Duff-Smith v. Collins*, 973 F.2d 1175, 1182 (5th Cir. 1992). Under that reasoning, "'ineffective assistance of habeas counsel cannot provide cause for a procedural default.'" *Henderson v. Cockrell*, 333 F.3d 592, 606 (5th Cir. 2003) (quoting *Martinez v. Johnson*, 255 F.3d 229, 241 (5th Cir. 2001)); *see also Ruiz*, 460 F.3d at 644. Second, Guevara claims that Texas law had not sufficiently outlined the procedure for filing *Atkins* claims when he filed his initial habeas application. As previously discussed, the legal and factual basis for an *Atkins* claim was open to Guevara when he filed his initial state habeas action. Guevara has not shown that he can overcome any procedural bar of his claims that might be present.

with a reasonable degree of medical certainty that Guevara met all the factors necessary to diagnose mental retardation.

Under § 5(a)(3)'s threshold assessment, the Court of Criminal Appeals found no reason to allow Guevara's successive habeas application to proceed. Treating that as something other than a procedural bar, however, does not open Guevara's *Atkins* claim to plenary federal habeas consideration. Generally, if a state court has not imposed a valid procedural bar, the claim has been "adjudicated on the merits" and requires AEDPA deference. *See Wiley v. Epps*, 625 F.3d 199, 207 (5th Cir. 2010). This same deference prevents an inmate from presenting new evidence for the first time in federal court. *See Pinholster*, ___ U.S. at ___, 131 S. Ct. at 1398.

The respondent argues that Guevara's claim lacks merit and this court can now proceed to adjudicate them. In doing so, however, the respondent does not explicitly rely on the AEDPA's deferential standard of review. The parties have not addressed what effect, if any, the AEDPA standards have on adjudicating Guevara's *Atkins* claim. The Fifth Circuit has relaxed the AEDPA standards when "a petitioner makes a prima facie showing of mental retardation" but the state fails "to provide him with an opportunity to develop his claim." *Wiley*, 625 F.3d at 207; *see also Pierce v. Thaler*, 604 F.3d 197, 218-19 (5th Cir. 2010) ("[U]nder *Atkins* a person has a substantive right not to be executed if he is mentally retarded, and once he makes a prima facie showing that he is mentally retarded, he is entitled to an adjudication meeting constitutional standards to determine his condition."); *Rivera*, 505 F.3d at 358.[12]

---

[12]     The court previously noted that, should the merits of Guevara's *Atkins* claim be fully before the federal courts, additional factfinding may be necessary. (Docket Entry No. 26 at 11). That statement, however, presumed that (1) the case came before the court on summary judgment, which it now does not, and (2) the court could weigh new evidence in deciding the case under 28 U.S.C. § 2254(d)(1). The parties' briefing should address whether additional factfinding is required or necessary.

The respondent makes a strong case that, as the facts now stand, Guevara has not shown an entitlement to federal habeas relief.  The parties, however, have not briefed whether Guevara made a prime facie showing of mental retardation in state court, triggering the need for a hearing.  The parties are ordered to file supplemental briefs addressing whether Guevara advanced a prima facie *Atkins* claim, whether the state court's adjudication of his claim merits AEDPA deference, and whether this court must hold an evidentiary hearing before adjudicating this issue.  The respondent must file his brief by **October 28, 2011**.  Guevara must reply by **December 16, 2011**.

**B.    The Claim Relating to Whether a Jury Must Determine Mental Retardation (Claim Two)**

In addition to his substantive *Atkins* claim, Guevara argues that only a jury should have the power to decide whether he is mentally retarded.  Guevara raised this claim in his successive habeas application.  Because the resolution of the issue would not require the Court of Criminal Appeals to address its merits, the court finds that Guevara procedurally defaulted this claim based on adequate and independent state procedural law.  Because Guevara has not shown that he can overcome that procedural bar, this court denies relief on his second claim.

Alternatively, the claim fails on the merits.  Federal courts have repeatedly denied the claim that a jury, not a court, should decide whether *Atkins* applies to prevent a particular inmate's execution.  *See In re Johnson*, 334 F.3d 403, 405 (5th Cir. 2003); *see also In re Woods*, 155 F. App'x 132, 135-36 (5th Cir. 2005) ("[T]he factfinder with respect to a determination of mental retardation need not be a jury[.]"); *United States v. Webster*, 421 F.3d 308, 311-12 (5th Cir. 2005).  Guevara concedes that "this issue may have been foreclosed by prior precedent," but he raises it so as not to "waive the claim."  (Docket Entry No. 1 at 24).  Even if Guevara presented his second claim in a procedural adequate manner, he has not shown that it merits federal habeas relief.

19

### C.   The Claims of Ineffective Assistance of Counsel (Claims Three through Seven)

Guevara claims that his state-appointed attorneys provided ineffective assistance, both at trial and on appeal, under *Strickland v. Washington*, 466 U.S. 668, 686 (1984).  Guevara faults trial counsel for not presenting an adequate defense to militate against a death sentence (Claims Three and Four), not objecting to victim impact testimony (Claim Five), and giving an inadequate summation in the penalty phase (Claim Six).  Guevara also argues that on direct appeal, his attorneys should have faulted trial counsel for not objecting to victim-impact testimony (Claim Seven).

"Surmounting *Strickland*'s high bar is never an easy task[.]" *Padilla v. Kentucky*, ___ U.S. ___, 130 S. Ct. 1473, 1485 (2010).  Under *Strickland*, a criminal defendant's Sixth Amendment rights are "denied when a defense attorney's performance falls below an objective standard of reasonableness and thereby prejudices the defense." *Yarborough v. Gentry*, 540 U.S. 1, 3 (2003); *see also Rompilla v. Beard*, 545 U.S. 374, 387 (2005); *Wiggins v. Smith*, 539 U.S. 510, 520 (2003).  An inmate meets the deficient performance prong by showing that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed . . . by the Sixth Amendment." *Strickland*, 466 U.S. at 687.  The actual-prejudice inquiry requires an inmate to show a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." *Id.* at 694; *see also Wiggins*, 539 U.S. at 534.[13]  On federal review, *Strickland*'s

---

[13]   In extreme cases in which counsel's assistance was constructively equivalent to no legal representation, *United States v. Cronic*, 466 U.S. 648 (1984) requires a court to assume that trial counsel prejudiced his client's defense.  Most claims of ineffective assistance, however, fall under *Strickland*'s requirement that a petitioner show deficient performance by his attorney that prejudiced his defense.  Guevara argues that his attorneys constructively deprived him of any legal representation under *Cronic*.  *Cronic* applies "in only a very narrow spectrum of cases where the circumstances leading to counsel's ineffectiveness are so egregious that the defendant was in effect denied any meaningful assistance at all." *Gochicoa v. Johnson*, 238 F.3d 278, 284 (5th Cir. 2000); *see also Haynes v. Cain*, 298 F.3d 375, 381 (5th Cir. 2002) ("*Cronic* is reserved only for those extreme cases in which counsel fails to present any defense.").  Courts
(continued...)

standards merge with AEDPA into a "doubly deferential" standard. *Knowles v. Mirzayance*, 556 U.S. ___, ___, 129 S. Ct. 1411, 173 (2009); *see also Pinholster*, ___ U.S. at ___, 131 S. Ct. at 1403; *Gentry*, 540 U.S. at 5–6. "When § 2254(d) applies . . . [t]he question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Premo v. Moore*, ___ U.S. ___, 131 S. Ct. 733, 740 (2011) (quotation omitted).

Each of Guevara's complaints about trial counsel's performance relate to the penalty phase of the trial. The jury had already convicted Guevara of a brutal double murder. There was no question of his identity or intent. In the penalty phase, the prosecution called witnesses to describe his violent past. Guevara had progressed from early crimes such as misdemeanor theft to felony auto theft, to aggravated robbery, to murder. His violence was often cruel. The prosecution showed that during an aggravated robbery, Guevara "struck [one victim] in the ribs with the gun [and] beat [another victim] on the head [leaving him] mentally impaired as a result of his head injuries." He later "bragged about robbing some 'Ghandis' and about . . . pistol-whipping one of the 'Ghandis' when he made too much noise." State Habeas Record at 456.[14] And Guevara faced "the most powerful imaginable aggravating evidence"; only hours after committing the murders for which the

---

[13]       (...continued)
use *Cronic*'s constructive denial of counsel standard sparingly and only when counsel's representation amounts to no representation. *See Haynes*, 298 F.3d at 381; *Gochicoa*, 238 F.3d at 284. Even a cursory review of the record reveals that trial counsel did not "entirely fail[] to subject the prosecution's case to meaningful adversarial testing." *Cronic*, 466 U.S. at 659. To merit relief, Guevara must show the state court's resolution of *Strickland*'s deficient performance and actual prejudice tests was unreasonable under 28 U.S.C. § 2254(d)(1).

[14]       On direct appeal, Guevara claimed that the prosecution's questioning about the lasting injuries caused by Guevara's attack constituted impermissible victim-impact testimony. The Court of Criminal Appeals found that the Texas contemporaneous-objection rule barred appellate consideration of the issue because trial counsel made no objection in the punishment phase. In the alternative, the Court of Criminal Appeals found that the "testimony is not the type of evidence that [had been] characterized as inadmissible extraneous 'victim impact evidence'" in other cases. *Guevara*, 97 S.W.3d at 583-84 (citing *Cantu v. State*, 939 S.W.2d 627 (Tex. Crim. App. 1997)).

jury convicted him, Guevara killed another person to take his weapon. *Wong v. Belmontes*, ___ U.S. at ___, 130 S. Ct. 383, 391 (2009) (citation omitted).   The prosecution argued in closing that Guevara would be a danger throughout his life.  "This type of violent person is not like the rest of us.  He's dangerous, ladies and gentlemen. . . . you [have] sat in a room for almost two weeks with probably one of the most dangerous and violent people that you will ever come in contact with again."  Tr. Vol. 19 at 25-26.  The defense did not call punishment-phase witnesses.

Guevara has not shown that the representation he received violated his constitutional rights.

### 1.    The Claim that Counsel was Ineffective for Failing to Present Available Mitigating Evidence (Claim Four)

Guevara alleges that his trial counsel should have called family, friends, and experts as witnesses to testify about: (1) Guevara's "nightmarish childhood," both because of abusive parents and "a hostile, horrifying, unlivable" climate caused by civil war in his native El Salvador and exacerbated by immigrant distress when he came to the United States; (2) proof that "he would not be a future danger in prison"; (3) insight into how he was a hard-working, churchgoing family man who deserved sympathy for overcoming his difficult background; and (4) his mental retardation.

22

(Docket Entry No. 1 at 44-45).[15]  Guevara argues that his trial counsel limited his investigation and made poor decisions about presenting mitigating evidence.

a.        The Arguments Guevara Made in State Court

When Guevara raised this claim in state court, he alleged that trial counsel should have called numerous witnesses, including many family members and friends.   Guevara presented three affidavits to substantiate his mitigating-evidence claim.  State Habeas Record at 103-37.  Those three affidavits form the basis of assessing trial counsel's choice not to call lay and expert witnesses in the punishment phase.  *See Pinholster*, ___ U.S. at ___, 131 S. Ct. at 1399 ("[R]eview under § 2254(d)(1) focuses on what a state court knew and did.").

First, Guevara relied heavily on a "Declaration" from Gina T. Vitale, a "mitigation expert." The declaration provided background information about Guevara's impoverished youth in El Salvador, his childhood illnesses, his relationship with his family, his difficulty in adjusting to life once he immigrated to the United States as a teenager, and his good character as an adult.  State Habeas Record at 103-18.  Vitale interviewed Guevara and friends and family members who had immigrated to the United States.[16]  She also reviewed transcripts of interviews another investigator

---

[15]        As previously discussed, this court can reach the merits of Guevara's *Atkins* claim.  Because the state courts would not need to rely on federal law in dismissing the claim that trial counsel should have presented evidence of mental retardation, a valid procedural bar forecloses review on the merits. Nevertheless, "[m]ental retardation as a mitigator and mental retardation under *Atkins* . . . are discrete legal issues."  *Bobby v. Bies*, ___ U.S. ___, 129 S. Ct. 2145, 2153 (2009).  "Borderline retardation is not always viewed as a mitigating circumstance."  *Riley v. Dretke*, 362 F.3d 302, 307 (5th Cir. 2004).  *Atkins* recognized that "reliance on mental retardation as a mitigating factor can be a two-edged sword that may enhance the likelihood that the aggravating factor of future dangerousness will be found by the jury." 536 U.S. at 321; *see also Penry v. Lynaugh*, 492 U.S. 302, 324 (1989); *Boyd v. Johnson*, 167 F.3d 907, 910 (5th Cir. 1999). The Fifth Circuit has previously found no *Strickland* prejudice in failing to present evidence of low IQ because "the upper borderline of mild retardation" (where Guevara's IQ falls) does not amount to "any significant organic damage or mental illness."  *Riley*, 362 F.3d at 307 (quotation omitted).

[16]        The record is not entirely clear as to which witnesses Vitale interviewed personally.  Her
(continued...)

23

had conducted with individuals in El Salvador.  She presented information in a narrative that Guevara describes as the "humanizing" and "compelling" story trial counsel should have put before the jury.[17]  (Docket Entry No. 1 at 30).  In her narrative, Vitale referred to declarations and statements she had relied on in creating the social history and provided an appendix listing her source documents.  But Guevara never submitted the underlying information to the state courts. Instead, the state courts had a hearsay-based declaration. The state courts did not extensively discuss this declaration in adjudicating Guevara's claim.[18]

Second, Guevara provided an affidavit from his brother, Benjamin Guevara, detailing his own interaction with the defense team.  Benjamin Guevara claimed that he first heard from the trial-team investigator two weeks before trial.  The investigator "informed [him] that . . . [Guevara] was going to get the death penalty."  When Benjamin Guevara tried to ask questions, the investigator told him to call Guevara's counsel.  Benjamin Guevara stated that the investigator "wanted to call my sister Sonia and I asked him not to.  She was under a lot of stress and I felt that this would upset her

_____

[16]         (...continued)
appendix suggests that she may have interviewed two of Guevara's neighbors, three of his brothers (Jose Benjamin, Felipe, and Jose Marvin Guevara), and his wife.  State Habeas Record at 119-20.  The record does not reveal which of Guevara's siblings were in the United States and available to trial counsel at the time of trial.

[17]         In recognizing that "there are countless ways to provide effective assistance in any given case," the Supreme Court recently cited with approval a case stating that "[t]he current infatuation with 'humanizing' the defendant as the be-all and end-all of mitigation disregards the possibility that this may be the wrong tactic in some cases because experienced lawyers conclude that the jury simply won't buy it." *Pinholster*, ___ U.S. at ___, 131 S. Ct. at 1408 (citing *Pinholster v. Ayers*, 590 F.3d 651, 692 (9th Cir. 2009) (Kozinski, C.J., dissenting)).

[18]         A "mitigation expert" often prepares a life history similar to the declaration prepared by Vitale.  The hearsay-based nature of such a document limits its evidentiary value.  *See Herrera v. Collins*, 506 U.S. 390, 417 (1993) (noting that affidavits submitted in habeas action were "particularly suspect" because they were based on hearsay); *Neill v. Gibson*, 278 F.3d 1044, 1056 (10th Cir. 2001) (holding district court did not abuse its discretion in disregarding inadmissible investigator affidavits presented to support a habeas petition).

more." Benjamin Guevara stated that he unsuccessfully tried to contact trial counsel several times, but they only spoke "on the Sunday before [Guevara's] trial." Benjamin Guevara described the limited discussions he had with trial counsel. "He told me that I should be prepared to testify in court as to our background in El Salvador. He then told me how bad my brother was and how much trouble he was in. He never asked me any questions about my brother's past." State Habeas Record at 137. Benjamin Guevara, however, did not describe what his testimony would have been had trial counsel called him as a witness.[19]

Third, Guevara submitted an affidavit prepared by Dr. Cervantes. Guevara retained Dr. Cervantes to opine on how Guevara's background affected his psychological capacity and behavioral functioning. Dr. Cervantes relied on much of the same information as Vitale. He reviewed "a variety of materials including school reports, investigator reports, court records, social and cultural history interview records, and information obtained through [his] personal interviews with [Guevara], [his brother] Jose Benjamin Guevara, and [his brother] Marvin Guevara." State Habeas Record at 123. Dr. Cervantes framed Guevara's life as one defined by war exposure because of the civil war and unsettled social and political conditions in Guevara's native El Salvador. Dr. Cervantes opined that Guevara, as well as his siblings, suffered psychological injury from that turbulent background in the form of Post-Traumatic Stress Disorder. Guevara also "experienced a significant amount of immigration related stress that compounded pre-migration stress and war exposure," largely because of separation from his home and family while living in a high-crime area of Houston. State Habeas Record at 129-30. Accordingly to Dr. Cervantes, "Guevara's early

---

[19]    Guevara did not provide any affidavit from his sister Sonia or any other way to verify the statements contained in the accounts by his mitigation or psychological experts.

childhood illness and exposure to war related violence made him extremely dependent on his mother . . . [and] resulted in his developing symptoms of PTSD . . . prohibit[ing] him from developing normal social and peer relations[.]"  State Habeas Record at 132.  Notwithstanding that background and a lack of parental supervision when he came to the United States, Guevara "demonstrated a very stable work history and a strong work ethic."  State Habeas Record at 133.  Dr. Cervantes gave a "final opinion based on [Guevara's] work history[,] his family relations and his religious convictions that he poses very little risk for any future violence in a structured, institutional setting."  State Habeas Record at 133.

### b.      *Trial Counsel's Investigation*

Capital defense attorneys have "the obligation to conduct a 'reasonably substantial, independent investigation' into potential mitigating circumstances."  *Neal v. Puckett*, 286 F.3d 236, 236-37 (5th Cir. 2002) (quoting *Baldwin v. Maggio*, 704 F.2d 1325, 1332 (5th Cir. 1983)).  Nevertheless, "[t]rial counsel's failure to present mitigating evidence during the penalty phase is not per se ineffective assistance" if based on reasoned strategic decision making.  *Smith v. Quarterman*, 515 F.3d 392, 405 (5th Cir. 2008); *see also Villegas v. Quarterman*, 274 F. App'x 378, 382 (5th Cir. 2008); *Riley v. Cockrell*, 339 F.3d 308, 316-17 (5th Cir. 2003); *Moore v. Johnson*, 194 F.3d 586, 615 (5th Cir. 1999); *Ransom v. Johnson*, 126 F.3d 716, 723 (5th Cir. 1997).  This court's analysis begins by determining whether the absence of mitigation evidence flowed from strategic decision-making.  *See Wood v. Allen*, ___ U.S. ___, 130 S. Ct. 841, 850 (2010) (distinguishing between "whether counsel made a strategic decision" and "whether counsel's judgment was reasonable"); *Loyd v. Whitley*, 977 F.2d 149, 158 (5th Cir. 1992) ("[W]hether counsel's omission served a strategic

purpose is a pivotal point in *Strickland* and its progeny.  The crucial distinction between strategic

judgment calls and plain omissions has echoed in the judgments of this court.").

On state habeas review, Guevara's attorneys provided three affidavits outlining their efforts

to defend Guevara.  Rodriguez explained that, though the defense team tried to develop information

about Guevara's childhood, they could not present mitigating testimony to that effect at trial.

Rodriguez stated:

> The Defendant was from El Salvador and his parents, as well as his
> siblings, all lived in that country with the exception of one brother.
> He was interviewed by me and it was decided that he would testify
> about the Defendant's upbringing and the violence that engulfed that
> country in the 1980's.  Essentially, the brother would testify that Mr.
> Guevara witnessed some violence and atrocities perpetuated by the
> El Salvador Government soldiers.  In short, that they were constantly
> harassed by the soldiers, as well as the right-wing militia.
>
> During the punishment phase, the State called the mother of the
> youngest victim who was also from El Salvador.  She testified how
> her son had escaped the ravages of violence in her country and how
> they journeyed to the United States to better their station in life.  She
> testified that her son was a hard worker and was doing very well in
> this country as a result of his stalwart determination and desire to
> better himself.  This testimony was not only emotional, but very
> powerful in the eyes of the jury.
>
> Mr. Jerry Guerinot and I both decided that the best course of action
> was to rest after the State'[s] case and not put the brother on the
> witness stand.  Essentially, we felt that the brother's testimony would
> demean the victim and that the jury would not give his testimony any
> mitigation value.

State Habeas Record at 139.  Guerinot filed an affidavit stating that his "recollection of the events

is the same as Mr. Rodriguez."  (Docket Entry No. 1, Exhibit F).

The State secured a second affidavit from Rodriguez that elaborated on the reasons the

defense presented no punishment-phase witnesses.  Rodriguez testified that he "explored mitigation

evidence with [his] client by discussing his growing up in El Salvador during the war."  State

Habeas Record at 201.  Guevara, however, "downplayed his experiences as a child," saying that he

"never saw anyone raped or killed in front of him.  He stated that he had heard of atrocities

happening in the area, and could hear gunshots, but he was never personally threatened or

mistreated."  State Habeas Records at 202.  In fact, "Guevara said the war did not really affect him,

and he left El Salvador because he wanted a better life, and to send money back to his family.  He

did not indicate that leaving his mother behind in El Salvador was traumatic.  [He] did not appear

to still be affected by the war[.]"  State Habeas Record at 202.

The state habeas court found:

> trial counsel interviewed [Guevara] concerning [his] background and
> childhood in El Salvador [and] posed the following questions [to
> which] Guevara answered each question[] negatively: whether [he]
> was personally threatened, mistreated, or harmed by soldiers or
> anyone else involved in the war in El Salvador, whether [he] saw
> anyone raped or killed during the war; whether [he] had suffered a[]
> head injury of any kind; whether [he] had brain surgery; whether [he]
> showed any sign of mental retardation; whether [he] was diagnosed
> with mental retardation; whether [he] had been treated by a doctor,
> psychiatrist, or psychologist; or, whether [he] had been physically or
> sexually abused by a parent or anyone else.

State Habeas Record at 459.

Trial counsel also explored the possibility of calling family members to testify.  Rodriguez

explained:

> In preparation for trial, I talked with Mr. Guevara about family
> members who could come to court and testify in his behalf.  Mr.
> Guevara told me he was from El Salvador originally.  Mr. Guevara
> told me that in terms of family living here in the United States, he had
> only his brother, Benjamin Guevara, and his sister, Sonya Soto, both
> of whom lived in the Houston area.  All the rest of Mr. Guevara's
> family lived in El Salvador.  When I asked him about his family in El
> Salvador coming to Houston for trial, Mr. Guevara said that they did

> not have the money nor the visas to come here, and there was no
> guarantee that the government of El Salvador would let them leave.
> It was my impression that Mr. Guevara's wife, Nancy Guevara, was
> so shocked and devastated by the criminal case that she did not want
> to be involved with Mr. Guevara or his trial.  I asked my investigator,
> John Castillo, to look for Mrs. Guevara, in an attempt to have her
> testify on behalf of Mr. Guevara.  However, Mr. Castillo was not
> successful in finding Mrs. Guevara.

State Habeas Record at 200.  Trial counsel tried to get Guevara's sister "to come to court to say

something good about him because this was such a serious case.  However, [she] was fearful of

coming to court, and wanted no part of the trial process."  State Habeas Record at 200.  The only

family member in the United States who would assist the defense was Guevara's brother, Benjamin

Guevara.

Trial counsel began speaking with Benjamin Guevara several months before trial.  Because

"Benjamin Guevara was . . . the only family member who could provide mitigation evidence at the

punishment stage of trial," the attorneys "kept in close contact with him."  State Habeas Record at

200.  Trial counsel "interviewed Benjamin Guevara and thoroughly discussed [his] client's

background and childhood, especially in regard to growing up in El Salvador at a time when the

country was going through a civil war."  State Habeas Record at 201.  Trial counsel asked Benjamin

Guevara the same questions posed to the defendant.  The answers provided no helpful information.

Trial counsel nonetheless planned to call Benjamin Guevara "at the punishment phase of trial in

regard to what both he and his brother had experienced as children regarding the war in El

Salvador."  State Habeas Record at 202.  Trial counsel thought that they could present "all the

mitigating evidence [they were] made aware of, and with personal details" through Benjamin

Guevara's testimony.  State Habeas Record at 203.  Trial counsel, however, informed Benjamin

Guevara that "the evidence against [their] client was very strong, and [they] prepared him for the worst."  State Habeas Record at 203.

Benjamin Guevara came to court and was ready to testify on the last day of the prosecution's punishment-phase evidence.  Trial counsel then decided not to call him as a witness.  The state habeas court found that trial counsel based their decision not to call Benjamin Guevara as a witness on two factors.  Both involved how the jury would likely weigh his mitigating evidence.  First, as described by Rodriguez, the defense lawyers decided to rest when Maria Flores, the mother of Freddy Marroquin,

> testified that she and her son had escaped the war in El Salvador and moved to the United States to better their station in life.  Ms. Flores testified that her son Freddy was doing well here and working as a security guard at the time of his death.  Ms. Flores' testimony was emotional, and also very powerful in the eyes of the jury.  At that point, there was a break in the trial, and Mr. Guerinot and myself discussed trial strategy during that break.  After that discussion, we mutually agreed that to call Benjamin Guevara to the stand would not be in our client's best interests.  If Benjamin Guevara were to testify regarding the atrocities he and Mr. Guevara experienced growing up in El Salvador, the jury would likely assume those experiences were also shared by the victim and his mother.  We felt that this testimony would not have the effect of mitigating punishment, but would instead have the effect of strengthening the State's victim impact testimony.

State Habeas Record at 204.

Trial counsel discussed these concerns with Benjamin Guevara.  That prompted their second reason for not calling him as a witness.  Trial counsel feared that the jury would compare Guevara to his law-abiding brother should he testify.  The state habeas court found: "trial counsel's decision not to present Benjamin Guevara's testimony was also based on the fact that Benjamin Guevara, who shared [his brother's] upbringing in El Salvador, had no criminal record and held a job, as

opposed to [Guevara's] extensive criminal history, and that [Benjamin] Guevara could only say that [his brother] 'took another path' when counsel asked [him] to explain the difference." State Habeas Record at 460. The defense rested without calling any witnesses in the penalty phase.

Guerinot delivered the closing argument for the defense. He gave a brief statement, lasting only about five minutes, urging the jury to return a life sentence. Clerk's Record at 191. Guerinot did not review the punishment-phase testimony or marshall the trial evidence. Instead, he emphasized that, although "[t]he easy route is to kill" Guevara, the jury could "stop the killing" and "not take another life because one was taken." Tr. Vol. 19 at 5-8. After deliberating for three hours, the jury answered the special issues in a manner requiring the death sentence. Clerk's Record at 191.

On this record, the state habeas court found that Guevara's trial counsel had carefully "weighed and examined" whether to present mitigating evidence and, after "a thorough analysis, consideration, and professional evaluation," made a "strategic decision not to present said information." State Habeas Record at 1792, 1827. The court presumes those findings correct unless Guevara presents clear and convincing evidence otherwise. *See* 28 U.S.C. § 2254(e)(1); *Carr v. Schofield*, 364 F.3d 1246, 1264 (11th Cir. 2004) (treating the question of whether counsel made a strategic decision as a question of fact). "*Strickland* requires . . . [courts to] defer to counsel's decision . . . not to present a certain line of mitigating evidence when that decision is both fully informed and strategic, in the sense that it is expected, on the basis of sound legal reasoning, to yield some benefit or avoid some harm to the defense." *Moore*, 194 F.3d at 615; *see also St. Aubin v. Quarterman*, 470 F.3d 1096, 1102 (5th Cir. 2006); *Riley v. Dretke*, 362 F.3d 302, 306 (5th Cir. 2004). A conscious and informed decision by trial counsel is "virtually unchallengeable."

31

*Strickland*, 466 U.S. at 690; *see also Bower v. Quarterman*, 497 F.3d 459, 467 (5th Cir. 2007);

*United States v. Jones*, 287 F.3d 325, 331 (5th Cir. 2002).

> c.    The Claim of Counsel's Failure to Call Lay Witnesses in the Punishment Phase

Guevara claims that his trial counsel should have called punishment-phase witnesses to put

mitigating evidence before the jury.  Complaints of uncalled witnesses are disfavored "because the

presentation of witnesses is generally a matter of trial strategy and speculation about what witnesses

would have said on the stand is too uncertain."  *Woodfox v. Cain*, 609 F.3d 774, 808 (5th Cir. 2010).

"To prevail on an ineffective assistance claim based on counsel's failure to call a witness, the

petitioner must name the witness, demonstrate that the witness was available to testify and would

have done so, set out the content of the witness's proposed testimony, and show that the testimony

would have been favorable to a particular defense."  *Day v. Quarterman*, 566 F.3d 527, 538 (5th Cir.

2009); *see also Gregory v. Thaler*, 601 F.3d 347, 352 (5th Cir. 2010); *Bray v. Quarterman*, 265 F.

App'x 296, 298 (5th Cir. 2008); *O'Brien v. Dretke*, 156 F. App'x 724, 733 (5th Cir. 2005).[20]

Guevara complains that his trial counsel "denied their client the only viable defense he had"

because "[t]here was a great quantity of mitigating evidence, but the jury did not get to hear any of

it." (Docket Entry No. 1 at 63).  The respondent argues that "[c]onspicuously absent from Guevara's

claim is any indication of how he expects counsel to have introduced any of this evidence at trial.

Aside from his brother Benjamin . . . Guevara identifies no witness who was willing and able to

testify about any of these topics at trial – no friends, no teachers, no family members, not even [his]

---

[20]    Only "[w]hen a petitioner comes forward with affidavits from those non-testifying witnesses attesting under oath as to (1) what they would have said at trial and (2) that in fact they would have testified at trial if they had been asked, [is the Fifth Circuit] chary to reject the uncalled witnesses' statements." *Adams v. Quarterman*, 324 F. App'x 340, 350 (5th Cir. 2009).

wife, children, or parents." (Docket Entry No. 27 at 67). Instead, Guevara apparently relies on Vitale's declaration, describing information from friends and family members. Guevara, however, did not secure an affidavit or other form of competent evidence of what these individuals could have told the jury. Without such competent evidence, "conclusory statements regarding the content of the uncalled witnesses testimony are insufficient to demonstrate ineffective assistance." *Gregory v. Thaler*, 601 F.3d 347, 353 (5th Cir. 2010).

Under clearly established law, Vitale's summary of information provided to her and other investigators was not competent evidence. *See Bruce v. Cockrell*, 74 F. App'x 326, 335 (5th Cir. 2003) (criticizing reliance on the "affidavit of federal habeas counsel's investigator, relating statements allegedly made to her by [the defendant's family]" instead of relying on "any affidavits by the uncalled witnesses themselves, or offer any evidence that they would have been willing to testify at the punishment phase of his trial"). Her declaration did not show that the uncalled witnesses could or would have testified at trial. Nor did the declaration present competent evidence of the content of any testimony these potential witnesses might have provided.[21] The state habeas court largely ignored Vitale's declaration.[22]

---

[21]    When Guevara challenged his trial counsel's punishment-phase preparation in state habeas court, he only made a tentative – and mostly unsubstantiated – proffer of evidence. But this court cannot take at face value that Vitale's declaration fairly represents what trial counsel could have presented at trial. For example, Vitale's affidavit relies on testimony that Guevara's sister, Sonia Sorto, purportedly would have given. The defense team contacted Sorto, but she "was afraid to come to court and wanted no part of the trial process." Her brother Benjamin Guevara told counsel not to contact her "because of the anticipated stress." Guevara himself refused to help his investigator speak with Sorto. State Habeas Record at 458. Similarly, even though Vitale credits testimony Guevara's wife could have given, she "could not be located." Trial counsel had the impression that "she was so shocked and devastated by the offense that she did not want to be involved with [Guevara] or the trial." State Habeas Record at 458. This court cannot assume that trial counsel could have verified the hearsay recitations in Vitale's declaration or obtained evidence similar to what the declaration describes.

[22]    To the limited extent the state habeas court considered Vitale's declaration, it did  not find
(continued...)

Benjamin Guevara provided an affidavit that is the only competent evidence.  The brief affidavit he provided, however, gave no insight as to the substance of information he could have provided the jury.  Instead, he described minimal interaction with the defense team and alleges that trial counsel "never asked me questions about my brother's past."  State Habeas Record at 137.  His account of his conversations with trial counsel conflicts with their affidavits, which describe several contacts and probing questioning.  The state habeas court found trial counsel's version of the events credible.  The state habeas court specifically found that trial counsel "kept in close contact with [Benjamin] Guevara and met with [Benjamin] Guevara several times before trial."  State Habeas Record at 456.  Guevara has not convincingly disputed that finding.

The record shows that trial counsel's interaction with Guevara and his brother Benjamin provided no reason to broaden their investigation into his childhood experiences in El Salvador.  The state habeas court found that trial counsel

> interviewed both [Guevara] and Benjamin Guevara concerning [his] background and childhood in El Salvador . . . and posed the following questions to both . . . [which] both answered negatively: whether [Guevara] was personally threatened, mistreated, or harmed by soldiers or anyone else involved in the war in El Salvador; whether [he] saw anyone raped or killed during the war; whether [he] had suffered a head injury of any kind; whether [he] had brain surgery; whether [he] showed any sign of mental retardation; whether [he] had been treated by a doctor, psychiatrist, or psychologist; or whether [he] had been physically or sexually abused by a parent or anyone.

---

that trial counsel ignored important material.  One employer and two friends "allegedly would have testified that [Guevara] was a hard worker and spent time with his family and that he did not use drugs or alcohol[.]"  A friend would have explained that he "would work and attend church."  State Habeas Record at 473.  Together, these witnesses could have explained that he "was a good worker and a family man."  State Habeas Record at 473.  The state habeas court, however, found that this was not "*meaningful* mitigation" evidence given the evidence that he "had a girlfriend, in addition to his wife" and had a "history of aggravated robberies."  State Habeas Record at 473.

State Habeas Record at 459.  Even though "trial counsel explored possible mitigation evidence arising from [Guevara's] growing up in El Salvador during the civil war," Guevara "downplayed his experiences during the war" and said that it "did not really affect him."  State Habeas Record at 459.[23]  He did not express any distress at separating from his family when he left El Salvador "because he wanted a better life and he wanted to send money back to his family."  State Habeas Record at 459.  In short, the results of trial counsels' discussions with their client and his brother gave them no reason to suppose that additional investigation would uncover meaningful mitigation evidence as described in Vitale's declaration.[24]

Trial counsel did investigate Guevara's background and interviewed witnesses who lived locally.  Trial counsel communicated a strategic reason for calling the only witness for whom Guevara has provided competent evidence.  This court must view the defense efforts through trial counsel's eyes.  *See Harrington v. Richter*, ___ U.S. ___, 131 S. Ct. 770, 788 (2011); *Strickland*, 466 U.S. at 689.  An ineffective-assistance claim focuses on "counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct[,]" because "[i]t is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence[.]"  *Strickland*, 466 U.S. at 689-90; *see also Richter*, ___ U.S. at ___, 131 S. Ct. at 790.

---

[23]     Guevara claims that Rodriguez gave inconsistent accounts of his interaction with Benjamin Guevara.  In one affidavit, Rodriguez said that Benjamin Guevara would testify about "violence and atrocities perpetrated by El Salvador soldiers."  State Habeas Record at 138.  In another affidavit, Rodriguez said that Benjamin Guevara told him that his client had said that soldiers had never threatened Guevara.  State Habeas Record at 363.  Guevara's own assertion to his attorneys that the "war did not really affect him" and "he never saw any atrocities and was never threatened or mistreated" provides context to the state court's reliance on the second account.  State Habeas Record at 459.  Neither Guevara nor his brother have provided an affidavit in federal court providing details about the alleged barbarities Guevara witnessed or suffered in his home country.

[24]     The state habeas court considered the change in their testimony to have come "post-trial, a time when [Guevara] and his family would potentially benefit from such changed reports."  State Habeas Record at 461.

The state habeas court found that, "even though more information could have been found, trial counsel made a reasonable investigation[.]"   State Habeas Record at 462.   Trial counsels' discussions with Guevara and his brother gave them no reason to expand their investigation into Guevara's background.   Attempts to reconfirm that information from individuals such as Guevara's wife and sister met roadblocks.[25]   Guevara has not shown that the state habeas court was unreasonable in finding no constitutional error in the investigation of, and decision not to present, lay witnesses.

### d.    Expert Assistance

Guevara faults trial counsel for not calling an expert such as Dr. Cervantes at trial.  Guevara retained Dr. Cervantes on state habeas review to "investigate and evaluate his cultural and social history and background," with a focus on war trauma, psychological issues, and social maladaptation.  State Habeas Record at 123.  Dr. Cervantes relied heavily on Vitale's declaration, but he also interviewed Guevara and two of his brothers, Benjamin and Marvin.  Dr. Cervantes described Guevara's life as one plagued by the ravages of the war he survived as a youth, exacerbated by an unhealthy environment after immigration that forced him into crime.  Guevara argues that trial counsel should have relied on Dr. Cervantes both to show mitigating evidence and to give the jury reasons to find that he would not be a future threat.

Even though it ultimately proved unfruitful, Guevara's attorneys focused their attention on the information he and his brother could provide.  State Habeas Record at 458-59.  In interviews with Guevara and his brother, trial counsel asked the pertinent questions to learn if expert testimony

---

[25]    Nevertheless, assuming that the information contained in Vitale's declaration is correct, Guevara gave the defense team a version of events that directly contradicted the information she collected. He gave trial counsel no reason to believe that more exploration of his background in El Salvador would be beneficial.

on PTSD or immigrant trauma would be possible defensive theories.  The interviews painted a vastly different picture from that described by Dr. Cervantes.  The interviews did not reveal a highly traumatized childhood.  Instead, Guevara told his attorneys that "the war did not really affect him . . . he never saw any atrocities and was never threatened or mistreated."  State Habeas Record at 459.  Guevara "downplayed his experiences during the war."  State Habeas Record at 459.  On this record, the state habeas court found that "trial counsel reasonably did not present a Post-Traumatic Stress Disorder (PTSD) theory as possible mitigation[.]"  State Habeas Record at 460.

The state habeas court found that Dr. Cervantes's testimony could have hurt the defense.  Had trial counsel presented evidence of the traumatic conditions Guevara faced as a child in El Salvador, the prosecution surely would have countered by contrasting Guevara's life in the United States with that of his victims and his brother (who he alleges trial counsel should have called as a witness).  Benjamin Guevara also came from El Salvador, but he lived a law-abiding life in the United States.  The state habeas court correctly recognized that "Benjamin Guevara, who shared [his] upbringing in El Salvador, had no criminal record and held a job, as opposed to [Guevara's] extensive criminal history[.]"  The only explanation Benjamin Guevara could give for his brother's lawlessness was that he "took another path."  State Habeas Record at 460.  Comparing those paths would likely eviscerate any mitigation gains in the defense case.

The state habeas court also looked skeptically on Dr. Cervantes's expert opinions.  The state habeas court expressly found his affidavit "unpersuasive," largely because it was based on facts different from what Guevara told his attorneys.  State Habeas Record at 460-61.  The state habeas court also found that Dr. Cervantes's opinions ignored the reality of Guevara's life.  "[I]n light of [Guevara's] extensive, repeated history of violence, in particular the . . . killing of three people in

the span of a few hours and [his] violent aggravated robbery spree in the month before [the murders]," the state habeas court found "unpersuasive" Dr. Cervantes's opinion that Guevara "supposedly 'poses very little risk' of future dangerousness in a structured setting because of his 'work history, his family relations and his religious conviction[.]" State Habeas Record at 463.

In sum, the state habeas court reasonably found that trial counsel did not provide ineffective assistance in failing to call an expert witness such as Dr. Cervantes. The standard is not whether counsel could have done more. *See United States v. Hasting*, 461 U.S. 499, 508 (1983). "There are . . . countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way." *Richter*, ___ U.S. at ___, 131 S. Ct. at 788. But the Supreme Court recently emphasized that "the Federal Constitution imposes one general requirement: that counsel make objectively reasonable choices." *Bobby v. Van Hook*, ___ U.S. ___, 130 S. Ct. 13, 17 (2009) (quoting *Roe v. Flores-Ortega*, 528 U.S. 470, 479 (2000)); *see also Gentry*, 540 U.S. at 8 ("The Sixth Amendment guarantees reasonable competence, not perfect advocacy judged with the benefit of hindsight."). The state habeas court was not unreasonable in finding that trial counsel's punishment phase performance met constitutional expectations.

### 2. The Claims that Counsel Was Ineffective for Failing to Object to Victim-Impact Testimony (Claims Five and Seven)

The prosecution called the son of Tae Youk, one of the victims, to describe his father's life. According to the state habeas court's summary of his testimony, the son explained "that [his father] came to the United States from Korea, graduated from theology school in Houston, worked as a pastor for twenty-three years, and had been working at the convenience store for only a few months to support his family." State Habeas Record at 455. Because Tae Youk "had obtained a special religious worker's visa," his "entire family was subject to deportation as a result of the murder."

38

State Habeas Record at 455.  The prosecution also called two of Gerardo Yaxon's family members.  They testified that Yaxon "came from Guatemala in 1997 and worked two jobs eleven hours a day" and "was sending money home to his family . . . and saving money so he could return to Guatemala."  State Habeas Record at 455.  Defense counsel did not object to this testimony.

The prosecution did not limit its presentation to the effect of Guevara's crimes on the victims listed in the indictment.  The prosecution called as its last witness Maria Flores, the mother of Freddy Marroquin.  Guevara killed Marroquin a few hours after the murders for which the jury convicted him.  Maria Flores began crying when asked to identify a photograph of her son, prompting the parties to stipulate to Marroquin's identity outside the jury's presence.  Maria Flores's testimony on direct discussed her son's childhood in El Salvador:

| | |
|---|---|
| The State: | Was Freddy born in this country? |
| Flores: | No, he was born in El Salvador. |
| The State: | Why did you and your family come to the United States? |
| Flores: | I wanted to – my children to prosper and to have a better life, a better future for them to be someone in life and for them to [be] able to raise them with pride. |
| The State: | Was something going on in El Salvador at the time you left with your family? |
| Flores: | There was a war. |
| The State: | Was that a civil war? |
| Flores: | Yes. |
| The State: | Was it a dangerous place? |
| Flores: | Twenty-four hours a day. |
| The State: | How old was Freddy when he came to the United States? |

39

| Flores: | He was between 5 and 6 years old |
|---|---|
| The State: | Let me ask you where Freddy was working at the time he died? |
| Flores: | He was working as a security guard at some condominiums. |
| The State: | How has your son's death affected you? |
| Flores: | It has affected me as much as if I were dead in life. |

Tr. Vol. 18 at 111-12.[26]  The defense did not cross-examine Maria Flores.

Guevara alleges that trial counsel should have objected that Maria Flores gave impermissible victim-impact testimony.  Guevara also faults appellate counsel for not bringing that claim on direct review.  The Constitution "erects no per se bar" to victim-impact testimony.  *See Payne v. Tennessee*, 501 U.S. 808, 827 (1991); *see also Beazley v. Johnson*, 242 F.3d 248, 257 (5th Cir 2001). Texas  law limits the prosecution's ability to present evidence about victims not identified in the indictment, but Texas law does not preclude prosecution from presenting all evidence about the victim of an extraneous offense.  *See Mathis v. State*, 67 S.W.3d 918, 928 (Tex. Crim. App. 2002) (finding no error in the admission of testimony from the caregiver of a victim injured in the same criminal episode but not named in the indictment because the testimony did not involve the character of the victim or the effect of her injuries on third persons).  The Court of Criminal Appeals has held that an "unacceptably high" danger of "unfair prejudice [is] inherent in the introduction of 'victim impact' evidence with respect to a victim not named in the indictment[.]"  *Cantu v. State*, 939 S.W.2d 627, 637 (Tex. Crim. App. 1997).  Under *Cantu*, the prosecution was limited in asking Maria Flores about her son's good character and the effect of his loss on her life.

---

[26]    On one hand, Guevara claims that this was "not . . . dramatic testimony," but on the other hand calls it "very emotional," "powerful," and "powerfully emotional."  *Compare* Docket Entry No. 1 at 48 *with* 50.

The state habeas trial court found that, under Texas law, Maria Flores's testimony did not amount to impermissible victim-impact testimony. State Habeas Record at 464, 474. The Court of Criminal Appeals, however, did not adopt that factfinding. The Court of Criminal Appeals declined to explain why it did not affirm the lower court's holding, other than to say that certain findings and conclusions "are not supported by the record or they are contrary to the law."[27]

The state habeas court found no "reasonable probability that the results of the appellate proceedings would have been different if appellate counsel had presented . . . the claim of ineffective assistance of trial counsel based on the lack of objection to Maria Flores' testimony." State Habeas Record at 475. Guevara's strongest complaint is that Maria Flores's testimony compelled defense counsel to abandon their intention to call Benjamin Guevara as a witness. (Docket Entry No. 1 at 48). Trial counsel's affidavits include Maria Flores's as one factor behind their decision for not calling him as a witness. Trial counsel, however, provided a second and separate reason for not calling Guevara's brother to testify. Guevara shared the same childhood experiences in El Salvador as his brother, who was not a violent criminal. The state habeas court found that:

> counsel's decision not to present Benjamin Guevara's testimony was also based on the fact that Benjamin Guevara, who shared [Guevara's] upbringing in El Salvador, had no criminal record and held a job, as opposed to [Guevara's] extensive criminal history, and that [Benjamin] Guevara could only say that [his brother] 'took another path' when counsel asked [him] to explain the difference.

---

[27] Notwithstanding Texas state law, it is not clear that the federal Constitution required that result. *See Thompson v. Thaler*, ___ F. App'x ___, 2011 WL 2748100 (5th Cir. July 13, 2011). Here, however, the question is whether trial counsel should have made the objection, not whether federal constitutional law would require the trial court to sustain the objection. However, even had the trial court erroneously allowed the testimony over counsel's objection, the Court of Criminal Appeals found that testimony harmless when Guevara raised the issue on habeas review.

State Habeas Record at 460.  Independent of Maria Flores's testimony, trial counsel provided a legitimate strategic reason for not calling Benjamin Guevara.  The discussion of prejudice from Maria Flores's testimony focuses on what was presented at trial rather than what was not.  Maria Flores "was one of twenty-eight punishment witness[es] . . . [her] testimony comprised only five out of approximately 350 pages of punishment testimony . . . and the State did not refer to [her] testimony during jury argument."  State Habeas Record at 464.  The Court of Criminal Appeals left intact the conclusion that her testimony was "harmless."  State Habeas Record at 474.

Because the Court of Criminal Appeals did not adopt the lower court's finding of no *Strickland* deficient performance, this court focuses on the prejudice from this omission.  The issue of prejudice is analyzed below in conjunction with other claims of prejudice from the alleged ineffective assistance.

### 3.    The Claims that Trial Counsel Was Ineffective for Failing to Give an Adequate Penalty Phase Summation  (Claim Six)

Trial counsel only spoke briefly during the punishment-phase closing arguments.  The thrust of trial counsel's short summation was that choosing death would be easy for the jury, but they should show restraint and choose life.  Tr. Vol. 19 at 5-8.  Guevara argues that the closing was too short to address the weighty considerations before the jury.  And Guevara claims that the content of the closing argument – particularly trial counsel's admission that the case was one of the worst he had seen – did not help his defense.

Guerinot began by asking a question.   "How do we stop the killing?  I don't know the answer to that.  I don't think you folks do.  Obviously one answer is that we know if we kill Alexander Guevara it stops for him forever.  And maybe that is the answer.  I don't know.  I don't know because I am not over where you are."  He conceded that "in 29 years I have seen few cases

match this.  Very few.  It is a hard decision.  It is a decision that ought to be gut wrenching and it is.  It is hard to sentence another human being to death.  You can view it as, Well, Mr. Guevara sentenced three people to death within an hour and five minutes and never gave them a trial.  That's obvious.  That's an easy answer."  Guerinot, however, urged the jury not to take the easy way out: "How do we stop the killing?  I don't know.  A great Roman general said once, What we do in life echoes for eternity.  His legacy is damnation.  What will yours be?  Can you come out and say I attempted to stop the killing by not killing another human being?  I would ask you to answer these questions in such a way that there is where you end up.  I tried to stop the killing by not killing him."  Tr. Vol. 19 at 5-8.

Trial counsel's state habeas affidavit did not provide an explanation for giving such a brief summation.  The case law clearly recognizes the "strong presumption that counsel's attention to certain issues to the exclusion of others reflects trial tactics rather than sheer neglect."  *Richter*, ___ U.S. at ___, 131 S. Ct. at 790 (quotations omitted).  This court must "not simply . . . give the attorneys the benefit of the doubt," but also "affirmatively entertain the range of possible reasons . . . counsel may have had for proceeding as they did[.]"  *Pinholster*, ___ U.S. at ___, 131 S. Ct. at 407.  This is particularly true with respect to a habeas petitioner's challenge to a closing argument.  The Supreme Court has instructed that

> counsel has wide latitude in deciding how best to represent a client, and deference to counsel's tactical decisions in his closing presentation is particularly important because of the broad range of legitimate defense strategy at that stage . . . . Judicial review of a defense attorney's summation is therefore highly deferential – and doubly deferential when it is conducted through the lens of federal habeas.

*Gentry*, 540 U.S. at 5-6.  When a challenge to trial counsel's summation "is to the strategy employed by trial counsel. . . [s]uch a challenge does not establish ineffective assistance."   *Coble v. Quarterman*, 496 F.3d 430, 437 (5th Cir. 2007).

Trial counsel faced a jury that had heard extensive evidence of Guevara's violence.  Trial counsel did not jeopardize his own credibility with the jury by discounting the prosecution's evidence.  Instead, he pleaded for the jury not to continue the killing.  The state habeas court found that trial counsel's "initial acknowledgment of the offense and [his client's] many victims . . . is a reasonable attempt for counsel to maintain credibility with the jury[.]"  State Habeas Record at 464. Trial counsel's argument gave the jury several

> reasons [to] return a life sentence: that a death sentence would not be the better punishment even though it would be easier to assess; that a life sentence would mean that [Guevara] lived the rest of his life in a cage, being told what to do, never holding any of his family members, never hearing a kind word, and living with the rest of the predators of the world; and, that, in contrast, a death penalty would mean putting an end to [his] suffering by peacefully putting [him] to sleep.

State Habeas Record at 464-65.  Trial counsel then argued that the "best course of action would be for the jury to show restraint, not to exact revenge[.]"  State Habeas Record at 465.  Trial counsel urged the jury to let Guevara accept a "legacy [of] eternal damnation," while the jury chose a "legacy . . . [to] help[] put an end to violence by not killing" Guevara.  State Habeas Record at 465.

Perhaps other attorneys would have approached summation differently.  But given the significant deference afforded trial counsel's actions, and given his strategy in closing argument, this court finds that the state court's rejection of Guevara's claim was reasonable.  *See* 28 U.S.C. § 2254(d)(1).

### 4.    The Claims that Counsel's Performance Caused Prejudice

The state habeas court found that Guevara "fail[ed] to show harm" from defense counsel's representation and particularly emphasized Guevara's "escalating violence" and the "overwhelming punishment evidence of [his] violent, escalating crime spree." State Habeas Record at 473. Weighing Guevara's allegations of deficient performance against the trial record, the state courts found no *Strickland* prejudice. Even if trial counsel had acted as Guevara alleges, he cannot show that the state habeas court was unreasonable in finding no *Strickland* prejudice.

The state habeas court's order repeatedly found that the overwhelming evidence against Guevara, particularly as to the nature of his violent criminal behavior, outweighed any available mitigating evidence. *See Wong v. Belmontes*, ___ U.S. ___, 130 S. Ct. 383, 390 (2009) ("[T]he reviewing court must consider all the evidence – the good and the bad – when evaluating prejudice."). Guevara had killed three people in a short period. He had a history of violent aggravated robberies. His acts of violence included the severe "unprovoked beating of a victim." He had killed "[Freddy] Marroquin just to steal a gun." He had committed a "violent, escalating crime spree." State Habeas Record at 475. As the state habeas court observed, Guevara was not only violent, he was cruel. He committed the "unprovoked beating of a victim" and then made "bragging, demeaning comments identifying his victims as 'Ghandis', [and]. . . us[ing] his victim's stolen credit card to buy items [at] an adult video store as a joke[.]" State Habeas Record at 464. He showed no remorse. Even given the full range of evidence Guevara gathered after trial and presented on federal habeas review, the overwhelming aggravating evidence put on by the prosecution shows that the state habeas court was not unreasonable in finding no *Strickland*

prejudice.  *See Ladd v. Cockrell*, 311 F.3d 349, 360 (5th Cir. 2002) (finding that if the "evidence of . . . future dangerousness was overwhelming . . . it is virtually impossible to establish prejudice").

This court denies Guevara's ineffective assistance of counsel claims.  Based on the record, he has not shown prejudice.

### D.    The Claim of Conflict With Counsel (Claims Eight and Nine)

In his ninth claim, Guevara asserts that the trial court violated his constitutional rights by failing to substitute his attorneys when an unresolvable conflict emerged.[28]  His eighth claim faults appellate counsel for not raising the issue on appeal.  Guevara bases these claims on letters, dated May 9, 10, and 16, 2001,[29] which bear his signature, though he contends they were written for him by another person.  Clerk's Record at 145-51.  On May 9, 2001, Guerinot informed the trial court during jury selection that Guevara wished to make a statement.  Guevara, through an interpreter, stated: "I just want to know if I would have the right to have all of my motions about all of what

---

[28]    The respondent argues that this claim is unexhausted and defaulted.  (Docket Entry No. 27 at 95).  While acknowledging that Guevara raised a state habeas claim based on the same factual scenario, the respondent asserts that Guevara has altered his legal argument in a manner that makes his claim unexhausted.  Specifically, the respondent characterizes Guevara's state habeas claim as championing an absolute right to appointed counsel of choice, and his federal claim as one of trial-court error for failing to investigate a potential conflict between Guevara and his attorneys.  While Guevara's state habeas application argued that the Constitution should allow a criminal defendant to chose his appointed attorneys, he specifically stated that "[b]ecause of the trial court's failure to hold even a minimal inquiry into [his] substantial complaints about his attorneys, [the state habeas court] should reverse the judgment and sentence and remand for new trial."  State Habeas Record at 43.  The state habeas court's findings and conclusions recognized Guevara's claim as an attack on the trial court's vigilance, not as asserting an unfettered right to pick appointed attorneys.  Guevara has exhausted his federal claim.

[29]    On state habeas review, Guevara alleged that he sent the letters in March, not May, 2001. State Habeas Record at 40-41.  The state habeas court's factual findings recognized that "the letters in the clerk's file are dated May 9, 2001; May 10, 2001; and, May 16, 2001, not March 2001[.]"  State Habeas Record at 466.  Guevara's federal petition closely follows the background  for this claim that he presented in his state habeas application.  (Docket Entry No. 1 at 71-72).  He again contends that he filed the letters in March, notwithstanding the clear date on the letters themselves, but does not provide any explanation for persisting in that argument in federal court.

is happening here, because I have been asking my attorneys for them and they haven't given me anything." Tr. Vol. 8 at 115. Guevara then clarified that he "would like a copy of the police report." Tr. Vol. 8 at 116. The trial judge told Guevara that while his attorneys could view the police report, he could not have a copy. Tr. Vol. 8 at 116. The trial judge then asked if Guevara wanted "the complaining witness's statements." Tr. Vol. 8 at 116. When Guevara answered in the affirmative, his trial counsel clarified that "it is obvious the complaining witnesses are dead. They made no statements." Tr. Vol. 8 at 117.

Guevara sent the trial judge letters during jury selection. In his first letter dated May 10, 2001, Guevara cites an exchange with one of his lawyers, Rodriguez. Guevara asserts that he told Rodriguez that he wanted to "cop a plea," but was told "no plea is await [*sic*] for me, so he told me to stop asking, and said to me how many time [*sic*] are you going to ask the same stupid ass questions you damn moron[.]" Clerk's Record at 145. The letter asked the trial judge to "look into the matter" and "appoint . . . another attorney." Clerk's Record at 145. Guevara's letter did not complain about cocounsel, Guerinot. That same day, Guevara sent the trial court a copy of a letter he wrote to Guerinot asking for copies of some motions "so I am able to make better informed decisions." Clerk's Record at 146. The next day, Guevara wrote another letter to the judge complaining that he had not "heard anything about [his] motions." Clerk's Record at 148. On May 16, 2002, Guevara wrote a third letter. He stated that both his attorneys were "not assisting [him] what[] so ever[.]" He alleged that Guerinot was "not helping [him] at all" and asked the court to "look into the matter[.]" Clerk's Record at 150-52. The record does not show that the trial court acted on these letters.

Trial counsel responded to these letters in affidavits filed in the state habeas court. Rodriguez explained:

> Because I am fluent in the Spanish language, I was able to easily communicate with Mr. Guevara. My relationship with Mr. Guevara was not contentious or conflict-ridden. I have never used profanity against Mr. Guevara or called him insulting names. Mr. Guevara was inquisitive, and I went out of my way to answer all of his questions, especially since Mr. Guevara's life was on the line.

State Habeas Record at 198. Rodriguez also detailed his efforts to explain the evidence to Guevara. According to Rodriguez, notwithstanding the evidence and his own confession, Guevara "simply stated that he did not do this crime, and that he could not be convicted since his prints were not at the crime scene." Rodriguez told Guevara that the prosecutors had "made it clear from the beginning that they would not be offering Mr. Guevara a plea bargain, but instead, would only be seeking the death penalty from a jury." According to Rodriguez, Guevara still insisted that counsel reach a plea agreement:

> Mr. Guevara stated that he would plead guilty in exchange for a plea bargain offer of 40 years in prison, and I explained to him repeatedly that the State would not make him that offer. In fact, I recall that I asked [Assistant District Attorney Di] Glaeser to relay that to Mr. Guevara, and with me present, interpreting into Spanish for Mr. Guevara, Ms. Glaeser explained to Mr. Guevara that she would not offer him a plea, but instead was seeking the death penalty from the jury.

Rodriguez did not remember Guevara ever asking for the appointment of new counsel, contacting the trial judge, or having any conflict with the attorneys. Rodriguez also did not know that Guevara had written any letters to the trial judge. State Habeas Record at 197-99.[30]

---

[30]    The state habeas court also explained why it took no action on the letters:

The Court finds that the presence of letters in the clerk's file does not

(continued...)

48

The state habeas court found trial counsels' affidavits credible.  The state habeas court explicitly found "that counsel's relationship with [Guevara] was not contentious or conflict-ridden" and that trial counsel did not use disparaging language toward him.  State Habeas Record at 465.  The state habeas court also found that Guevara's "claims of alleged personality conflict and disagreements concerning trial preparation do not constitute grounds for withdrawal of counsel and do not rise to a level that would obligate the trial court to initiate an inquiry."  State Habeas Record at 466.  The state habeas court concluded that it had not erred by not investigating the possibility of a conflict, particularly because Guevara "fail[ed] to show that such conflict existed, if at all, to a level so that the trial court was aware of an alleged conflict problem and so that trial court was obligated to make such inquiries."  State Habeas Record at 476.  Guevara's letters did not "necessitat[e] withdrawal of counsel and appointment of new counsel."  State Habeas Record at 477.  In sum, Guevara "fail[ed] to show that there existed any conflict that affected the adequacy of representation provided by . . . trial counsel[.]"  State Habeas Record at 477.  The trial court rejected Guevara's claim that trial counsel was insulting, dismissive, and inattentive.  The trial judge had viewed Guevara's interaction with his attorneys and heard his oral complaint about not receiving copies of "motions."  Relying on trial counsel's affidavit and her own recollection, the

---

<sup>30</sup> (...continued)
ensure that the trial court received or reviewed such letters; the court has no recollection of ever seeing these letters; . . . the letters were dated during the midst of jury selection after counsel had prepared for trial and presented [Guevara] in pre-trial proceedings; and, that a change of counsel at that point in [his] trial would likely have thrown the proceedings into disarray, obstructed the judicial process, and interfered with the administration of justice.

State Habeas Record at 466.

state habeas judge found no objective indicia of a conflict between Guevara and his attorneys. Guevara has not rebutted the state-court findings on this claim.

Even if the trial court were aware of a conflict, either by observation or by Guevara's letters, the respondent persuasively argues that Guevara has not shown an entitlement to relief. The circumstances before the trial court – assuming that the trial court was aware of Guevara's letters – were not so egregious so as to require appointing new counsel. The Constitution does not guarantee an indigent defendant the counsel of choice. *See Neal v. Texas*, 870 F.2d 312, 315 (5th Cir. 1989) ("[T]here is no constitutional right to representation by a particular attorney."); *United States v. Snyder*, 707 F.2d 139, 145 (5th Cir. 1983) ("Although the sixth amendment's right to counsel in criminal cases is absolute, an accused right to *particular* counsel is not."). Consistent with the Sixth Amendment's "limited" guarantee of a fair trial, "[w]hen examining any alleged deprivation of the right to counsel, we must therefore focus upon the interests of the adversarial process, not on the defendant's relationship with any particular lawyer." *United States v. Hughey*, 147 F.3d 423, 428 n.2 (5th Cir. 1998). The issue is whether the problems between a petitioner and his attorney prevented effective assistance. If an inmate's "claim was insubstantial" and "he received vigorous and able representation at trial," then personality conflicts and other complaints about an attorney's service survive constitutional examination. *Untied States v. Young*, 482 F.2d 993, 995-96 (5th Cir. 1973); *see also United States v. Dilworth*, 524 F.2d 470, 472-73 (5th Cir. 1975). This court has already extensively reviewed the specific complaints Guevara has raised about his trial counsel's representation. Based on that review, the court finds that Guevara has not shown that any failure to inquire into a potential conflict prejudiced his defense.

Because Guevara has not shown that a conflict existed that required dismissal of his trial attorneys on the eve of trial, or that his trial or appellate attorneys provided ineffective assistance as alleged, he has not shown that the state court's adjudication was contrary to, or an unreasonable application, of federal law.  *See* 28 U.S.C. § 2254(d)(1).  These claims are denied.

### E.     The Claims Relating to the Future-Dangerousness Special Issue (Claims Ten and Eleven)

At the time of Guevara's trial, Texas law allowed for two sentences after a capital conviction: death or life with parole eligibility after 40 years of incarceration.  The jury answered two questions.  One asked the jury if they found "beyond a reasonable doubt that there is a reasonable probability that the Defendant, Gilmar Alexander Guevara, would commit criminal acts of violence that would constitute a continuing threat to society."  Guevara asserts that reliance on a jury finding of future dangerousness in the penalty phase violates the Constitution.  (Claim Eleven).  Guevara alleges that juries cannot reliably predict whether a defendant may continue to pose a societal threat decades in the future.  As a result, Guevara argues that the future-dangerousness special issue encouraged jurors to find him worthy of a death sentence rather than risk the chance of his reoffending after serving a life sentence.  Guevara asserts that asking jurors to prognosticate future dangerousness forces them to abandon the beyond a reasonable doubt standard.  Guevara also asserts that even if the question can constitutionally be asked, the State failed to prove beyond a reasonable doubt that he would be a continuing societal threat.  (Claim Ten).

A procedural bar forecloses review of Claim Eleven.  The state habeas court found that Guevara defaulted judicial consideration on that issue by not objecting at trial.[31]  State Habeas Record at 467, 478.  Guevara makes no effort to overcome the procedural bar.

In the alternative, the state habeas court found no merit to this claim.  The state habeas court found that Guevara "fail[ed] to show that his constitutional rights were violated by the wording of the future dangerousness special issue or the standard of proof required for the special issue[.]"  State Habeas Record at 478.  However difficult predicting future dangerousness may be, the Constitution allows Texas to base its capital sentencing decision on that question.  *See Jurek v. Texas*, 428 U.S. 262, 274-75 (1976).  The Supreme Court "has approved the jury's consideration of future dangerousness during the penalty phase of a capital trial, recognizing that a defendant's future dangerousness bears on all sentencing determinations made in our criminal justice system." *Simmons v. South Carolina*, 512 U.S. 154, 162 (1994).  "It is, of course, not easy to predict future behavior. The fact that such a determination is difficult, however, does not mean that it cannot be made."  *Jurek*, 428 U.S. at 274-75.  Essentially,

> [t]he task that a Texas jury must perform in answering the statutory question in issue is thus basically no different from the task performed countless times each day throughout the American system of criminal justice. What is essential is that the jury have before it all possible relevant information about the individual defendant whose fate it must determine. Texas law clearly assures that all such evidence will be adduced.

---

[31]     In doing so, the state court relied on the Texas contemporaneous objection rule. "The Texas contemporaneous objection rule has long been recognized in Fifth Circuit jurisprudence. The essence of the rule is that in order for a party to preserve an issue for appellate review, that party must have made a timely objection with specific grounds for the desired ruling-unless apparent from the context." *Livingston v. Johnson*, 107 F.3d 297, 311 (5th Cir. 1997). The Fifth Circuit "has consistently held that the Texas contemporaneous objection rule constitutes an adequate and independent state ground that procedurally bars federal habeas review of a petitioner's claims." *Fisher v. Texas*, 169 F.3d 295, 300 (5th Cir. 1999); *see also Cotton v. Cockrell*, 343 F.3d 746, 754 (5th Cir. 2003).

*Jurek*, 428 U.S. at 275-76.  Because "the likelihood of a defendant committing further crimes is a constitutionally acceptable criterion for imposing the death penalty," *Barefoot v. Estelle*, 463 U.S. 880, 896 (1983), Guevara's constitutional challenge lacks merit.[32]

In his tenth claim, Guevara complains that the evidence in this case would not allow the jury to forecast his future violence.  Guevara argues that the evidence did not show that he would be a penological concern while incarcerated.  As a result, the jury had to focus on whether he would hypothetically be a future danger decades later.  Guevara contends that insufficient evidence showed that he would be a continuing threat when he became a candidate for release at almost 60 years of age.

Under *Jackson v. Virginia*, 443 U.S. 307 (1979), a reviewing court affirms a jury's decision if, when considering all of the evidence in a light most favorable to the prosecution, any rational trier of fact could have returned a verdict unfavorable to the defendant.  The AEDPA makes this a doubly deferential standard.  A federal court may question only whether the state court's assessment of the already deferential *Jackson* standard was unreasonable.  *See Garcia v. Carey*, 395 F.3d 1099, 1103 (9th Cir. 2005) (noting that the AEDPA "adds a second level of deference" to the *Jackson* standard); *Torres v. Mullin*, 317 F.3d 1145, 1151 (10th Cir. 2003) ("[The] AEDPA ha[s] added an additional degree of deference to state courts' resolution of sufficiency of the evidence questions.").  This court must decide whether the state court reasonably applied the *Jackson* analysis in deciding that Guevara would be a future threat.  *See Williams*, 529 U.S. at 407.

---

[32]     The Fifth Circuit has rejected a similar claim in an unpublished case.  *See McCullum v. Dretke*, 89 F. App'x 888, 892 (5th Cir. 2004).

The prosecution's punishment-phase evidence proved that Guevara was extremely violent. On the same day he committed the capital murders for which the jury convicted him, he killed another man.  Those murders were the latest events in a series of increasingly violent acts.  As a teenager, Guevara had several convictions for various types of theft.  As he aged, he became increasingly and uncontrollably violent.  He repeatedly engaged in aggravated robberies in which he unnecessarily and senselessly attacked his victims.  The jury had little reason to believe that incarceration would make Guevara less aggressive or that time would make him more law-abiding. As the Texas Court of Criminal Appeals stated:

> The evidence presented at trial demonstrates [Guevara's] complete disregard for the sanctity of human life. . . .  The State also presented evidence revealing [Guevara's] lack of remorse over the murders. . . . Further, the State presented evidence of a number of prior crimes [he] had committed. . . .  Taken together, the facts of the instant case and [his] history, which shows an escalating pattern of violence, permit a rational jury to conclude that [he] would continue to be a threat to society.

*Guevara*, 97 S.W.3d at 581-82.

Guevara has not shown that the jury based its assessment of his future dangerousness on constitutionally infirm or insufficient evidence.  The state court's rejection of Guevara's tenth and eleventh claims was not contrary to, or an unreasonable application of, federal law.  *See* 28 U.S.C. § 2254(d)(1).

### F.    The Claim Relating to the Texas Dual-Track Capital Postconviction Review (Claim Twelve)

Guevara claims that the Texas capital habeas procedure violates due process.[33]  In 1995, the Texas legislature revised its capital habeas corpus statute and made the direct appeal and habeas corpus proceedings advance concurrently.   Guevara argues that this dual-track system of adjudication denigrates the traditional role of habeas corpus proceedings, impairs the thorough maturation of claims, stifles development of ineffective assistance of counsel arguments, and impedes fair judicial review.   The state habeas court found that Guevara did not show a constitutional violation and did not show that the Texas postconviction review caused him to default judicial review of any issue.  State Habeas Record at 479.

Guevara has not shown that the Texas statutory scheme violated his constitutional rights. The Supreme Court has never placed constitutional requirements on a state's method of making habeas review available to its prisoners.  In fact, the Supreme Court has held that "[s]tate collateral proceedings are not constitutionally required[.]" *Murray v. Giarratano*, 492 U.S. 1, 10 (1989); *see also Pennsylvania v. Finley,* 481 U.S. 551, 557 (1987) ("States have no obligation to provide [a habeas] avenue of relief.").  Guevara's complaints about the Texas habeas procedure do not show that he "is in custody in violation of the Constitution or laws or treaties of the United States," 28 U.S.C. § 2254(a), but instead challenge a matter collateral to his conviction and sentence.  This court a basis to grant habeas relief on Guevara's twelfth claim.

---

[33]       The state habeas court found that Guevara procedurally defaulted this claim because he "did not object," presumably at trial.  State Habeas Record at 467.  Texas law, however, does not specify when an objection to the state habeas corpus statute becomes ripe.  Respondent does not rely on the state procedural rule to bar federal review of this claim.

### G.    The Claim Relating to the Right to Consular Access (Claim Thirteen)

Guevara is a native and citizen of El Salvador.  He claims that the State of Texas violated international law by not giving him access to consular officials on his arrest.  Guevara's arrest triggered a right to consular assistance under the Vienna Convention on Consular Relations ("Vienna Convention"), Apr. 24, 1963, [1970] 21 U.S.T. 77, T.I.A.S. No. 6820.  The Vienna Convention "provides that if a person detained by a foreign country so requests, the competent authorities of the receiving State shall, without delay, inform the consular post of the sending State of such detention, and inform the detainee of his right to request assistance from the consul of his own state." *Medellin v. Texas*, 552 U.S. 491, 499 (2008) (quotation omitted).  "In other words, when a national of one country is detained by authorities in another, the authorities must notify the consular officers of the detainee's home country if the detainee so requests." *Sanchez-Llamas v. Oregon*, 548 U.S. 331, 338 (2006).

Guevara apparently requested that the State of Texas notify the Salvadorian consulate of his arrest.  Guevara asserts that the State of Texas did not comply with that request, preventing him from receiving assistance from Salvadorian officials.  Guevara claims that Salvadorian authorities would have provided comprehensive assistance which would have aided him at trial, mostly through the effective defense that he alleges his trial attorneys did not offer.  The respondent argues that this court should deny relief because: (1) Guevara procedurally defaulted this claim in state court; (2) Texas complied with its obligation under the Vienna Convention; and (3) Guevara has not shown an actionable legal basis for habeas relief.

When Guevara first raised his Vienna Convention claim in his initial state habeas application, the state habeas court found that Guevara "did not object either pre-trial or during trial

56

to any alleged violation of the Vienna Convention on Consular Relations."  State Habeas Record at 468.  The state habeas court concluded that Guevara was "procedurally barred from presenting such habeas claim."  State Habeas Record at 479.  Because Guevara has not shown that he can overcome the procedural bar, this court cannot reach the merits of his Vienna Convention claim.[34]

Even if this court could reach the merits, Guevara has not shown that the State of Texas failed to comply with international treaty obligations.  The state habeas court found that "on June 11, 2000, the presiding hearing officer, while giving [Guevara] his magistrate warnings, notified [him] of his right to contact his country' consular representatives, and that the notification was documented both in English . . . and in Spanish[.]"  State Habeas Record at 468.  Guevara signed the notification of his consular rights.  The state habeas court found that "on June 11, 2000, the Harris County District Clerk, Detention Court, notified the El Salvadoran consulate by fax of [Guevara's] arrest[.]"  State Habeas Record at 468.  The trial court again notified Guevara "of his right to contact his consulate, a notification that was translated for" him.  State Habeas Record at 468.  Guevara did not ask his trial attorneys to "notify the El Salvadoran consulate, notwithstanding [Guevara] being twice admonished of his right to contact his consulate."  State Habeas Record at 468.  Based on those factual findings, the state habeas court held that the State of Texas had

---

[34]    In *Breard v. Greene*, 523 U.S. 371 (1998), the Supreme Court considered the effect of the procedural default doctrine on a prisoner's Vienna Convention claim.  Recognizing that federal courts "should give respectful consideration to the interpretation of an international treaty rendered by an international court," the Supreme Court nonetheless found that, "absent a clear and express statement to the contrary, the procedural rules of the forum State govern the implementation of the treaty in that State."  *Id.* at 375.  The Supreme Court held that the procedural default doctrine could bar consideration of a Vienna Convention claim.  *See id.* at 375-76.  The Supreme Court has reiterated that the Vienna Convention does not supplant the independence of the States.  *See Sanchez-Llamas*, 548 U.S. at 351-52 (refusing to reconsider *Breard*).  The state habeas court correctly noted that international law "does not obviate the Texas rule of contemporaneous objection and default."  State Habeas Record at 469.

adequately informed Guevara of his right to consular access and had notified the Salvadorian officials of his arrest.  State Habeas Record at 479-80.

Even if Guevara was correct that Texas violated the Vienna Convention, federal precedent does not allow for habeas relief on that basis.  The writ of habeas corpus is only available when a petitioner shows that the state-court judgment was "contrary to, or involved an unreasonable application of, *clearly established Federal law, as determined by the Supreme Court of the United States*[.]" 28 U.S.C. § 2254(d)(1) (emphasis added).  Guevara premises his Vienna Convention claim on the assumption that criminal defendants can enforce that international treaty in the domestic courts. The Supreme Court has, to date, found "it unnecessary to resolve the question whether the Vienna Convention grants individuals enforceable rights." *Sanchez-Llamas*, 548 U.S. at 343; *see also Medellin*, ___ U.S. at ___, 128 S. Ct. at 1357 n.4; *Breard v. Greene*, 523 U.S. 371, 376 (1998); *Carty v. Quarterman*, 345 F. App'x 897, 905 (5th Cir. 2009).  No Supreme Court precedent provides for relief on Guevara's Vienna Convention claim.

The state habeas court also found that the Salvadoran consulate could not have provided services that would have improved on trial counsel's efforts:

> the trial court appointed experienced trial counsel Ricardo Rodriguez to represent [Guevara] within days of [his] arrest and subsequently appointed experienced trial counsel Jerry Guerinot; the counsel Rodriguez is fluent in [Guevara's] native language; that [his] skilled counsel were far more qualified to explain the Texas criminal justice system to [Guevara] than a representative of the consulate; and, that [Guevara] was familiar with the local criminal justice system as a result of his arrests and convictions prior to the instant offense.

State Habeas Record at 469. The Supreme Court has expressed doubt that any Vienna Convention claim could be successful absent "some showing that the violation had an effect on the trial." *Breard*, 523 U.S. at 377 (citing *Arizona v. Fulminate*, 499 U.S. 279 (1991)).

In the absence of contrary Supreme Court authority, Fifth Circuit precedent guides this court's analysis. The Fifth Circuit has held that "[t]he Vienna Convention binds the United States as a matter of international law, but does not bind the individual states of the Union unless and until Congress passes enabling legislation enacting its provisions." *Leal Garcia v. Quarterman*, 573 F.3d 214, 218 n .19 (5th Cir. 2009); *see also Sanchez-Llamas*, 548 U.S. at 346-47. As it now stands, Vienna Convention violations are only "enforceable by one member-nation against another[.]" *Leal Garcia*, 573 F.3d at 218 n.19. Because the preamble to the Vienna Convention explains that it is "not to benefit individuals but to ensure the efficient performance of functions by consular posts on behalf of their respective States," the Fifth Circuit has "held that Article 36 of the Vienna Convention does not create an individually enforceable right." *Medellin v. Dretke*, 371 F.3d 270, 280 (5th Cir. 2004); *see also United States v. Jimenez-Nava*, 243 F.3d 192, 198 (5th Cir. 2001).

Guevara has not shown that the Vienna Convention creates a right that can form the basis for habeas relief. Recognizing such a right would violate *Teague*. *See Breard*, 523 U.S. at 377 (suggesting that a Vienna Convention claim would fall under *Teague*'s non-retroactivity principle); *Plata v. Dretke*, 111 F. App'x 213, 216 (5th Cir. 2004) (finding that the petitioner "ha[d] not shown that the district court's denial of his [Vienna Convention] claim as *Teague*-barred is debatable"); *Flores v. Johnson*, 210 F.3d 456, 457-58 (5th Cir. 2000) (citing *Breard* to *Teague*-bar a Vienna Convention claim). Guevara has not shown a basis for habeas relief on his Vienna Convention claim.

Guevara has not overcome the state procedural bar of his Vienna Convention claim, has not shown as a factual matter that the State of Texas failed to notify him or the Salvadoran consulate of his arrest, and has not demonstrated that Vienna Convention violations provide an actionable ground for habeas relief.  Guevara has not shown that the state court decision was contrary to, or an unreasonable application of, federal law.  *See* 28 U.S.C. § 2254(d)(1).  Relief on this claim is denied.

**H.     The Claim Related to the Jury's Consideration of Unadjudicated Offenses (Claim Fourteen)**

Guevara's fourteenth claim attacks the use of unadjudicated offenses in the punishment phase.  The prosecution presented the jury with testimony and evidence about unrelated criminal acts Guevara had committed.  Relying on *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000) and subsequent cases, Guevara alleges that Texas law does not require the indictment to notify him of the evidence the state intends to introduce in the punishment phase.  In *Apprendi*, the Supreme Court held that "[o]ther than the fact of prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt[.]"  *See also Ring v. Arizona*, 536 U.S. 584, 609 (2002) (extending *Apprendi* to capital cases).  Guevara argues that the *Apprendi* standard has elevated any punishment-phase aggravating circumstances to an element of the underlying offense.  He argues that an indictment is defective unless it outlines the facts it will rely upon in seeking a death sentence.

Guevara defaulted consideration of this claim by failing to object at trial.  State Habeas Record at 470, 480.  In the alternative, the state habeas court relied on its well-established jurisprudence to deny his claim.  The Texas Court of Criminal Appeals has repeatedly held that (1) the special-issue questions are not elements of a capital offense and (2) neither *Apprendi* nor *Ring*

60

require the State to allege the special issues in the indictment.  *See Williams v. State*, 273 S.W.3d 200, 214 (Tex. Crim. App. 2008); *Gallo v. State*, 239 S.W.3d 757, 779 (Tex. Crim. App. 2007); *Joubert v. State*, 235 S.W.3d 729, 732 (Tex. Crim. App. 2007); *Roberts v. State*, 220 S.W.3d 521, 535 (Tex. Crim. App. 2007); *Renteria v. State*, 206 S.W.3d 689, 709 (Tex. Crim. App. 2006); *Russeau v. State*, 171 S.W.3d 871, 885-86 (Tex. Crim. App. 2005); *Threadgill v. State*, 125 S.W.3d 654, 671-72 (Tex. Crim. App. 2004); *Rayford v. State*, 125 S.W.3d 521, 533 (Tex. Crim. App. 2003).

In all the numerous and repeated challenges to the Texas capital sentencing scheme that petitioners has based on *Apprendi*, it does not appear that the Fifth Circuit has yet considered this argument.  The Supreme Court has applied *Ring* and *Apprendi* in different contexts but has not held that the prosecution must plead the aggravating factors in the indictment.  *See Apprendi*, 530 U.S. at 477 n.3 (refusing to address the indictment issue because the petitioner did not raise it); *Ring*, 536 U.S. at 597 n.4 (noting that petitioner did not allege constitutional defects in the indictment); *see also United States v. Bourgeois*, 423 F.3d 501, 507 (5th Cir. 2005) (noting that the Supreme Court has yet to hold that aggravating factors must be charged in the indictment).

Texas places the constitutionally required finding of an aggravating factor in the guilt/innocence phase, in which the jury finds a defendant guilty of a death-eligible offense.  *See Jurek v. Texas*, 428 U.S. 262, 270-71 (1976) (approving the use of aggravating factors in the guilt/innocence phase to narrow the class of death-eligible defendants); *Woods v. Cockrell*, 75 F.3d 1017, 1033-34 (5th Cir. 1996); *James v. Collins*, 987 F.2d 1116, 1119 (5th Cir. 1993).  Once narrowing occurs in the guilt/innocence phase, no further narrowing is necessary in the punishment phase.  *See Lowenfield v. Phelps*, 484 U.S. 231, 242-47 (1988); *see also Zant v. Stephens*, 462 U.S.

862, 875 (1983) (finding that a state may give "unbridled discretion in determining whether the death penalty should be imposed after it has found that the defendant is a member of the class made eligible for that penalty.").   After a jury convicts a capital inmate, the maximum punishment available is death.   The use of extraneous offenses thereafter does not increase an inmate's authorized punishment.   As a result, *Apprendi* is inapplicable.

Unadjudicated offenses are not elements of the offense that the State must allege in the indictment and then prove beyond a reasonable doubt.   For this court to rule otherwise would violate the *Teague* nonretroactivity rule.   *See Harris v. Johnson*, 81 F.3d 535, 541 (5th Cir. 1996).  The Court of Criminal Appeals denial of Guevara's claim of error in the indictment was not contrary to, or an unreasonable application of, federal law.   *See* 28 U.S.C. § 2254(d)(1).   Relief on this claim is denied.

## IV.   Conclusion

The claims other than the *Atkins* claim are dismissed.   The respondent must file a brief by **October 28, 2011** addressing the remaining issues as discussed in this Memorandum and Order.  Guevara will file a reply by **December 16, 2011**.

SIGNED on September 23, 2011, at Houston, Texas.

Lee H. Rosenthal
United States District Judge

62