IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| **GILMAR ALEXANDER GUEVARA,** | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| | § | |
| -VS- | § | CIVIL NO. 4:08-cv-01604 |
| | § | |
| | § | *CAPITAL CASE* |
| | § | |
| **RICK THALER**, Director, | § | |
| Texas Department of Criminal Justice, | § | |
| Correctional Institutions Division, | § | |
| | § | |
| Respondent. | § | |

_____

**PETITIONER'S OPPOSITION TO RESPONDENT'S
MOTION TO ALTER OR AMEND JUDGMENT
AND RESPONSE TO COURT-ORDERED BRIEFING**

On September 23, 2011, this Court issued a Memorandum and Order directing the parties to file briefing addressing whether Mr. Guevara advanced a prima facie claim of mental retardation pursuant to *Atkins v. Virginia*, 536 U.S. 304 (2002), in state court; whether the state court's adjudication of his claim merits deference under the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"); and whether this Court must hold an evidentiary hearing before adjudicating this issue. Docket Entry 36 at 19. On October 20, 2011, Respondent filed a Motion to Alter or Amend Judgment. Docket Entry 37. Petitioner now files this opposition to Respondent's motion and briefing in response to the Court's order.

First, Mr. Guevara presented a prima facie case of mental retardation to the state court. The evidence before the state court was sufficient to permit a trier of fact to infer that Mr.

Guevara is mentally retarded.  That evidence included an expert opinion that Mr. Guevara has mental retardation as well as evidence independently supporting a diagnosis of mental retardation per *Ex parte Briseno*, 135 S.W.3d 1 (Tex. Crim. App. 2004), and *Atkins*.  Second, Fifth Circuit precedent holds that 28 U.S.C. § 2254(d) ("Section 2254(d)") applies to cases like Mr. Guevara's where the state court has applied Texas Code of Criminal Procedure article 11.071, § 5(a)(3) in the course of dismissing an Atkins claim. *Blue v. Thaler*, 2011 U.S. App. LEXIS 25437 (5th Cir. 2011).  Per *Blue*, however, Section 2254(d) does not pose an impediment to relief in this case because Mr. Guevara presented a prima facie case of mental retardation to the state court and the state court's failure to afford him a meaningful opportunity to be heard unreasonably applied clearly established federal law.  *Id*. at *13-14.  Third, because Section 2254(d) has been satisfied, *Pinholster v. Cullen*, 131 S.Ct. 1388 (2011), has no further application to the adjudication of Mr. Guevara's *Atkins* claim.  Finally, *Blue* requires that this Court afford Mr. Guevara a meaningful opportunity to be heard on his *Atkins* claim and hold an evidentiary hearing.  *Blue*, 2011 U.S. App. LEXIS 25437 at *14.

## I.     THIS COURT SHOULD DENY RESPONDENT'S MOTION TO ALTER OR AMEND ITS FINDING THAT MR. GUEVARA'S *ATKINS* CLAIM IS NOT DEFAULTED.

Following this Court's ruling that Mr. Guevara has not defaulted his *Atkins* claim, the Director filed a Motion to Alter or Amend Judgment under Federal Rule of Civil Procedure 59(e), as well as a supplement to that motion. Docket Entries 37, 39. "A motion to reconsider an order . . . is appropriate when the court is presented with newly discovered evidence, when the court committed clear error, when there is an intervening change in controlling law, or when other highly unusual circumstances exist." *Becerra v. Asher*, 921 F.Supp. 1538, 1548 (S.D. Tex. 1996), *aff'd*, 105 F.3d 1042 (5th Cir. 1997), *cert. denied sub nom. Becerra v. Houston*

*Independent School District*, 522 U.S. 824 (1997). The Director does not urge the Court to consider newly discovered evidence and cites neither an intervening change in controlling law nor any highly unusual circumstances. Rather, the Director rehashes his arguments from prior pleadings, arguing that this Court committed clear error in finding that Texas Code of Criminal Procedure article 11.071, § 5(a)(3) intermingles the state procedural rule with substantive review of the underlying claim. Moreover, the Director is collaterally estopped from making this argument. Because Respondent misreads the applicable law and misapplies it to this case, and because the Director is collaterally estopped from arguing that Mr. Guevara's Atkins claim is procedurally defaulted, his motion should be denied.

### A. The Director is collaterally estopped from arguing that Mr. Guevara's *Atkins* claim is procedurally defaulted.

Where (1) the issue at stake is identical to one involved in prior litigation; (2) the issue has been actually litigated in the prior litigation; and (3) the determination of the issue in the prior litigation has been a critical and necessary part of the judgment in that earlier action, a party is collaterally estopped from re-litigating the issue in a different action. *Rabo Agrifinance, Inc. v. Terra XXI LTD*, 583 F.3d 348, 353 (5th Cir. 2009). In *Blue v. Thaler*, 2011 U.S. App. LEXIS 25437 (5th Cir. 2011), the Director litigated, and lost, the question whether the petitioner's *Atkins* claim was procedurally defaulted under circumstances identical to those presented here. *Id*. at *5. On appeal, the Director even conceded that procedural default did not apply to the petitioner's claims. *Id*. Accordingly, the Director is collaterally estopped from arguing that Mr. Guevara's *Atkins* claim is procedurally defaulted.[1]

---

[1] The Director is similarly collaterally estopped from arguing that 28 U.S.C. § 2254(e)(2) bars Mr. Guevara from obtaining an evidentiary hearing. *See Blue*, 2011 U.S. App. LEXIS at *9 ("The State concedes that § 2254(e)(2) does not bar Blue from obtaining an evidentiary hearing . . . .").

**B.      The Director fundamentally misunderstands the doctrine of procedural default.**

The Director's motion repeatedly evinces a fundamental misunderstanding of the doctrine of procedural default.  For instance, the Director implies that this Court's ruling is dependent on a determination that "the CCA's dismissal is a merits assessment and not a procedural ruling." Docket Entry 37 at 4. Procedural default does not turn on whether the state court ruling was a procedural ruling or a merits ruling; the issue is whether the state court ruling—whether procedural or substantive—was independent of the underlying federal constitutional question. This is evident from an examination of the Supreme Court's decision in *Ake v. Oklahoma*, 470 U.S. 68 (1985). As explained by the Fifth Circuit in *Rivera v. Quarterman*,

> [t]he substantive issue in *Ake* was whether the Constitution requires a state to provide assistance to an indigent defendant when there is a serious question about the defendant's sanity at the time of the offense. However, the Court faced a threshold issue of whether an adequate and independent state ground—the state's waiver rule—deprived it of jurisdiction. The Court held that it did have jurisdiction as the application of the state's procedural rule turned on an antecedent determination of federal law. . . . The necessity of examining the merits of the federal law issue to decide the applicability of the state procedural rule meant that "the state law prong of the court's holding is not independent of federal law."

505 F.3d 349, 359 (5th Cir. 2007) (quoting *Ake*, 470 U.S. at 75). In short, *Ake* involved a procedural ruling disposing of a federal claim that was nevertheless subject to federal review because the state court's procedural waiver rule interwove federal law.

Similarly, the Director argues that the CCA's review under § 5(a)(3) is analogous to "the gateway inquiry performed by the federal courts under 28 U.S.C. § 2244(b)(2)" and "a federal courts' determination on whether to grant a certificate of appealability under 28 U.S.C. § 2253." Docket Entry 37 at 9. This analogy is accurate—indeed, this Court acknowledged as much in footnote 9 of its Memorandum and Order—but again misses the crucial point: the CCA's

gateway inquiry requires application of federal law because *Atkins* announced a prohibition on executing the mentally retarded grounded in the federal constitution.

The Director's effort to somehow morph *Atkins* into state law in an effort to disentangle the § 5(a)(3) inquiry from federal law is unavailing. *See* Docket Entry 37 at 10 ("The CCA would not need to consider federal law in order to determine that the pleading is inadequate because it lacks clear and convincing evidence to support the state-law element on intellectual functioning."). There can be no serious question that *Atkins* is a federal constitutional decision. That the Supreme Court left it to the states to "develop[ ] appropriate ways to enforce the constitutional restriction upon its execution of sentences," *Atkins*, 536 U.S. at 317, does not alter the federal nature of the prohibition.

The Director's arguments that this Court's ruling means that "no *Atkins* claim could ever be defaulted" and that such a result in federal court would thwart the intent of the Texas legislature are equally futile.   Docket Entry 37 at 12-13.   Section 5(a)(3) cannot have been crafted by the Texas legislature to limit or thwart review in the federal courts; such interference by a state in the business of the federal judiciary would be blatantly unconstitutional.[2]  *See James v. Kentucky*, 466 US 341, 348-49 (1984) (state laws which "force resort to an arid ritual of meaningless form ... and would further no perceivable state interest" cannot "prevent implementation of federal constitutional rights" by federal courts); *Ward v. Board of Com'rs of Love County*, 253 U.S. 17, 22-23 (1920) (state court's reliance on nonfederal grounds of decision without any fair or substantial support cannot preclude federal review of the alleged denial of

---

[2] If this Court were to accept at face value the Director's argument that the CCA applies § 5 for the purpose of thwarting federal review rather than furthering legitimate state interests, it must then find the disposition of Mr. Guevara's mental retardation claim by the state court inadequate to preclude review. Such review would be entirely unencumbered by 28 U.S.C. § 2254(d).

federal rights because "if nonfederal grounds, plainly untenable, may be thus put forward successfully, [the federal judiciary's] power to review easily may be avoided").  Rather, § 5(a)(3) is a state procedural bar that is intended to serve Texas's interests in orderly procedure its own courts.  If Texas is dissatisfied with the way its judiciary applies § 5(a)(3), Texas is free to make whatever changes to the statutory scheme it desires, including utilizing a standard of review that does not contemplate the underlying federal constitutional question.  Similarly, the CCA is free to make unambiguous pronouncements in its § 5(a)(3) dismissal orders if its decision has not turned on a review of the underlying federal claim. *See, e.g.*, *Harris v. Reed*, 489 U.S. 255, 264 (1989) (noting that "state courts have become familiar with the 'plain statement' requirement under *Long* and *Caldwell*"); *Ruiz v. Quarterman*, 504 F.3d 523, 527 (5th Cir. 2007) (recognizing that "an absence of clarity in an opinion is seldom inadvertent"); *id.* at 529 ("As the CCA is keenly aware, its choice of language was made against a background legal standard—which directs the CCA in either granting an application for consideration of subsequent claims or dismissing that application as an abuse of the writ—that is interwoven with federal law.").

Indeed, as the Director notes in his supplement, the CCA has proven itself perfectly capable of issuing such unambiguous pronouncements. Docket Entry 39. The Director's discussion of the CCA's unpublished order in *Ex parte Garcia*, WR-66,977-02 (Tex. Crim. App. Oct. 27, 2011) (unpublished), however, again misses the point crucial to the procedural default analysis: "when . . . a state law court decision fairly appears to rest primarily on federal law, or to be interwoven with federal law, *and when the adequacy and independence of any possible state law ground is not clear from the face of the opinion*, [the federal courts] will accept as the most reasonable explanation that the state court decided the case the way it did because it believed that federal law required it to do so." *Michigan v. Long*, 463 U.S. 1032, 1040-41 (1983) (emphasis

added). The CCA's unequivocal statement in *Garcia* that it did not consider the merits of Garcia's claim bolsters Mr. Guevara's argument precisely because the order in Mr. Guevara's case lacked such language.[3]

Because Respondent's arguments fail to show that this Court committed clear error—or error of any kind—in reaching its determination that Mr. Guevara's *Atkins* claim is ripe for review, his motion to alter or amend should be denied.

## II.   MR. GUEVARA ADVANCED A PRIMA FACIE *ATKINS* CLAIM BEFORE THE STATE COURT.

A "prima facie case" is defined as "[a] party's production of enough evidence to allow the fact-trier to infer the fact at issue and rule in the party's favor." Black's Law Dict. 1310 (9th ed. 2009). *See also Virginia v. Black*, 538 U.S. 343, 369 (2003) ("Typically, 'prima facie evidence' is defined as: 'Such evidence as, in the judgment of the law, is sufficient to establish a given fact ... and which if not rebutted or contradicted, will remain sufficient. [Such evidence], if unexplained or uncontradicted, is sufficient to sustain a judgment in favor of the issue which it supports, but [it] may be contradicted by other evidence.') (quoting Black's Law Dict. 1190 (6th ed.1990)); *id.* (referring to this understanding of "prima facie" as "canonical").

---

[3] *Garcia*, moreover, does not constitute "an intervening change in controlling law." *Becerra*, 921 F.Supp. at 1548. The CCA issued similar orders explicitly stating that it did not reach the merits in *Ex parte Foster*, WR-65,799-03 (Tex. Crim. App. Sept. 12, 2011) (unpublished) (attached as Exhibit A); *Ex parte Garza*, WR-70,797-02 (Tex. Crim. App. Oct. 12, 2011) (unpublished) (attached as Exhibit B); *Ex parte Esparza*, WR-66,111-03 (Tex. Crim. App. Oct. 19, 2011) (unpublished) (attached as Exhibit C); *Ex parte Hernandez*, WR-69,470-02 (Tex. Crim. App. Jan. 23, 2012) (unpublished) (attached as Exhibit D). Of particular significance for purposes of the Rule 59(e) standard is the fact that the *Foster* dismissal was issued prior to this Court's ruling. Moreover, it is not at all clear that even these orders are necessarily independent, because the Supreme Court has exercised jurisdiction in Foster's case on certiorari review despite such language. *Foster v. Texas*, 132 S. Ct. 69 (2011).

Accordingly, when determining whether a prima facie case has been presented, a court examines only the evidence affirmatively supporting the establishment of the fact at issue and asks whether that evidence would *permit* a rational trier of fact to find the fact true. That the evidence may be contradicted by other evidence or may be subject to rebuttal or impeachment is irrelevant and not to be considered. Here, the question is not whether a fact-trier, after weighing all of the evidence both supporting and controverting the issue of whether Mr. Guevara has mental retardation, would find Mr. Guevara to be mentally retarded. The question is whether, looking only at the evidence supporting the case that Mr. Guevara is mentally retarded, that evidence is legally sufficient to *permit* a fact-trier to infer that he is.[4]

### A.    The Standard for Assessing Mental Retardation

In *Atkins*, the Supreme Court placed its imprimatur on the definitions of mental retardation set out by the American Association on Mental Retardation ("AAMR") and the American Psychiatric Association.   *See* 536 U.S. at 308 n.3, 309. Those organization's definitions are the ones on which Dr. Antolin M. Llorente relied in his expert report presented to the Texas courts, Llorente Report at 11; which the CCA has itself adopted, *Ex parte Briseno*, 135 S.W.3d 1, 7-8 (Tex. Crim. App. 2004); and which this Court should apply in these proceedings. *See Blue*, 2011 U.S. App. LEXIS at *17 -18 (applying standard).

### 1.    AAMR/AAIDD Manual Definition

On January 1, 2007, the AAMR changed its name to the American Association on Intellectual and Developmental Disabilities ("AAIDD"), in line with its decision to refer to the condition previously known as "mental retardation" as "intellectual disability." The change is one of nomenclature only, as the AAIDD has made clear that any person who qualified for a

---

[4] For example, IQ scores above 75 are ignored for purpose of determining whether a prima facie case exists.

diagnosis of mental retardation qualifies for a diagnosis of intellectual disability, and vice versa. *See* American Association on Intellectual and Developmental Disabilities, *Intellectual Disability: Definition, Classification, and Systems of Supports* xvi (11th ed. 2010) (hereinafter "2010 AAIDD Manual"). In its 2010 manual, the AAIDD defines mental retardation as follows:

> Intellectual disability is characterized by significant limitations both in intellectual functioning and in adaptive behavior as expressed in conceptual, social, and practical adaptive skills. This disability originates before age 18.

2010 AAIDD Manual at 1. This three-pronged definition is identical—with the exception of the change in terminology—to the definition contained in the organization's 2002 manual. American Association on Mental Retardation, *Mental Retardation: Definition, Classification, and Systems of Supports* 1 (10th ed. 2002) (hereinafter "2002 AAMR Manual").[5]

The AAIDD defines the first prong of its definition—requiring significant limitations in intellectual functioning—as "an IQ score that is approximately two standard deviations below the mean, considering the standard error of measurement for the specific measurements used and the instruments' strengths and limitations." 2010 AAIDD Manual at 31. *See also* 2002 AAMR Manual at 58 (same).

The second prong—significant limitations in adaptive behavior—concerns the "collection of conceptual, social, and practical skills that have been learned and are performed by people in their everyday lives." 2010 AAIDD Manual at 43. *See also* 2002 AAMR Manual at 73 (same). Significant limitations in these skills are "operationally defined as performance that is approximately two standard deviations below the mean of either (a) *one of the following three*

---

[5] For continuity's sake, this brief will continue to use the term "mental retardation," as that is the term used in prior briefing and orders in this case, as well as in Dr. Llorente's report. Though the 2010 AAIDD Manual is the most recent, this brief will cross-reference the 2002 AAMR Manual, as that was the most current manual at the time that Dr. Llorente wrote his report on March 5, 2005, and therefore the manual on which he relied in his report.

types of adaptive behavior: conceptual, social, or practical *or* (b) an overall score on a standardized measure of conceptual, social, and practical skills." 2010 AAIDD Manual at 43 (emphasis added). *See also* 2002 AAMR Manual at 76 (same). These three overarching domains of adaptive behaviors correspond with specific skill areas, as detailed in the following table reproduced from the 2002 AAMR Manual:

| Adaptive Behavior Skills Areas in 2002 Definition | Representative Skills in 2002 Definition | Skill Areas Listed in 1992 Definition[6] |
|---|---|---|
| Conceptual | Language<br>Reading and writing<br>Money concepts<br>Self-direction | Communication<br>Functional academics<br>Self-direction<br>Health and Safety |
| Social | Interpersonal<br>Responsibility<br>Self-esteem<br>Gullibility<br>Naiveté<br>Follows rules<br>Obeys laws<br>Avoids victimization | Social skills<br>Leisure |
| Practical | Activities of daily living<br>Instrumental activities of daily living<br>Occupational skills<br>Maintains safe environments | Self-care<br>Home living<br>Community use<br>Health and safety<br>Work |

2002 AAMR Manual at 82.

The third prong of the AAIDD definition requires the disability to originate before the age of 18.

## 2. DSM-IV-TR Definition

In addition to the definition provided by the AAIDD, clinicians and courts rely on the standard set out in the American Psychiatric Association's Diagnostic and Statistical Manual of

---

[6] The ninth edition of the AAMR manual was published in 1992 as American Association on Mental Retardation, *Mental Retardation: Definition, Classification, and Systems of Supports* (9th ed. 1992) (hereinafter "1992 AAMR Manual").

Mental Disorders, Fourth Edition, Text Revision (hereinafter "DSM-IV-TR"). The three diagnostic criteria for mental retardation in the DSM-IV-TR are as follows:

> A. Significantly subaverage intellectual functioning: an IQ of approximately 70 or below on an individually administered IQ test (for infants, a clinical judgment of significantly subaverage intellectual functioning).

> B. Concurrent deficits or impairments in present adaptive functioning (i.e., the person's effectiveness in meeting the standards expected for his or her age by his or her cultural group) in *at least two* of the following areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety.

> C. The onset is before age 18 years.

DSM-IV-TR at 49 (emphasis added). This definition mirrors the AAIDD/AAMR definition, with the exception that the DSM-IV-TR continues to employ an adaptive behavior definition requiring deficits in at least two of eleven particular skills areas (which are themselves from the 1992 AAMR Manual), rather than in at least one of three of the overarching domains now employed by the AAIDD.

Thus, under either the AAIDD/AAMR or the DSM-IV-TR definition, the first requirement for a diagnosis of mental retardation is significantly impaired cognitive functioning, as evidenced by an IQ score approximately two standard deviations below the mean, accounting for the standard error of measurement. The second requirement—significant deficits in adaptive behavior—confirms that these cognitive impairments have negative effects on the individual's life functioning. *See, e.g.*, *Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432, 442 (1985) (noting that persons with mental retardation "have a reduced ability to cope with and function in the everyday world"). The third and final requirement is manifestation of these diagnostic features before the age of eighteen. As detailed below, Mr. Guevara presented affirmative evidence sufficient to establish each of these definitional prongs.

11

**B.      Mr. Guevara Presented Evidence in the Form of an Expert Opinion That Mr. Guevara Is a Person with Mental Retardation.**

Before the state court, Mr. Guevara submitted a report from a neuropsychologist who evaluated Mr. Guevara and opined that he has mental retardation. This evidence, alone, establishes a prima facie case of mental retardation, as it is legally sufficient to sustain a judgment in favor of the issue which it supports, *i.e.*, it is enough evidence to allow a fact-trier who believed the expert opinion to infer that Mr. Guevara has mental retardation.[7]

Although an expert opinion that Mr. Guevara has mental retardation establishes a prima facie case, the underlying information on which that opinion was based, as well as other evidence, establishes a prima facie case as to each of the three criteria for a diagnosis of mental retardation.

**C.      Evidence from Which a Fact-Trier Could Infer That Mr. Guevara Possesses Significant Limitations in Intellectual Functioning.**

The testing completed by Dr. Llorente on August 25, 2003, provides ample evidence of Mr. Guevara's significant limitations in intellectual functioning. Dr. Llorente administered the Batería Woodcock-Muñoz Pruebas de Habilidad Cognitiva-Revisada ("WMPHC-R"), which is a Spanish-language test of intellectual ability. Mr. Guevara's primary language is Spanish. As detailed in Dr. Llorente's report, Mr. Guevara obtained a Broad Cognitive Ability score of 60. Llorente Report at 6. The standard error of measurement is plus or minus five points; Mr. Guevara's true score accordingly could be as high as 65 or as low as 55. *See* Llorente Report at 6 (reporting score of 60±5).[8]

---

[7] The possibility that a fact-trier could reject Dr. Llorente's opinion in light of other evidence is legally irrelevant to whether a prima facie case has been made.

[8] *See* 2010 AAIDD Manual at 36 ("The results of any psychometric assessment must be evaluated in terms of the accuracy of the instrument used and such is the case with the assessment of intelligence. An IQ score is subject to variability as a function of a number of

Because the mean score on the WMPHC-R is 100 and the standard deviation is 15, Llorente Report at 6, any score in this range of 65 to 55 is more than two standard deviations below the mean. Indeed, as Dr. Llorente reported, Mr. Guevara scored in the 0.4th percentile, placing his performance "within the very poor or mentally deficient range of intellectual skills." *Id.* Dr. Llorente found that Mr. Guevara's "impaired valid scores and performance on several tests and procedures, but particularly his inability to abstract at levels expected for adults [ ] demonstrate deficits in cognition consistent with mental deficiency." *Id.* at 10.[9] Dr. Llorente also administered the Draw-A-Person Test, from which Dr. Llorente concluded that Mr. Guevara's "drawing … revealed a great deal of cognitive immaturity." *Id.* at 9.

In sum, Mr. Guevara has presented evidence from which a fact-trier could conclude that Mr. Guevara has significant limitations in intellectual functioning. He has presented evidence in the form of an IQ test reflecting an IQ score approximately two standard deviations below the mean and in the form of an expert opinion that Mr. Guevara has significant limitations in intellectual functioning.

###### D. Evidence from Which a Fact-Trier Could Infer That Mr. Guevara Possesses Significant Limitations in Adaptive Behavior.

---

potential sources of error, including variations in test performance, examiner's behavior, cooperation of test taker, and other personal and environmental factors. Thus, variation in scores may or may not represent the individual's actual or true level of intellectual functioning. The term standard error of measurement, which varies by test, subgroup, and age group, is used to quantify this variability and provide a stated statistical confidence interval within which the person's true score falls.").

[9] Although irrelevant to whether a prima facie case was presented to the state court, Dr. Llorente was sensitive to the possibility that Mr. Guevara could attempt to feign mental retardation and administered a number of measures designed to detect feigned symptom exaggeration and/or negative response bias. Specifically, Dr. Llorente administered the Rey 15-Item Memory Test, the Dot Counting Test, and the Symptom Validity Test. Llorente Report at 6. Dr. Llorente reported that Mr. Guevara's scores fell within the expected range on each of those measures and that "[t]he results of these procedures revealed that Mr. Guevara was being straightforward in his responses to test items." *Id.*

As detailed above, the DSM-IV-TR examines limitations in adaptive behavior by focusing on eleven specific adaptive skills: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety. Since 2002, the AAIDD has focused on three broader domains of adaptive behavior: conceptual, social, and practical skills. As the table reproduced above from the 2002 AAMR Manual makes clear, these eleven skill areas are linked to the broader adaptive domains. Applying the DSM-IV-TR criteria, significant deficits in two of the eleven adaptive skills must be shown; the AAIDD definition requires significant deficits in one of the three domains.

Both the AAIDD/AAMR manuals and the DSM-IV-TR note the care that must be taken in examining adaptive behaviors. The DSM-IV-TR states that persons with mild mental retardation, which includes persons with IQ scores of 50-55 to approximately 70, DSM-IV-TR at 42, "can acquire academic skills up to approximately the sixth-grade level." *Id.* at 43. The 2010 AAIDD Manual cautions that "the assessment of adaptive behavior is based on the person's typical (not maximum) performance" and that "adaptive skill limitations often coexist with strengths." 2010 AAIDD Manual at 45. *See also* 2002 AAMR Manual at 1 ("Within an individual, limitations often coexist with strengths."); 73-4 ("[I]t is expected that reasons for limitations in adaptive skills may include (a) not knowing how to perform the skill (acquisition deficit), (b) not knowing when to use learned skills (performance deficit), or (c) other motivational factors that can affect the expression of skills (performance deficit).") . Accordingly, identification of strengths does not inform the adaptive behavior assessment. It is only the identification of deficits that matter.

Dr. Llorente's report applied the appropriate standard of care and documented significant adaptive deficits across a broad range of these skill areas and within all three domains.

### 1.    Conceptual Adaptive Deficits

Representative skills in the conceptual adaptive domain include the use of language, reading and writing, money concepts, and self-direction. 2010 AAIDD Manual at 44; 2002 AAMR Manual at 82. The comparable skills in the DSM-IV-TR are communication, functional academic skills, health, safety, and self-direction. *Id.*; DSM-IV-TR at 49.

### a.    Deficits in Reading and Writing / Functional Academics[10]

Dr. Llorente's report, presented as evidence to the state court, documented Mr. Guevara's significant difficulties in school. Because Mr. Guevara did not attend school in the United States and his educational records from El Salvador were not available to Dr. Llorente, Dr. Llorente interviewed Mr. Guevara's mother and relied on information provided by family members and others in El Salvador. Llorente Report at 3. As Dr. Llorente noted, relying on information from interviews is a regular practice among experts conducting retrospective evaluations of mental retardation. *Id.* at 9. *See also* 2010 AAIDD Manual at 98 (noting that persons with mental retardation are often unreliable self-reporters and that "clinicians should seek out direct input from knowledgeable informants" who "know the person well, have observed the person across different community environments and situation, and have formally observed the person longitudinally (i.e., over time)").

Evidence presented to the state court reflected that Mr. Guevara did "very poorly" in school and repeated third grade. Llorente Report at 3. In particular, Dr. Llorente cited an affidavit from family noting that Mr. Guevara was slow and that he "did not have the

---

[10] Each skill area discussed will be referenced by citing the representative skill from the 2002 AAMR Manual, followed by the corresponding skill from the DSM-IV-TR.

'intelligence' to succeed in school." *Id.* at 3. Mr. Guevara dropped out of school after the fourth grade, an important fact for a number of reasons. *Id.* at 15. First, the fact that Mr. Guevara dropped out is significant in and of itself, as high dropout rates are common among the mentally retarded. 2010 AAIDD Manual at 156. Second, the particular timing of Mr. Guevara ending his education is meaningful. As Dr. Llorente's report explained, the "first cycle" of schooling in El Salvador encompassed the years from kindergarten through third grade. During this cycle, all students were socially promoted. After the third grade, however, students were only promoted if they earned adequate grades.[11] Llorente Report at 15. Tellingly, Mr. Guevara's favorite subject in school was recess. *Id.*

Objective measures Dr. Llorente administered to Mr. Guevara support the information upon which Dr. Llorente relied. Dr. Llorente administered picture vocabulary, reading, and reading understanding measures to Mr. Guevara. Mr. Guevara scored at the 4.4, 7.8, and 4.6 grade-equivalent levels, respectively. *Id.* at 6. Dr. Llorente explained that Mr. Guevara can sight-read words at the seventh grade level, but his picture vocabulary and ability to understand what he reads are at a fourth grade level. *Id.* Although Mr. Guevara speaks Spanish fluently, his score on an instrument requiring confrontational naming in Spanish "fell in the impaired range (1st %ile) when compared to his same age peers and individuals with his level of education." *Id.* at 7. In other words, test data reflected that Mr. Guevara performed more poorly in naming objects in his native language than 99% of people his age and with his low level of education.

---

[11]   Although irrelevant to whether a prima facie case was presented, this information places into context the statement of a family member that Mr. Guevara got "good grades but was slow." Llorente Report at 3. While on the surface that statement appears inconsistent with limitations in academic functioning, Dr. Llorente's explanation of social promotion in the early grades of schooling El Salvador reflects that those grades are not a reliable measure of academic functioning.

Given these indications of significant limitations in functional academics, Dr. Llorente concluded that Mr. Guevara's "level of academic attainment . . . points to congenital deficits, which in conjunction with his present intellectual performance is consistent with mental retardation." *Id.* at 9-10.

### b.      Deficits in Language / Communication

In *Atkins*, the Supreme Court found that "[m]entally retarded defendants may be less able to give meaningful assistance to their counsel." 536 U.S. at 320-21. Dr. Llorente's report documented serious impairments in Mr. Guevara's communicative and cognitive abilities, indicating he possesses precisely the deficits about which the Supreme Court expressed concern.

As noted above, Mr. Guevara performed poorly on objective measures of language and auditory processing that Dr. Llorente administered, scoring in the first percentile on the confrontational naming task. Llorente Report at 7. Dr. Llorente also observed during his clinical interview of Mr. Guevara that "[t]he content of his speech was primitive for a man his age." *Id.* at 4. Moreover, although Mr. Guevara's performance on feigning instruments confirmed he was putting forth appropriate effort, Dr. Llorente found that Mr. Guevara "exhibited difficulties understanding and following instructions on occasions, particularly when asked to perform complex tasks." *Id.* Based upon his examination, Dr. Llorente concluded that Mr. Guevara demonstrated deficits in most neuropsychological domains, including "attention, *expressive language, verbal* and visual *memory*, complex visual processing and perceptual organization, etc.," in comparison to same-age peers. *Id.* at 10 (emphasis added).

### c.      Deficits in Self-Direction[12]

---

[12] Both the 2002 AAMR Manual and the DSM-IV-TR use the term "self-direction."

Self-direction is another adaptive behavior included in the conceptual domain. Self-direction skills are "related to making choices; learning and following a schedule; initiating activities appropriate to the setting, conditions, schedule, and personal interests; completing necessary or required tasks; seeking assistance when needed; resolving problems confronted in familiar and novel situations; and demonstrating appropriate assertiveness and self-advocacy skills." 1992 AAMR Manual at 40. Mr. Guevara presented to the state court evidence from which a fact-trier could infer that he possessed deficits in these adaptive skills, dating back to his early childhood.

Evidence before the state court reflected that Mr. Guevara's developmental milestones were delayed. Llorente Report at 2. He did not learn to walk until he was approximately two years old; he did not learn to talk until he was approximately four years old; and he was unable to tie his own shoes when he was seven years old. *Id.* at 3.[13]  Moreover, Mr. Guevara had difficulty following simple directions.  For example, when Mr. Guevara's mother sent him to the store for a specific item, he returned with the wrong item.  *Id.*  Mr. Guevara's mother believed his problem with following directions "was very different from her other children."  *Id.* Evidence also reflected that Mr. Guevara's father attempted to teach him "simple tasks such as drying and grinding corn but he could not learn how to do so." *Id.*

The objective data obtained by Dr. Llorente during his evaluation and presented as evidence to the state court confirms the information obtained from others.  Dr. Llorente's report reflects that "[a]lthough [Mr. Guevara] obtained scores in the low end of the average and low

---

[13] These represent significant delays. The Centers for Disease Control and Prevention website states that the milestone of talking is typically reached at 12 months and that the milestone of walking unassisted is typically reached by 18 months. *See* Centers for Disease Control and Prevention, Developmental Milestones, *available at* http://www.cdc.gov/ncbddd/actearly/milestones/index.html (last visited Feb. 3, 2012).

average range on measures requiring memory for phrases and synthesis-analytic processing, respectively, *all* other subtest scores fell in the impaired range." *Id.* at 9 (emphasis added). The measures on which Mr. Guevara obtained scores in the impaired range include those testing verbal memory, *id.* at 7; rote learning and memory, *id.* at 8; visual learning and memory, *id.*; and problem solving and other executive skills, *id.* at 8. Dr. Llorente concluded that this profile "suggests that Mr. Guevara suffers from reasoning deficits capable of infringing upon his ability to process information as well as encroach upon other aspects of functioning subserved by these skills including judgment and planning." *Id.* at 9.

### 2.      Social Adaptive Deficits

Representative skills in the social adaptive domain include interpersonal skills, responsibility, self-esteem, gullibility, naiveté, following rules, obeying laws, and avoidance of victimization. 2010 AAIDD Manual at 44; 2002 AAMR Manual at 82. The comparable skills in the DSM-IV-TR are social/interpersonal skills and leisure. *Id.*; DSM-IV-TR at 49.

#### a.      Deficits in Interpersonal / Social/Interpersonal Skills and Leisure Skills

Evidence presented to the state court reflected that Mr. Guevara possessed significant interpersonal and leisure skill deficits. As a young child, Mr. Guevara neither played with other children, nor did he play by himself. Llorente Report at 3. His mother was so concerned that she sought advice from a doctor at a local clinic when Mr. Guevara was approximately six or seven years old. *Id.* These issues led Dr. Llortente to conclude that Mr. Guevara "exhibit[ed] poor play skills," *id.* at 15, consistent with deficits in the social domain.

Similarly, the Declaration of Gina Vitale, which was also presented to the state courts, reflected that Mrs. Guevara characterized Mr. Guevara as "extremely introverted . . . he always wanted to be around me, he would sit in the kitchen with his face between his hands and watch

me doing things." Vitale Declaration at 3. His older brother Benjamin likewise reported that "Alex was extremely reserved and timid, he was not communicative at all and did not want to play." *Id.*

Dr. Llorente opined that Mr. Guevara's "profile is commonly seen in impulsive, immature, and socially inept individuals." Llorente Report at 10-11. Dr. Llorente concluded that "[t]his assessment additionally revealed consistent themes associated with a need to feel accepted by paternal (or societal) figures and inappropriate attention-seeking behaviors (deficits in executive skills)." *Id.* at 11.

### 3. Practical Adaptive Deficits

Representative skills in the domain of practical adaptive skills include personal and instrumental activities of daily living, occupational skills, and maintaining a safe environment. 2002 AAIDD Manual at 82.[14] The comparable skills in the DSM-IV-TR are self-care, home living, community use, health and safety, and work. *Id.*; DSM-IV-TR at 49.

### a. Deficits in Occupational Skills / Work

In his report before the state court, Dr. Llorente documented significant deficits in Mr. Guevara's occupational skills. Mr. Guevara's father attempted to teach Mr. Guevara "simple tasks such as drying and grinding corn" but he was unable to learn them. Llorente Report at 3. Mr. Geuvara's father then approached friends and neighbors to locate someone willing to take Mr. Guevara on as an apprentice so that he could learn a trade. *Id.*

Dr. Llorente interviewed one of the business owners to whom Mr. Guevara's father turned, as well as the widow of another. *Id.* Rafael Antonio Ventura owned a garage and

---

[14] In the 2010 AAIDD Manual, the representative skills in this domain have been listed more expansively, to include activities of daily living (personal care), occupational skills, use of money, safety, health care, travel/transportation, schedules/routines, and use of the telephone. 2010 AAIDD Manual at 44.

attempted to train Mr. Guevara as a mechanic. *Id.*  Mr. Ventura reported that Mr. Guevara did

not receive a salary and worked for tips from customers. *Id.* at 4. Dr. Llorente's summary of his

interview with Mr. Ventura merits quoting at length:

> He [ ] experienced difficulties attempting to train "Gilmar." He emphatically
> indicated that Mr. Guevara's chief problem was that he was incapable of
> "understanding" what he was being asked to do. When Mr. Guevara would
> perform a simple task incorrectly, Mr. Ventura would have Mr. Guevara do
> the task again after explaining what needed to be done, but Mr. Guevara would often
> fail again. When asked, he also noted that other apprentices, younger than Mr.
> Guevara, would be more advanced and could do [ ] many more and advanced
> tasks than Mr. Guevara.

*Id.*

Similar information was reported to Dr. Llorente by Vina Asencio, whose deceased

husband owned a second garage at which Mr. Guevara was an apprentice.  *Id.* at 3. Though it

was Mrs. Asencio's husband who attempted to train Mr. Guevara, Mrs. Asencio herself worked

in the garage alongside her husband and reported that her husband had "significant difficulties

training Mr. Guevara":

> . . . Mr. Guevara exhibited problems understanding the work he was being asked
> to do, including simple tasks. She noted that Mr. Guevara was forgetful,
> oftentimes appeared confused, could not take responsibility and "was not
> normal." As an apprentice, he was often asked to assist finding specific tools "but
> Gilmar repeatedly would bring the wrong tool." She noted that her husband felt
> that he was not capable of training Mr. Guevara.

*Id.* at 3-4.  Though Mr. Guevara was paid at the Asencio garage, he earned only $1.15 per week.

*Id.* at 4.

In summing up the information gleaned from these interviewed, Dr. Llorente reported

that Mr. Geuvara "was unable to learn simple mechanic tasks, could not follow basic instruction,

seemed confused and was forgetful." *Id.* at 15. *See also id.* at 15 ("Mr. Guevara has always been

dependent o[n] other individuals in order to function in society.").

The information from these interviews is significant for a number of reasons. First, both Mr. Ventura and Ms. Asencio had an opportunity to directly observe Mr. Guevara's occupational skills during the developmental period. *Id.* at 3. Second, both independently reported that Mr. Guevara exhibited no conduct or behavioral problems, indicating that Mr. Guevara's failure to succeed as an apprentice is not attributable to a lack of effort on his part. *Id.* at 4. Third, Dr. Llorente observed that because of this demeanor, people were easily confused and held "expectations [about Mr. Guevara] that usually surpassed Mr. Guevara's actual abilities." *Id.* at 4. [15]

Finally, consistent with the information above, Dr. Llorente reported that after his immigration to the United States, Mr. Guevara held a number of "menial and unskilled jobs including dishwasher, cook, and mechanic's aid." *Id.* [16]

---

[15] These final two points are particularly important, as Dr. Llorente noted that "several sources of information in the past may have indicated that Mr. Guevara was either a good student or worker." *Id.* at 10. As Dr. Llorente explained, such information is part of the pattern of confusing a pleasant demeanor with ability:

> [These sources] were referring to his demeanor and characteristics, a set of factors not to be confused with the quality of his work from a products standpoint. For example, when Mr. Rafael Ventura refers to Mr. Guevara as a good worker he stated that this means he trusted Mr. Guevara and allowed him to go into his home unsupervised. In fact, it is not unusual to get this contradictory information in these cases were the person with impaired intellect is behaviorally appropriate, yet impaired, leading to academic and occupational problems well documented in their academic record and work history.

*Id.* at 10.  As discussed in Section II, moreover, this Court's review of whether Mr. Guevara has advanced a *prima facie* case is focused on the affirmative evidence Mr. Guevara has produced, rather than any potentially contradictory evidence.

[16] With respect to employment, mildly mentally retarded people often have adaptive deficits related to their occupational skills, but many are nevertheless able to seek, obtain, and even maintain work. Indeed, employment is the norm among mildly mentally retarded persons. While members of this class typically hold lower-level, manual, and lesser-paying jobs than non-mentally retarded persons, the jobs that they perform are nonetheless varied. A handbook regarding "job placement of mentally retarded adults who are preparing for independent living

###### E.   Evidence from Which a Fact-Trier Could Infer That Onset Occurred before the Age of Eighteen.

Dr. Llorente's report before the state court likewise documented the onset of these significant limitations in intellectual functioning and adaptive behavior prior to the age of 18. Mr. Geuvara's adaptive deficits appeared as early as his first years of life, when all developmental milestones were delayed, continuing through his school years and his attempts to learn a trade during his teen years.

Both the AAIDD/AAMR manuals and the DSM-IV-TR recognize the existence of particular circumstances that put a person at risk of developing mental retardation. As the 2010 AAIDD Manual notes, "[i]ndividuals may be born with perfectly normal DNA and still develop ID due to a birth injury, malnutrition, child abuse, or extreme social deprivation." 2010 AAIDD Manual at 59. The AAIDD/AAMR manuals identify four main categories of risk factors that can occur at the prenatal, perinatal, or postnatal stage of development:

1. *Biomedical*: biological processes, such as genetic disorders or nutrition
2. *Social*: social and family interaction, such as stimulation and adult responsiveness
3. *Behavioral*: potentially causal behaviors, such as dangerous (injurious) activities or maternal substance abuse
4. *Educational*: availability of educational supports that promote mental development and the development of adaptive skills

---

and competitive employment" lists many kinds of employment that mentally retarded persons satisfactorily perform, including:

- Library Assistant;
- Typist;
- Waiter/Waitress;
- Landscaping Worker;
- Painting and Maintenance Worker;
- Sewing Machine Operator;
- Forklift Operator; and
- Factory Equipment Cleaner

Angeline M. Jacobs, *et. al.*, HANDBOOK FOR JOB PLACEMENT OF MENTALLY RETARDED WORKERS: TRAINING, OPPORTUNITIES, AND CAREER AREAS (Eileen M. Oullette ed., Garland STPM Press 3d ed. 1979) (excerpts attached as Exhibit E).

2010 AAAIDD Manual at 61. *See also* 2002 AAMR Manual at 126 (same). Both manuals emphasize that "the impairment of functioning that is present when an individual meets the three criteria for a diagnosis of ID usually reflects the presence of several risk factors that interact over time." 2010 AAIDD Manual at 61; 2002 AAMR Manual at 126.

The DSM-IV-TR likewise identifies a number of risk factors. Those relevant to Mr. Guevara are as follows:

> *Environmental influences*: These factors include deprivation of nurturance and of social, linguistic, and other stimulation.
> *Pregnancy and perinatal problems*: These factors include fetal malnutrition, prematurity, hypoxia, viral and other infections, and trauma.
> *General medical conditions acquired in infancy or childhood*: These factors include infections, traumas, and poisoning (e.g., due to lead).

DSM-IV-TR at 46.

Extensive evidence of all of the risk factors from the AAIDD/AAMR manuals and of each risk factor set out above from the DSM-IV-TR is documented in Dr. Llorente's report and was before the state court, confirming that Mr. Guevara manifested the diagnostic features of mental retardation before the age of 18.

### 1.    Biomedical / Pregnancy and Perinatal Problem Risk Factors / General Medical Conditions

Maternal illness, birth injury, and malnutrition are among the biomedical risk factors identified in the AAIDD/AAMR manuals. 2010 AAIDD Manual at 60; 2002 AAMR Manual at 127. The DSM-IV-TR includes fetal malnutrition, hypoxia, viral and other infections, and trauma in its list of potential pregnancy and perinatal problems and infections and traumas in its list of general medical conditions acquired in infancy or childhood. DSM-IV-TR at 46. Evidence that each of those conditions was present in Mr. Guevara's history was before the state court.

Dr. Llorente's report documented Mrs. Guevara's difficult pregnancy, noting that she contracted chicken pox while pregnant with Mr. Guevara. Llorente Report at 2. Information contained in the Vitale Declaration provided further details about the circumstances of the pregnancy. Mrs. Guevara received no prenatal care, as none was available. Vitale Declaration at 2. She was exposed to a great deal of stress due to the war and bombings in the area. *Id.* After she contracted the chicken pox in the seventh month, she suffered swelling and inflammation, as well as very high fevers into the eighth month of her pregnancy. *Id.* She also experienced what she described as "a natural tendency to lose the child" during this period. *Id.*

Though Mrs. Guevara considered Mr. Guevara's birth to be "normal," Vitale Declaration at 3, Dr. Llorente's report documented what are actually a host of complications with Mr. Guevara's birth. A midwife had been following Mrs. Guevara's pregnancy and was to deliver Mr. Guevara at the Guevara family home. Llorente Report at 2. Because the midwife was not available when Mrs. Guevara went into labor, a substitute midwife attended the birth. *Id.* Dr. Llorente observed that this complicated Mr. Guevara's "remarkable delivery," which was preceded by an "unduly extended labor." *Id.* Mr. Guevara was deprived of oxygen during the delivery, and the asphyxia was so severe that "the midwife believed that he was not viable product." *Id.* Despite these difficulties, Mr. Guevara was not taken to a hospital after his birth because of the rural environment in which the Guevara family lived. *Id.* Dr. Llorente emphasized the significance of the circumstances of Mr. Guevara's birth, opining that asphyxia at birth "may have affected his present level of functioning, and could partially account for his present neuropsychological profile and impaired cognition." *Id.* at 10.

The remainder of Mr. Guevara's perinatal and his postnatal periods were likewise marred by biomedical risk factors. Mr. Guevara was born underweight, did not breastfeed well, and

25

suffered from diarrhea. *Id.* at 15; Vitale Declaration at 3. He contracted the chicken pox from his mother *in utero* and was born with the infection. Llorente Report at 15. For approximately three months after birth, his skin was scabbed and bloodied, and it peeled off if he was laid on any surface other than big leaves. Vitale Declaration at 3.

Moreover, because of the impoverished environment in which his family lived, Mr. Guevara suffered from malnutrition in the postnatal period. Llorente Report at 15. Dr. Llorente described this risk factor as "critical," because "such a history of malnutrition at a critical stage of development is consistent with his present neuropsychological profile." *Id.* at 10. Finally, Mr. Guevara endured what Dr. Llorente termed "significant childhood illnesses," including hepatitis and frequent high fevers. *Id.* at 3, 16; Vitale Declaration at 3.

### 2.    Social Risk Factors / Environmental Influences

Poverty, lack of adequate stimulation, and lack of access to prenatal care are included in the AAIDD/AAMR category of social risk factors. 2010 AAIDD Manual at 60; 2002 AAMR Manual at 126. The DSM-IV-TR includes deprivation of social, linguistic, and other stimulation as problematic environmental influences that can lead to the development of mental retardation. DSM-IV-TR at 46. Evidence that Mr. Guevara was exposed to such factors was before the state court.

As noted above, Mrs. Guevara did not have access to prenatal care. Indeed, her access to healthcare was so lacking that Mr. Guevara was born at home with a midwife despite her complicated pregnancy and was not taken to a hospital after his traumatic birth. Llorente Report at 2.

Dr. Llorente also noted that the Guevara family lived in an "impoverished, deprived and unsanitary environment." *Id.* at 2. The Guevaras lived in a small home made of stones and wood

with a dirt floor. Vitale Declaration at 3. The children slept on the dirt floor or in a hammock, and the home had no running water. *Id.* The bathroom was a coverless hole in the ground, and the Guevaras shared a well with other families. *Id.* Such grinding poverty has far-reaching effects, including malnutrition. Dr. Llorente concluded that Mr. Guevara "received little sensory stimulation due to the abject poverty in which he was reared." Llorente Report at 16.

### 3.     Behavioral Risk Factors / Environmental Influences

The AAIDD/AAMR manuals define behavioral risk factors as "potentially causal behaviors, such as dangerous (injurious) activities or maternal substance abuse." 2010 AAIDD Manual at 61; 2002 AAMR Manual at 126. Representative postnatal factors include child abuse and neglect and domestic violence, 2010 AAIDD Manual at 60; 2002 AAMR Manual at 127, and the DSM-IV-TR includes deprivation of nurturance and other stimulation as problematic environmental influences, DSM-IV-TR at 46. Evidence that Mr. Guevara was exposed to behavior risk factors was before the state court.

The Vitale Declaration included information about domestic violence in the Guevara home. Speaking of Mr. Guevara's father, his mother reported that "he would sometimes scare the children talking loud and throwing things. . . . He is bad tempered and rough and has been like that his whole life. I would have to tell him not to be rough with the kids. An example is when I would cook and he did not like it and he would throw the plate away." Vitale Declaration at 4.

Mr. Guevara suffered "exposure to significant violence during the war in El Salvador to the extent that he appears to have suffered from [posttraumatic stress disorder]."[17] Llorente Report at 2. Dr. Llorente's report specifically noted the extreme violence and attendant stress to

---

[17] Posttraumatic stress disorder is one of the mental health disorders most prevalently found to be co-morbid with mental retardation. 2002 AAMR Manual at 173-74.

which Mr. Guevara was exposed, including "seeing dead bodies, and being under the constant threat of death or physical harm." *Id.* at 11.

Mr. Guevara's older brother Benjamin described their lives during Mr. Guevara's developmental period as "a constant situation of terror for all of us." Vitale Declaration at 5. Even as children the Guevaras were "terr[ified] of being seen by either of the sides [in the civil war] because they would take us away and if we resisted they would kill us." *Id.* Benjamin and Mr. Guevara saw the parents and brother of Benjamin's best friend killed. *Id.* Mr. Guevara's younger brother Marvin provided a similarly horrific description of death and destruction that he and Mr. Guevara witnessed:

> I would see mountains of dead people without heads, hands and other body parts laying in the streets in my neighborhood. I have seen bodies burning. I remember once when [Mr. Guevara] and I visited an aunt, from the window we were watching how the guerillas had the people making holes in the ground and the next thing was donkeys would come loaded with bodies that they would throw in those holes.

*Id.* Like Benjamin, Marvin described constant terror at the prospect of being taken away to fight by the military or the guerillas and recalled hiding in the well when fighters came into houses looking for children. *Id.*

### 4.    Educational Risk Factors

The AAIDD/AAMR manuals include delayed diagnosis, inadequate early intervention services, inadequate special education services, and inadequate family support among the educational risk factors of developing mental retardation. 2010 AAIDD Manual at 60; 2002 AAMR Manual at 127. Evidence before the state court reflected Mr. Guevara's exposure to educational risk factors.

The discussion above of Mr. Guevara's adaptive deficits in functional academics / reading and writing makes clear that these risk factors were present in Mr. Guevara's

developmental years. There is no indication that Mr. Guevara was diagnosed as mentally retarded by the El Salvadoran educational system. Indeed, the prospect of a formal diagnosis in a system in which children were socially promoted through the third grade seems exceedingly unlikely. *See* Llorente Report at 15. Mr. Guevara was clearly not provided with adequate special education services, as he dropped out of school in the fourth grade. *Id.* at 15.

It is equally clear that Mr. Guevara was not provided with adequate early intervention services. Mrs. Guevara's account of taking her son to a local clinic when he was six or seven years old is telling. As recounted by Dr. Llorente, Mrs. Geuvara was concerned because Mr. Guevara did not play with other children, nor did he play by himself. *Id.* at 3. The local health professional was unsure about Mr. Guevara's prognosis, and the advice he gave Mrs. Guevara was to buy her son a ball. *Id.* Such advice hardly qualifies as an effective intervention for a child with mental retardation.

In sum, Mr. Guevara presented to the state court evidence of his significant deficits in intellectual functioning, his significant deficits in adaptive behavior, and the onset of those deficits during the developmental period sufficient to trigger his right to an evidentiary hearing.

## III.    BECAUSE MR. GUEVARA PLEADED A PRIMA FACIE CASE OF MENTAL RETARDATION BEFORE THE STATE COURT AND THAT CLAIM WAS ADJUDICATED WITHOUT AN EVIDENTIARY HEARING, 28 U.S.C. § 2254(D) DOES NOT PRECLUDE RELIEF.

This court is not prohibited by 28 U.S.C. § 2254(d) from granting relief to Mr. Guevara. In *Blue v. Thaler*, 2011 U.S. App. LEXIS 25437 (5th Cir. 2011), the Fifth Circuit considered whether a certificate of appealability was warranted in a case procedurally identical to Mr. Guevara's.  In fact, it was that case's state court decision (*Ex parte Blue*, 230 S.W.3d 151 (Tex. Crim. App. 2007)) to which the CCA cited to dispose of Mr. Guevara's *Atkins* claim.  In *Blue*, the petitioner had not raised an *Atkins* claim during his initial state habeas corpus proceeding. He

raised the claim in a subsequent state habeas application, which the CCA dismissed for failing to meet the requirements in Texas law for filing a subsequent habeas application.  Blue thereafter raised the claim in a federal habeas petition.  The Director argued, as here, that the claim was defaulted because the state court had dismissed the claim under Texas's procedural provisions governing review of subsequent state habeas applications.   The district court rejected the argument, but held that Blue's *Atkins* claim lacked merit without holding an evidentiary hearing.

The court of appeals concluded that the district court did not err in denying relief or in failing to hold an evidentiary hearing. The court held that the state court decision, even though based on a state procedural rule, was an adjudication on the merits, and that, for this reason, § 2254(d) applied.[18]  But "[w]hen a petitioner makes a prima facie showing of mental retardation, a state court's failure to provide him with an opportunity to develop his claim deprives the state court decision of the deference ordinarily due under the AEDPA."  *Blue*, 2011 U.S. App. LEXIS at *13-14 (quoting *Wiley v. Epps*, 625 F.3d 199, 207 (5th Cir. 2010)).  The *Blue* Court explained:

> This rule stems from the fact that *Atkins* created and protects a significant substantive liberty interest, a liberty interest that entitles the petitioner to a set of core procedural due process protections: the opportunity to develop and be heard on his claim that he is ineligible for the death penalty. This does not mean that states must give hearings to all persons with *Atkins* claims. The states retain discretion to set gateways to full consideration and to define the manner in which habeas petitioners may develop their claims. But if a state court dismisses a prima facie valid *Atkins* claim without having afforded the petitioner an adequate opportunity to develop the claim, it has run afoul of the Due Process Clause, and that due process violation constitutes an unreasonable application of clearly established federal law that is sufficient to deprive the state court's decision of AEDPA deference.

*Id*. at *14.

---

[18]  Mr. Guevara acknowledges this Fifth Circuit precedent, but wishes to preserve for further review an argument that Section 2254(d) does not apply under the circumstances of this case because there was not an adjudication on the merits of Mr. Guevara's *Atkins* claim within the meaning of Section 2254(d). *See Prevatte v. French*, 459 F.Supp.2d 1305, 1382 (N.D.Ga. 2006).

In short, if a prima facie case were presented to the state court, and the state court adjudicated its merits without affording the petitioner an opportunity to develop and prove the claim at an evidentiary hearing, then it has violated due process and § 2254(d) has been satisfied. In that circumstance, § 2254(d) does not bar a federal district court from granting relief, and the district court is required to hold an evidentiary hearing.  In *Blue*, the appeals court found that the petitioner's evidence before the state court, assumed true, did not amount to a prima facie showing because Blue did not present the CCA with *any* evidence that he had attained a full-scale IQ score of 75 or lower, *i.e.*, that the petitioner had significant limitations in adaptive functioning.  *Id.* at *20-26.[19]

Unlike the *Blue* petitioner, Mr. Guevara demonstrated above that a prima facie case of mental retardation was presented to the state court.  He presented legally sufficient evidence for a fact-trier to infer that (1) Mr. Guevara has significant limitations in intellectual functioning; (2) Mr. Guevara has significant limitations in adaptive behavior; and (3) the onset of the prior two circumstances occurred before age 18.  Despite the presentation of a prima facie case, the state court thereafter proceeded to adjudicate its merits without affording Mr. Guevara an evidentiary hearing or meaningful opportunity to be heard.  Accordingly, § 2254(d)(1) has been satisfied and Mr. Guevara's claim must be considered free from the constraints of AEDPA deference.  *Id.* at *14 (citing *Wiley*, 625 F.3d at 207 ("'When a state court's adjudication of a claim is dependent on an antecedent unreasonable application of federal law, the requirement set forth in § 2254(d)(1) is satisfied. A federal court must then resolve the claim without the deference AEDPA otherwise requires.'" (quoting *Panetti v. Quarterman*, 551 U.S. 930, 944 (2007)));

---

[19] The only evidence of IQ that Blue presented in his state-court proceeding was a trial transcript of the testimony of Dr. Windell Dickerson that he had administered to Blue several short-form versions of the verbal portions of the Weschler test and concluded that Blue "has an actual IQ in the range of 75 to 80." *Blue*, 2011 U.S. App. LEXIS at *21.

*Rivera*, 505 F.3d at 358 ("The lesson we draw from *Panetti* is that, where a petitioner has made a prima facie showing of retardation . . . , the state court's failure to provide him with the opportunity to develop his claim deprives the state court's decision of the deference normally due.")).

## IV.   BECAUSE § 2254(D) HAS BEEN SATISFIED, *PINHOLSTER* HAS NO FURTHER APPLICATION TO THIS CASE.

*Cullen v. Pinholster*, 131 S.Ct. 1388 (2011), poses no barrier to this Court affording Mr. Guevara an evidentiary hearing or otherwise considering evidence that was not before the state court in adjudicating Mr. Guevara's mental retardation claim. The narrow question before the *Pinholster* Court was whether federal courts may consider evidence presented during federal habeas proceedings when conducting a § 2254(d)(1) analysis into whether federal relief on any given claim is precluded notwithstanding its merit.

Understanding the function of § 2254(d) in habeas corpus cases is critical because while *Pinholster* "[l]imit[ed] § 2254(d)(1) review to the state-court record," 131 S.Ct. at 1399, it did not limit the entire scope of federal habeas corpus review to the state court record.  AEDPA's § 2254(d) requires that state court decisions that have reliably adjudicated a federal constitutional claim be given preclusive effect by a federal reviewing court.  28 U.S.C. § 2254(d).  A state court decision is not given preclusive effect, however, if it is unreliable.  AEDPA provides two measures to test the integrity of state court decisions.  State court adjudications of federal constitutional claims are not given preclusive effect when they (1) are based on unreasonable applications of clearly established federal law or applications of law contrary to federal law; or (2) are based on unreasonable determinations of fact in light of the evidence before the court. 28 U.S.C. § 2254(d)(1)-(2). If scrutiny of the state court decision fails to withstand either of these tests, then the state court decision is not given preclusive effect, and the federal court must

consider whether the constitutional claims alleged in the petition merit relief. *Pinholster* merely held that, when conducting the inquiry into whether a state court decision would be given preclusive effect, "a federal habeas petitioner must overcome the limitation of § 2254(d)(1) on the record that was before the state court." 131 S.Ct. at 1400. *See also Blue*, 2011 U.S. App. LEXIS at *12-13 ("*Pinholster* prohibits a federal court from using evidence that is introduced for the first time at a federal-court evidentiary hearing ***as the basis for concluding that a state court's adjudication is not entitled to deference under § 2254(d)***" (emphasis supplied)).

*Pinholster* thus confined itself to interpreting §2254(d)(1) and did not address any question regarding the scope of a federal court's power when determining whether there has been a constitutional violation. It simply held that the federal court's judgment of the reliability of a state court adjudication on the merits must be limited to the state court record. *Pinholster* accordingly does not stand for the broad proposition that a federal court may not consider evidence in a habeas corpus proceeding that was not presented to the state court. In cases where § 2254(d) does not apply (e.g., because the state court did not adjudicate the merits of the claim despite its exhaustion) or where it applies but the state court has been determined unreliable pursuant to either § 2254(d)(1) or § 2254(d)(2) (e.g., as here, because the state court's decision was based on an unreasonable application of federal law), then the only constraints on the federal court's power to consider additional evidence than was presented in state court in determining whether a constitutional violation has been proved are those which pre-existed AEDPA. *See Morris v. Thaler*, 2011 WL 1886096, slip op. at *9 n.1 (5th Cir. May 18, 2011) (unpublished) (an evidentiary hearing is permissible, and appropriate, after determining that § 2254(d)(1) is satisfied); *Hearn v. Ryan*, 2011 WL 1526912, slip op. at *2 (D.Ariz April 21, 2011) (denying State's motion, in light of *Pinholster*, to reconsider granting evidentiary hearing because,

"[h]aving determined Petitioner's *Faretta* claim satisfied § 2254(d)(1), it fell to this Court to resolve the claim"). The only such constraint to consideration of additional evidence is the exhaustion doctrine, in which additional evidence that fundamentally alters a claim renders it a new claim and hence unexhausted. *Pinholster* therefore poses no barrier to this Court considering any and all evidence adduced at a hearing in support of Mr. Guevara's *Atkins* claim that supplements, but does not fundamentally alter, that claim. *See, e.g.*, *Morris v. Dretke*, 413 F.3d 484, 495 (5th Cir. 2005) (considering "new IQ evidence presented for the first time in federal court" because the "new evidence merely supplemented the petitioner's claim").

Because § 2254(d) is satisfied in this case, *Pinholster* has no bearing on this Court's power to afford Mr. Guevara a hearing and to consider any and all evidence in support of his *Atkins* claim—whether presented to the state court or not—that does not fundamentally alter it.

**IV.    BECAUSE MR. GUEVARA PLEADED A PRIMA FACIE CASE OF MENTAL RETARDATION BEFORE THE STATE COURT AND THAT CLAIM WAS ADJUDICATED WITHOUT AN EVIDENTIARY HEARING, FAILURE OF THIS COURT TO HOLD AN EVIDENTIARY HEARING WOULD BE AN ABUSE OF DISCRETION.**

Because Mr. Guevara has advanced a prima facie *Atkins* claim and was not given a hearing in state court, this Court cannot adjudicate that claim on the pleadings filed in state court alone and must instead afford him an evidentiary hearing. *Blue*, 2011 U.S. App. LEXIS at *14 (a district court abuses its discretion where it does not hold an evidentiary hearing in circumstances where a petitioner who made a valid prima facie *Atkins* case to the state court was not afforded a hearing by the state court). Mr. Guevara is situated identically to the *Blue* petitioner, except that whereas the *Blue* petitioner failed to present a prima facie *Atkins* case to the state court, Mr. Guevara did.  Accordingly, it will be an abuse of discretion to fail to hold an evidentiary hearing.

The Director's argument that 28 U.S.C. § 2254(e)(2) precludes a hearing in this case is unavailing. First, *Blue* directly refutes it. Second, the Director is collaterally estopped from making this argument, as the Director conceded in *Blue* that Section 2254(e)(2) did not bar an evidentiary hearing in circumstances identical to those presented here. *See Blue*, 2011 U.S. App. LEXIS 25437 at *9 ("The [Director] concedes that § 2254(e)(2) does not bar Blue from obtaining an evidentiary hearing...").

## CONCLUSION

For the reasons stated herein, Mr. Guevara respectfully requests that this Court deny Respondent's Motion to Alter or Amend Judgment and provide him with the evidentiary hearing to which he is entitled.

Respectfully submitted,


/s/ Laura Ferry

Thomas S. Berg
Texas Bar No. 02189200
600 Travis Street, Suite 1900
Houston, TX 77208-1508
Tel. (713) 236-1900
Fax (713) 228-0321

Laura Ferry
Texas Bar No. 24069715
TEXAS DEFENDER SERVICE
510 S. Congress Ave., Suite 403
Austin, TX 78704
Tel. (512) 320-8300
Fax (512) 477-2153


Counsel for Gilmar Guevara

## CERTIFICATE OF SERVICE

I hereby certify that on February 16, 2012, I electronically filed the foregoing motion with the Clerk of the Court for the U.S. District Court, Southern District of Texas. The ECF system sent a "Notice of Electronic Filing" to counsel for Respondent:

KATHERINE D. HAYES
Assistant Attorney General
P.O. Box 12548, Capitol Station
Austin, TX 78711
Katherine.hayes@oag.state.tx.us

/s/ Laura Ferry
Laura Ferry