IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| **GILMAR ALEXANDER GUEVARA,** | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| | § | |
| -VS- | § | CIVIL NO. 4:08-cv-01604 |
| | § | |
| | § | *CAPITAL CASE* |
| | § | |
| **RICK THALER**, Director, | § | |
| Texas Department of Criminal Justice, | § | |
| Correctional Institutions Division, | § | |
| | § | |
| Respondent. | § | |

_____

**SUPPLEMENTAL BRIEFONG ON HOW *MARTINEZ V. RYAN* IMPACTS THIS COURT'S IMPOSITION OF PROCEDURAL DEFAULT TO MR. GUEVARA'S *STRICKLAND* CLAIM**

*Martinez v. Ryan*, 132 S. Ct. 1309 (2012), requires this Court to review Mr. Guevara's full claim that trial counsel failed to conduct a reasonable sentencing investigation, pursuant to *Strickland v. Washington*, 466 U.S. 668 (1984). Moreover, because the full *Strickland* claim is procedurally defaulted, and not adjudicated on the merits by the state court, 28 U.S.C. § 2254(d) is inapplicable and accordingly cannot operate to limit the Court's power to grant relief.

In his petition for a writ of habeas corpus before this Court, Mr. Guevara alleged that trial counsel were ineffective for failing to conduct a reasonable sentencing investigation and discover evidence of Mr. Guevara's traumatic and impoverished childhood in El Salvador, including his experience of the El Salvadoran civil war; of his difficulty adjusting as an immigrant to life in America without his parents; of his suffering from both Post Traumatic Stress Disorder and immigrant trauma; and of his mental retardation. Docket Entry 1. In this court's interim order

1

denying Mr. Guevara's *Strickland* claim, the Court did not review Mr. Guevara's full *Strickland* claim, but only reviewed a partial *Strickland* claim. Specifically, the Court excised from its review of Mr. Guevara's *Strickland* claim allegations related to Mr. Guevara's mental retardation, holding that "a valid procedural bar forecloses review on the merits" of Mr. Guevara's expanded *Strickland* claim. Docket Entry 36 at 23 n.15.

In *Martinez*, the Supreme Court held that an attorney's errors in state post-conviction proceedings can constitute cause excusing the procedural default of a claim of ineffective assistance of trial counsel if state habeas corpus proceedings provided the first meaningful opportunity to raise and adjudicate such a claim. The Court concluded that this exception to the unqualified holding in *Coleman* was necessary "[t]o protect prisoners with a potentially legitimate claim of ineffective-assistance of trial counsel." 132 S. Ct. at 1315.

The default of Mr. Guevara's expanded *Strickland* claim is attributable to the ineffective assistance of his state habeas counsel.[1] Moreover, because it is based on substantial extra-record evidence and could not have been presented via a motion for a new trial, state habeas corpus proceedings presented the first meaningful opportunity for Mr. Guevara to present and have his *Strickland* claim adjudicated. Accordingly, this Court may review the merits of Mr. Guevara's full *Strickland* claim, and the Court's power to grant relief is not circumscribed by Section 2254(d).

I.   **State habeas corpus proceedings presented the first opportunity for Mr. Guevara to challenge trial counsel's failure to conduct a reasonable sentencing investigation under *Strickland*.**

---

[1] Mr. Guevara does not waive the argument that his expanded *Strickland* claim is not procedurally defaulted because it does not fundamentally alter the claim and preserves that issue for appeal. The arguments presented herein are, accordingly, made in the alternative.

A.   **Under Texas law, state habeas corpus proceedings provide the first and only opportunity to raise ineffective assistance of trial counsel claims that require evidence outside the trial record.**

An allegation that trial counsel were ineffective is a quintessential example of an extra-record claim that must be pressed in habeas corpus proceedings in Texas. Litigants raising a *Strickland* claim first "must show that counsel's representation fell below an objective standard of reasonableness," which must be judged under "prevailing professional norms." 466 U.S. at 688.  Second, the prisoner must demonstrate prejudice by showing "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694.

Satisfying either prong of the *Strickland* test requires the submission of extra-record evidence. For example, when preparing for trial, "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. When assessing counsel's performance, courts look not only to the trial record of the case but to trial counsel's reasons for their actions. *Id*. "Whether counsel's omission served a strategic purpose is a pivotal point in *Strickland* and its progeny. The crucial distinction between strategic judgment calls and plain omissions has echoed in the judgments of this court." *Loyd v. Whitley*, 977 F.2d 149, 158 (5th Cir. 1992).

Resolving the pivotal *Strickland* inquiry requires evidence of counsel's rationale for their actions or omissions. Typically, in Texas capital cases, the habeas court orders trial counsel to submit testimony or affidavits addressing the reasons for their actions. *See, e.g., Ex parte Runnels*, No. WR-46,226-02, Order (Tex. Crim. App. June 8, 2011) (unpublished) (remanding for evidentiary hearing on claim of ineffective assistance of counsel for failure to present any

mitigating evidence, and requiring trial court to "direct trial counsel . . . to respond to the claims in a live evidentiary hearing").

Demonstrating *Strickland* prejudice requires a showing of what evidence would have existed but for counsel's deficiencies. Death-sentenced prisoners who claim their counsel failed to conduct a reasonable sentencing investigation must present the evidence that counsel would have discovered had a reasonable investigation been conducted, which often includes extensive social history documents, as well as affidavits from witnesses. *See Wiggins v. Smith*, 539 U.S. 510, 535 (2003) (habeas counsel introduced evidence of the "kind of troubled history we have declared relevant to assessing a defendant's moral culpability"); *Rompilla v. Beard*, 545 U.S. 374, 391 (2005) (assessing the impact of "the material postconviction counsel found").

Recognizing that state habeas corpus is the first opportunity to raise most *Strickland* claims, the State Bar of Texas Task Force on Habeas Counsel Training and Qualification has emphasized that it is also the *only* such opportunity:

> Habeas proceedings are the only opportunity available to those sentenced to death to raise post conviction claims of prosecutorial misconduct or ineffective assistance of trial counsel and to present evidence not developed or discovered during trial—including evidence as to the actual innocence of the applicant.

Task Force Report, Apr. 27, 2007 (available at http://www.aclutx.org/files/SBOT%20Task%20Force%20Final%20Report%20Signed.pdf). This dual reality—that trial counsel's ineffectiveness can only be raised in habeas proceedings *and* that habeas is the *only* opportunity to raise such claims—has been addressed by members of the Texas Court of Criminal Appeals ("TCCA") in various contexts, but each has recognized that *Strickland* claims can be irremediable if habeas counsel fails to present them effectively:

> If the defendant's habeas counsel performs deficiently, a meritorious [*Strickland*] claim may not be adequately raised or investigated. Applicants only get one shot at habeas corpus relief. If the attorney appointed on his first writ is incompetent,

4

then a defendant, who was deprived of effective assistance of counsel at trial, has *no means* to enforce his constitutional right to effective assistance of counsel at trial.

*Ex parte Graves*, 70 S.W.3d 103, 124–25 (Tex. Crim. App. 2002) (Price, J., dissenting) (emphasis added). *See also Ex parte Rojas*, 2003 WL 1825617, at *1 (Tex. Crim. App. Feb. 12, 2003) (unpublished) (Price, J., dissenting) (stating collateral review is the "one opportunity to raise claims not based solely on the record").

In an opinion issued on June 28, 2012,[2] the Fifth Circuit found that the petitioner was not entitled to the benefit of *Martinez* because "Texas defendants may first raise ineffectiveness claims before the trial court following conviction via a motion for new trial, ***when practicable*** . . . ." *Ibarra v. Thaler*, 2012 U.S. App. LEXIS 13777, *11 (5th Cir. June 28, 2012).[3] The *Martinez* Court itself recognized the inadequacy of this approach, noting that "[a]bbreviated deadlines to expand the record on direct appeal may not allow adequate time for an attorney to investigate the ineffective-assistance claim." *Martinez*, 132 S.Ct. at 1318 (citing Primus, *Structural Reform in Criminal Defense*, 92 Cornell L. Rev. 679, 689, n.57 (2004)). The TCCA has likewise recognized the obvious flaws in this method of litigating ineffective assistance of counsel claims. *See, e.g.*, *Ex parte Torres*, 943 S.W.2d 469, 475 (Tex. Crim. App. 1997) ("While expansion of the record may be accomplished in a motion for new trial, that vehicle is often inadequate because of time constraints and because the trial record has generally not been transcribed at this point."); *Mata v. State*, 226 S.W.3d 425, 430 n.14 (Tex. Crim. App. 2008).

In Mr. Guevara's case, moreover, there is no question that raising his ineffective assistance of counsel claim via a motion for new trial was not only impracticable, but impossible.

---

[2] The opinion was initially issued as an unpublished opinion on June 28, 2012. Eight days later and without explanation, on July 6, 2012, it was re-issued as a published opinion.

[3] The *Ibarra* panel also raised the possibility that *Strickland* claims could be effectively raised on direct appeal, a contention that is rebutted in Section I.B., below.

Mr. Guevara was sentenced to death on June 4, 2001. 1 C.R. 143-44.[4] He was appointed new counsel to represent him in his appellate proceedings on the same day. 1 C.R. 156. The Texas Rules of Appellate Procedure in effect at the time of Mr. Guevara's trial required that a motion for a new trial be filed no later than 30 days after the imposition of sentence.[5] The clerk's record and the full reporter's record for Mr. Guevara's trial were not filed with the convicting court until September 5, 2001. 1 C.R. 194 (Certification of Clerk, dated September 5, 2001); S.F. Vol. 22: 1 (final volume of the reporter's record, bearing a file-stamp date of September 5, 2001).

Before a movant for a new trial is entitled to a hearing on a motion alleging ineffective assistance of counsel, a movant must "allege sufficient facts from which a trial court could reasonably conclude *both* that counsel failed to act as a reasonably competent attorney *and* that, but for counsel's failure, there is a reasonable likelihood that the outcome of his trial would have been different." *Smith v. State*, 286 S.W.3d 333, 340-41 (Tex. Crim. App. 2009) (emphasis in original). Accordingly, in order to press Mr. Guevara's ineffective assistance claim in a motion for a new trial, his appellate counsel—who had no involvement in the trial proceedings—would have been required to develop the necessary deficiency and prejudice allegations within 30 days of his appointment, without the benefit of either the clerk's or the reporter's record. Such a feat would have been impossible.

### B. TCCA direct appeal and habeas corpus opinions demonstrate that state habeas provides the first opportunity to adjudicate an ineffective assistance claim that requires evidence that is not in the trial record.

---

[4] The clerk's record from Mr. Guevara's capital murder trial will be referenced as "[Volume] C.R. [page number]."

[5] In 2001, this deadline was to be found in Texas Rule of Appellate Procedure 31. The same deadline governs motions for new trial at present, but it is now found in Texas Rule of Appellate Procedure 21.4.

Although Texas does not have a rule of procedure prohibiting appellants in criminal cases from raising *Strickland* claims on direct appeal, the TCCA has made clear, for the same reasons recognized in *Martinez*, 132 S.Ct. at 1318, that claims based on evidence not in the trial record must be adjudicated in state collateral proceedings and cannot be adjudicated on direct appeal:

> While defendants in criminal cases in Texas are not legally prohibited from challenging the effectiveness of their trial counsel on direct appeal, such claims typically call for extensive factual development beyond what is disclosed in the appellate record, and thus, as a practical matter, post-conviction habeas corpus is the first opportunity to raise them.

*Ex parte Balentine*, No. WR-54,071-03, slip op. at 2 n.5 (Tex. Crim. App. June 14, 2011) (dissenting statement of Price, J., joined by Johnson and Alcala, JJ.). "As a general rule, one should *not* raise an issue of ineffective assistance of counsel on direct appeal." *Mata*, 226 S.W.3d at 430 n.14 (emphasis in original). In all but the rarest of instances, the TCCA will not adjudicate *Strickland* claims raised by a defendant on direct appeal. When such claims are raised, the non-adjudication appears as a denial of the claim, but the TCCA has been explicit that such a "denial" of a *Strickland* claim on direct appeal is *not* an adjudication of the claim but rather merely a determination that the trial record is inadequate to support the reversal of the judgment on that ground. Such denials of *Strickland* claims have no res judicata implications in Texas and do not bar consideration of the claim in collateral proceedings based on an expanded record, where it will be adjudicated in the first instance.

In *Ex parte Duffy*, 607 S.W.2d 507 (Tex. Crim. App. 1980), *overruled on other grounds by Hernandez v. State*, 988 S.W.2d 770 (Tex. Crim. App. 1999), a capitally sentenced defendant raised a *Strickland* claim in his state habeas corpus application. The State argued that the claim had been improperly raised in habeas corpus because the applicant could have raised it on direct appeal. The State relied on Texas's long-standing rule "that habeas corpus relief generally does not lie where relief could have been obtained by properly preserving the issue on direct appeal."

*Id*. at 512 (citing *Ex parte Puckett*, 274 S.W.2d 696 (Tex. Crim. App. 1954)). The TCCA

rejected the State's argument:

> Experience has taught us that in most instances where the claim of ineffective
> assistance of counsel is raised, the record on direct appeal is simply not in a
> shape, perhaps because of the very alleged ineffectiveness below, that would
> adequately reflect the failings of trial counsel. Indeed, in a case such as this,
> where the alleged derelictions primarily are errors of omission de hors the record
> rather than commission revealed in the trial record, collateral attack may be just
> the vehicle by which a thorough and detailed examination of alleged
> ineffectiveness may be developed and spread upon a record.

*Duffy*, 607 S.W.2d at 513, *overruled on other grounds by Hernandez v. State*, 988 S.W.2d 770

(Tex. Crim. App. 1999). Not only was it the case that experience counseled against adjudicating

such claims on direct appeal, but in view of the capital nature of the case, the court also "would

be hard pressed to find that our petitioner had any other available remedy [besides habeas

corpus] in the courts of this State." *Id*. In short, the TCCA held that direct appeal does *not* afford

an adequate remedy for a complaint about the effectiveness of trial counsel.

In 1994, the TCCA overturned a lower court's decision reversing a conviction based on

ineffective assistance of counsel because the record did not reflect trial counsel's reasons for the

challenged actions.[6] *Jackson v. State*, 877 S.W.2d 768 (Tex. Crim. App. 1994). Concurring in the

opinion, Judge Baird emphasized the difficulty of adjudicating *Strickland* claims on direct

appeal:

> This case stands for a very simple proposition: As a general rule, one should *not*
> raise an issue of ineffective assistance of counsel on direct appeal. This is so
> because a trial record is generally insufficient to address claims of ineffective
> assistance of counsel in light of the "strong presumption that [trial] counsel's
> conduct falls within the wide range of reasonable professional assistance."
> *Strickland v. Washington,* 466 U.S. 668, 689, 104 S.Ct. 2052, 2065, 80 L.Ed.2d
> 674 (1984).

---

[6] In Texas, direct appeals in non-capital cases are filed in regional appellate courts and
applications for discretionary review of the Court of Appeals decisions are filed in the TCCA.
Direct appeals in death penalty cases are filed directly in the TCCA.

* * *

> A trial record is directed to the issues of guilt/innocence and punishment. And we review that record with an eye toward the errors allegedly committed in relation to those issues. However, in order to effectively argue an issue of ineffective assistance of counsel, a record focused on the conduct of trial or appellate counsel should be developed. Such a record is generally best developed in the context of a hearing held in relation to an application for writ of habeas corpus.  For example, in *Ex parte Menchaca*, 854 S.W.2d 128, 130 (Tex.Cr.App.1993), the habeas judge conducted a hearing and entered findings of fact and conclusions of law on the claim of ineffective assistance of counsel. In such instances, we can better gauge the effectiveness of counsel's representation by reviewing the record from the writ hearing as well as the habeas judge's findings and conclusions, all of which are directed to the representation issue.

*Jackson*,  877 S.W.2d at 772-773 (Baird, J., concurring) (footnotes omitted). Judge Baird also

addressed the difficulty of developing a record on a motion for new trial sufficient to adjudicate a

*Strickland* claim:

> [I]n most cases this will be impractical because the time constraints for filing a motion for new trial, Tex.R.App.P. 31, do not provide for adequate investigation … [and] the trial record will generally not be transcribed and, therefore, unavailable for preparation for and use at the motion for new trial hearing.[7]

*Id*. at 773, n.3.

In *Ex parte Torres*, 943 S.W.2d 469 (Tex. Crim. App. 1997), a petitioner raised a

*Strickland* claim in a petition for writ of habeas corpus in state court after having unsuccessfully

---

[7] The *Martinez* Court echoed Judge Price's concerns about why state courts would route *Strickland* claims into collateral proceedings rather than consider them on appeal:

> Ineffective-assistance claims often depend on evidence outside the trial record. Direct appeals, without evidentiary hearings, may not be as effective as other proceedings for developing the factual basis for the claim. Abbreviated deadlines to expand the record on direct appeal may not allow adequate time for an attorney to investigate the ineffective-assistance claim. Thus, there are sound reasons for deferring consideration of ineffective-assistance-of-trial-counsel claims until the collateral-review stage, but this decision is not without consequences for the State's ability to assert a procedural default in later proceedings.

*Martinez*, 132 S.Ct. at 1318 (citations omitted).

raised it on direct appeal. The State argued, and the trial court had found, that res judicata barred consideration of the *Strickland* claim in the habeas corpus proceeding because it had been previously raised and rejected on direct appeal. *Id.* at 471. The TCCA rejected the argument. The Court concluded that, because the inadequate appellate record on which *Strickland* claims are presented on direct appeal is due to the "inherent nature" of such claims, res judicata would not operate to bar adjudication of a *Strickland* claim that had previously been denied on direct appeal:

> Generally, a claim which was previously raised and rejected on direct appeal is not cognizable on habeas corpus. However, this doctrine should not be applied where direct appeal cannot be expected to provide an adequate record to evaluate the claim in question, and the claim might be substantiated through additional evidence gathering in a habeas corpus proceeding. In most instances, the record on direct appeal is inadequate to develop an ineffective assistance claim. Moreover, the inadequacy of the appellate record in these situations is due to the inherent nature of most ineffective assistance claims. The very ineffectiveness claimed may prevent the record from containing the information necessary to substantiate such a claim. Moreover, the trial record ordinarily does not reflect counsel's reasons for doing or failing to do actions of which the defendant complains. While expansion of the record may be accomplished in a motion for new trial, that vehicle is often inadequate because of time constraints and because the trial record has generally not been transcribed at this point. Further, mounting an ineffective assistance attack in a motion for new trial is inherently unlikely if trial counsel remains counsel during the time required to file such a motion. Hence, in most ineffective assistance claims, ***a writ of habeas corpus is essential to gathering the facts necessary to adequately evaluate such claims***.

943 S.W.2d at 475 (citations omitted and emphasis added).

In 1999, the TCCA reversed another court of appeals decision that found trial counsel ineffective for failing to object to hearsay evidence previously determined to be inadmissible. *Thompson v. State*, 9 S.W.3d 808 (Tex.Crim.App. 1999). After discussing at length the stringent requirements under *Strickland*, and the burden of overcoming the "strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance," the TCCA held that the record was inadequate to adjudicate the claim because it was "silent as to why

appellant's trial counsel failed to object to the State's persistent attempts to elicit inadmissible hearsay." *Id.* at 813-14. The TCCA went on to announce that when it denied *Strickland* claims on direct appeal, it does not decide whether "appellant did or did not receive the effective assistance of counsel during trial." *Id.* at 814. In short, the TCCA's denial of a *Strickland* claim on direct appeal is not really an adjudication of the claim, but merely a determination that the record is inadequate to resolve it:

> Recourse for appellant's claim is still available. This Court has held that the general doctrine that forbids an application for writ of habeas corpus after direct appeal has addressed the issue does not apply in these situations, and appellant can resubmit his claim via an application for writ of habeas corpus. This would provide an opportunity to conduct a dedicated hearing to consider the facts, circumstances, and rationale behind counsel's actions at that juncture of trial. Specifically, a hearing would allow trial counsel himself to explain why no objection was voiced during the proceedings.

*Id.* at 815-816 (citations omitted). *See also Rylander v. State*, 101 S.W.3d 107 (Tex. Crim. App. 2003) (reversing court of appeals' decision on ineffective assistance claim and noting that the court was not "deciding on this direct appeal whether appellant did or did not receive effective assistance of counsel . . . [and that] Appellant may still submit his ineffective assistance of counsel claim for review on the merits in an application for writ of habeas corpus[,]"); *Bone v. State,* 77 SW 3d 828 (Tex. Crim. App 2002) (reversing lower court's reversal of conviction on Strickland grounds due to inadequate record and noting that the appellant was entitled to raise his *Strickland* claim in habeas corpus); *Velez v. State*, No. AP-76,051, slip op. at 60-61 (Tex. Crim. App. June 13, 2012) (unpublished) (concluding that "the record is not sufficient to address appellant's ineffective-assistance-of-counsel claims").[8]

---

[8] Even in the rare case where the TCCA finds adequate support in the record to uphold a *Strickland* claim on direct appeal, it cautions that "[g]enerally the record on direct appeal will not be sufficient to show the counsel's representation was so deficient as to meet the first part of the *Strickland* standard" and that habeas corpus "usually is the appropriate vehicle to investigate ineffective-assistance claims." *Mitchell v. State*, 68 S.W.3d 640, 643 (Tex. Crim. App. 2002).

Accordingly, Texas has chosen habeas corpus proceedings and not direct appeal as the appropriate forum for adjudicating *Strickland* claims, particularly in capital cases. And Texas prisoners with potentially meritorious *Strickland* claims are as much in need of protection from default of such claims as prisoners in Arizona.

## II.    Mr. Guevara's full *Strickland* claim is substantial.

Mr. Guevara's full *Strickland* claim is a substantial claim. *Martinez* defines a "substantial" claim as one about which reasonable jurists could debate. 132 S. Ct. at 1318-19.

### A.    Reasonable jurists could debate whether trial counsel failed to conduct a reasonable sentencing investigation.

#### 1.    Trial counsel's sentencing investigation.

Mr. Guevara was arrested for capital murder on June 10, 2000. The next day, Mr. Guevara was judicially recognized at a hearing before a magistrate to be an El Salvadoran citizen. 1 C.R. 5. The court appointed Ricardo Rodriguez to represent Mr. Guevara on June 13, 2000. 1 C.R. 8. Jerry Guerinot was also appointed to represent Mr. Guevara on December 1, 2000.  1 C.R. 50.

In preparation for sentencing, Mr. Rodriguez spoke to Mr. Guevara about family members who could come to court and testify in his behalf. Mr. Guevara told Mr. Rodriguez that he was from El Salvador and that only his brother, Benjamin Guevara, and his sister, Sonia Soto,

---

Indeed, the TCCA even requires a heightened showing of deficiency before it will reverse a judgment on direct appeal based upon a complaint about counsel's representation. *See Mata*, 141 S.W.3d at 869 (to be entitled to reversal on direct appeal based on an allegation that counsel performed deficiently, an appellant must demonstrate that counsel's acts as they appear in the appellate record were "so outrageous that no competent attorney would have engaged in it"); *Roberts v. State*, 220 S.W.3d 521, 533 (Tex. Crim. App. 2007). This standard is higher than the constitutional standard for proving deficient performance under the Sixth Amendment, which requires only that a claimant show that counsel's performance was not reasonable under prevailing professional norms. *Strickland*, 466 U.S. at 688.

lived in the United States. All the rest of Mr. Guevara's family lived in El Salvador. Mr. Guevara told Mr. Rodriguez that his family was too poor to travel to the United States.

On November 17, 2000, counsel filed a motion for authorization of payment for an investigator. The motion explained that "it is imperative that an Investigator be promptly appointed in order that the witnesses can be found well in advance of the trial and that a thorough and impartial investigation be made." 1 C.R. 15. On December 1, 2000, the trial court approved up to $2,500 in funding to retain John Castillo as an investigator, further funding subject to approval of the court upon petition. 1 C.R. 17-18. Trial counsel never sought out the services of a mitigation specialist, a person with special training to investigate and develop mitigating evidence about an accused's background and mental health. Mr. Castillo, although he attempted to speak to Mr. Guevara's brother, sister, and wife, was never tasked with conducting—and did not conduct—any investigation into Mr. Guevara's life history.

Mr. Castillo first attempted to speak with Mr. Guevara in the Harris County jail on December 19, 2000. *See* Affidavit of John Castillo, 1 H.C.R. 141.[9] Mr. Guevara's counsel, however, had never informed Mr. Guevara that they had retained an investigator and did not alert him that a representative from the defense team would be visiting him. Mr. Guevara accordingly declined to speak to Mr. Castillo in accordance with previous instructions from counsel that he not speak to persons about his case. *Id.* Mr. Castillo informed counsel about the problem the next day, but it was not until February 24, 2001, that Mr. Castillo met with Mr. Guevara for the first time. *Id.*

Mr. Castillo questioned Mr. Guevara about facts surrounding Mr. Guevara's involvement in various charged offenses. Mr. Guevara also told Mr. Castillo that he had a brother and sister

---

[9] The clerk's record from Mr. Guevara's habeas proceedings in the trial court will be referenced as "[Volume] H.C.R. [page number]."

living in the United States. On February 25, 2001, Mr. Castillo attempted to call Mr. Guevara's brother, Benjamin Guevara, and his sister, Sonia Soto. Neither answered, and Mr. Castillo left a machine message for each. *Id.* Benjamin did not ever become aware of any messages left by Mr. Castillo. *See* Affidavit of Benjamin Guevara, 1 H.C.R. 137. Mr. Castillo did not work on the case again until May of 2001, the month trial was to start. 1 H.C.R. 141.

On April 9, 2001, Mr. Guevara's counsel filed a motion requesting that the court authorize funding for defense counsel to retain psychiatrist Fred Fason as a mental health expert. 1 C.R. 68-71. The motion stated, "If [Mr. Guevara] is found guilty of the offense, the Defendant intends to offer evidence in mitigation of the special issues submitted to the jury during the punishment phase of the trial regarding his present mental status." 1 C.R. 68. The request was granted by the trial court the same day. 1 C.R. 72.

Voir dire began on May 3, 2001. 1 C.R. 160. At this time, counsel for Mr. Guevara had not conducted any mitigation investigation and accordingly did not know what life history and mental health evidence might be available for presentation in defense of Mr. Guevara's life at sentencing. During voir dire, Mr. Guevara's counsel did not question any of the jurors about their views on mitigating evidence, including whether the potential juror would consider having had a traumatic and impoverished childhood, having experienced a brutal civil war, having post-traumatic stress disorder, or having mental retardation to be mitigating.

While voir dire was ongoing, Mr. Castillo made an unsuccessful attempt to contact Mr. Guevara's brother and sister by telephone on May 4, 2001. 1 H.C.R. 141. On May 6, 2001, Mr. Castillo tried to contact Mr. Guevara's wife at her last known address in Texas City, Texas. No one was home, and Mr. Castillo left a business card with a note requesting that she contact him. *Id.* The next day, on May 7, 2001, Mr. Castillo made telephonic contact with Mr. Guevara's

sister's husband. Mr. Soto stated that his wife was at work. *Id.* That same day, Mr. Castillo also made contact with Mr. Guevara's brother, Benjamin. Mr. Castillo's affidavit does not reflect that the content of the discussion broached Mr. Guevara's life history or childhood background.[10] *Id.* at 141-42. Benjamin's affidavit attests that, after receiving Mr. Castillo's phone call, he asked the employees at his auto shop whether Mr. Castillo had called before, and they said he had not. 1 H.C.R. at 137. Benjamin also stated that he had never before received any voicemails from Mr. Castillo. *Id.* After speaking with Mr. Castillo, Benjamin made numerous attempts to call both Mr. Rodriguez and Mr. Guerinot. Either there was no answer or he was told the attorneys were in court, and neither returned any of Benjamin's calls. *Id.*

On May 10, 2001—a week after voir dire began and less than two weeks before the start of trial—Mr. Rodriguez sent a letter to Dr. Fason, retained one month earlier. *See* Exhibit A (Letter from Ricardo Rodriguez to Fred L. Fason, M.D.). The letter conveyed that Rodriguez was enclosing with the letter "the completed MMPI" and told Fason, "We are working on some time constraints due largely to the Defendant's taking too long to complete the MMPI." *Id.* The MMPI is a psychological instrument intended to detect patterns of psychopathology. The test consists of over 500 true-false questions and requires at least an 8th grade reading level to complete.[11] Richard Rogers, *Forensic Use and Abuse of Psychological Tests: Multiscale*

---

[10]   The affidavit reflects that Benjamin became "highly emotional" during the conversation and that Benjamin felt the pressure of all of his family's problems. Benjamin told Mr. Castillo that his sister, Sonia Soto, had even greater problems and that this situation could kill her. He further relayed that he did not know where Mr. Guevara's wife was currently living. Benjamin told Mr. Castillo that he would contact Mr. Rodriguez later that day.

[11]   "The essential prerequisite for multiscale inventories is that patients have adequate reading comprehension." 9 J. Psychiatric Prac. 316, 317 (2003). Mr. Guevara has a reading comprehension at the fourth grade level in the Spanish language. *See* Affidavit of Antolin M. Llorente, Ph.D. at 6 (attached as Exhibit A to Subsequent State Writ).

*Inventories*, 9 J. Psychiatric Prac. 316, 318 (2003). Mr. Rodriguez asked Dr. Fason to call him so that Mr. Rodriguez could give Dr. Fason more information.

After finally making contact with Mr. Rodriguez, Mr. Guevara's brother Benjamin met with him on May 20, 2001, the Sunday before trial was to begin. 1 H.C.R. 137. Although Mr. Rodriguez did not ask Benjamin any questions about Mr. Guevara's background, Mr. Rodriguez told him that he should be prepared to testify in court as to Mr. Guevara's background and experiences in El Salvador. *Id.*

Testimony in the guilt-innocence phase began on May 23, 2001. On May 30, the jury returned a verdict finding Mr. Guevara guilty of capital murder. The sentencing trial began the next day. After the State presented its case-in-chief at sentencing, Mr. Guerinot stood up for the defense and immediately rested. S.F. Vol. 18: 116. No witnesses were called and no evidence was admitted. On June 4, 2001, the jury answered the special issues in a manner requiring the imposition of death. 1 C.R. 140.

### 2.    A reasonable jurist could conclude that trial counsel's sentencing investigation was unreasonable.

In a capital case, "[i]t is unquestioned that under the prevailing professional norms [since at least 1988], counsel ha[s] an 'obligation to conduct a thorough investigation of the defendant's background.'" *Porter v. McCollum*, 130 S. Ct. 447, 452 (2009) (per curiam) (quoting *Williams v. Taylor*, 529 U.S. 362, 396 (2000)); *see also Sears v. Upton*, 130 S. Ct. 3259, 3265 (2010) (*per curiam*) (same). A failure to discover particular mitigating evidence cannot be justified as a tactical decision unless counsel have *first* fulfilled their obligation to conduct a thorough background investigation. *Wiggins v. Smith*, 539 U.S. 510, 522 (2003). Accordingly, the relevant deficiency question is whether the investigation supporting counsel's decision not to introduce mitigating evidence was reasonable. *Id*. at 523.

16

In *Wiggins*, trial counsel conducted some mitigation investigation. Counsel's investigation in fact drew from three sources. First, counsel retained a psychologist who administered several psychological instruments to the client. 539 U.S. at 523. The psychologist concluded that the client had borderline intelligence, had difficulty coping with demanding situations, and exhibited features of a personality disorder. *Id*. Second, counsel had available to them the written presentence investigation report (PSI), which included a short account of Wiggins' "personal history" noting his "misery as a youth," quoting his description of his own background as "'disgusting,'" and observing that he spent most of his life in foster care. *Id*. Third, counsel sought and obtained records from the Baltimore City Department of Social Services (DSS) documenting the client's various placements in the State's foster care system. *Id*. The Supreme Court held that counsel's decision not to expand their mitigation investigation beyond this fell short of the professional standards that prevailed in their state in 1989. *Id*. at 524. In short, "counsel abandoned their investigation of petitioner's background after having acquired only rudimentary knowledge of his history from a narrow set of sources." *Id*.

In *Sears*, the Supreme Court observed that limiting investigation into the defendant's background only to interviewing persons selected by a defendant's mother is "on its face [ ] constitutionally inadequate." 130 S.Ct. at 3264. The Court has also made clear that failure to follow up on pertinent avenues for investigation of which counsel should have been aware reflects unreasonable professional judgment. *Porter*, 130 S.Ct. at 453.

Prevailing professional norms in Texas established well before Mr. Guevara's trial that counsel bear an affirmative obligation to conduct an adequate mitigation investigation. For example, the State Bar of Texas 20th Annual Advanced Criminal Law Course took place in July of 1994, seven years before Mr. Geuvara's trial. Materials distributed at the State Bar course

included a primer on defending capital cases at the sentencing phase. *See* Exhibit B (Capital Sentencing Strategy: A Defense Primer, July 1994) (hereinafter "1994 State Bar Materials"). The materials reflect the expectation that defense counsel will conduct a searching background investigation:

> A thorough intergenerational life history ***must*** be developed, incorporating all life history documents and ***interviews with all first and second degree relatives, friends, [and] peers***.  As relatives with histories of relevant physical illnesses (diabetes, endocrine/hormonal, and neurological) and mental illnesses are identified, obtain their medical and life history documents.

Exhibit B at 17–18 (emphasis added). The standard of care required that the defense team search for all potentially relevant mitigating circumstances because the mitigation special issue made explicit that "<u>everything</u> about the circumstances of the underlying offense (or other prior bad acts), the defendant's character, and the defendant's record (read 'history') is relevant to the jury's final determination of the issue." *Id.* (emphasis in original).

The 1994 State Bar of Texas Materials document that counsel had a duty to independently investigate the wide range of social, psychological, medical, environmental, and other factors that shaped the client's life. Like the current ABA standards, the 1994 State Bar Materials instructed counsel both to collect a comprehensive set of life history documents and to interview numerous people who can shed light on the client's background. To that end, the 1994 State Bar Materials provided counsel with "an ***initial*** list of essential people to talk to and records to obtain." *Id.* (emphasis added). The list was not intended to be comprehensive because "[e]ach person and document will have information that will lead to additional people and records that [counsel] will need to talk to or obtain." *Id.* Thus, the materials defined a starting point for a mitigation investigation that expands in the directions indicated by the information gathered by counsel.

According to the 1994 State Bar Materials, the standard of care called for a thorough intergenerational life history, which included interviews with "all first and second degree relatives, friends, [and] peers." *Id*. at 17. Counsel were expected to interview life history witnesses about a wide range of topics, and not merely ask, "Is there anything you think we should know about the client?" Because the life history witnesses often have no concept of what is important or mitigating about a person's background, it was counsel's obligation to raise and explore the relevant areas with the witnesses.  Hence the 1994 State Bar Materials specifically instructed counsel to inquire into a broad range of topics, including:

- sexual and physical abuse;
- medical care, education, and nutrition;
- difficulty reading, speech impediments;
- nightmares, sleep disturbances, fear of the dark;
- withdrawal, quietness, shyness;
- rocking, biting, head banging during early childhood;
- anxiety, nervousness, crying,
- superstitions;
- fears;
- the parents' socio-economic history;
- client and family physical illness and disabilities;
- client and family mental illness and/or  mental retardation;
- family history of suicide;
- a detailed drug and alcohol history, including age first used, frequency, amounts, effects, and so forth.

*Id*. at 17-21.

The ultimate aim of the mitigation investigation is to support a punishment phase defense: "***Once you have assembled everything***—both information and records—regarding your client's life, you must create a defense." *Id*. at 22 (emphasis supplied). Counsel should seek to "humanize" the client and "explain as much as possible." *Id*. Counsel must relate the mitigating evidence to the criminal act. "Negative" qualities, such as abuse or mental illness, "are often the primary source of explanatory evidence." *Id*. It is important to "[e]xplain as much as possible"

because "[f]acts in a vacuum are what prosecutions are made of." *Id*. Counsel's duty during the punishment phase was to "[u]se [their] witnesses to fully develop the picture of a person who is life-worthy." *Id*.

The 1994 State Bar of Texas Materials were hardly cutting-edge material. The materials merely conformed to the national capital defense norms in place since the mid-1980's. *See, e.g.,* Exhibit C (David C. Stebbins & Scott P. Kenney, Zen and the Art of Mitigation Presentation, or, The Use of Psycho-Social Experts in the Penalty Phase of a Capital Trial, The Champion, Aug. 1986, at pp. 16–17) ("Upon appointment to a capital case, two concurrent investigations should be begun by separate and distinct investigatory personnel . . . . A social history is a complete chronicle of every event of any significance in the life of the client from birth, or even before, to the present . . . . Without a complete social history, any psychological examination is incomplete and the resulting opinions, conclusions, or diagnoses are subject to severe scrutiny."); *see also id*. at 16 ("[A]ttorneys are not trained in . . . dealing with the psycho-social problems of their clients and explaining these to the jury. Because of this, it is necessary for attorneys in capital cases to recognize at the beginning that the do not have the skills to accomplish the goals of mitigation and to go and seek the assistance of psycho-social professionals who are skilled in these fields. For all practical purposes, the effective use of social workers, psychologists, and psychiatrists is necessary for the effective representation of a capitally-charged defendant."); Exhibit D (Jeff Blum, Investigation in a Capital Case: Telling the Client's Story, The Champion, Aug. 1985, at pp. 27-31) (instructing capital defense counsel to thoroughly investigate the client's background by collecting documentary evidence and interviewing witnesses related to family background, medical history, school performance, military experience, work history, psychological profile,

criminal record, institutional record, significant others, religious background, drug/alcohol history, geography, skills and talents).

To the extent one can categorize anything Mr. Guevara's counsel did as background investigation, counsel clearly abandoned any such investigation after having acquired only "rudimentary knowledge" of Mr. Guevara's history "from an extremely narrow set of sources"— namely, Mr. Guevara and his brother Benjamin.[12] *Wiggins*, 539 U.S. at 524. Counsel knew that their client was came from an impoverished background in El Salvador during a brutal civil war, yet did virtually nothing to investigate that background beyond talking to Mr. Guevara and his brother. Indeed, counsel apparently believed they had no duty to investigate at all, and that this duty was instead owed by people who knew Mr. Guevara. *See, e.g.,* Affidavit of Ricardo Rodriguez at 6[13] ("Although Benjamin Guevara was the only witness who could testify to these mitigation facts, he was able to cover all the mitigation evidence ***that I was made aware of***, and with personal details." (emphasis supplied)); *id*. ("Other than Benjamin Guevara, no other friends or relatives of Mr. Guevara came to court to testify."); *id*. ("A man stating he was a friend of Benjamin Guevara did call me on the telephone, and we had a conversation. However, he did not have any evidence to provide for trial, and he did not come to court to testify."). Counsel's

---

[12] The fact that almost all of Mr. Guevara's life history witnesses resided in El Salvador did not absolve counsel of the duty to interview them—or at least attempt to do so. Counsel made ***no effort*** whatsoever to secure funding to retain a Spanish-speaking mitigation specialist to travel to El Salvador for investigative purposes. Indeed, such a request would have assuredly been granted, because post-conviction counsel secured approval of such funding even though there is no due process right to funding for ancillary services in post-conviction proceedings. *See Ake v. Oklahoma*, 470 U.S. 68 (1985).

[13] Mr. Rodriguez's affidavit was attached as an exhibit to the State's Answer to Mr. Guevara's original writ in the trial court. 1 H.C.R. 197-205. There is a factual dispute about the content of Mr. Guevara's trial counsel's discussions with Mr. Guevara's brother. Benjamin denied, in an affidavit attached to the original writ filed in trial court, that counsel inquired into his brother's background, 1 H.C.R. 137, while Mr. Rodriguez attests in his affidavit that he did. 1 H.C.R. 200-01.

belief that their responsibilities were fulfilled by lying in wait turned the capital lawyer's duty to thoroughly investigate the client's background on its head.[14]

**B.      Reasonable jurists could debate whether trial counsel's failure to conduct a reasonable sentencing investigation prejudiced Mr. Guevara at trial.**

Because counsel's preparation was so inadequate, they were left with nothing to say about why the jury should answer the mitigation special issue "yes." By failing to conduct any real social history investigation, Mr. Guevara's counsel effectively conceded this issue to the State, and with it the most fundamental Eighth Amendment guarantee to emerge from the Supreme Court's post-*Furman* capital punishment jurisprudence: "our cases ha[ve] firmly established that sentencing juries must be able to give meaningful consideration and effect to all mitigating evidence that might provide a basis for refusing to impose the death penalty on a particular individual, notwithstanding the severity of his crime or his potential to commit similar offenses in the future." *Abdul-Kabir v. Quarterman*, 550 U.S. 233, 246 (2007) (emphasis added). Trial counsel's deficient performance thwarted this critical function.

A habeas petitioner satisfies the prejudice requirement by showing a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Strickland*, 466 U.S. at 694. This test is not outcome determinative. The

---

[14] Mr. Rodriguez's affidavit states that he and Mr. Guerinot did not present any testimony from Benjamin because the prosecution presented a witness who testified that the victim also came from war-torn El Salvador and was doing well in the United States working as a security guard at the time of his death. 1 H.C.R. 203-04. Counsel's strategic decisions, however, have no import in a deficiency analysis if the investigation underlying the strategic decisions was inadequate. *Wiggins*, 539 US at 522 (a decision not to present mitigating evidence cannot be justified as a tactical decision unless counsel have first fulfilled their obligation to conduct a thorough background investigation). Had counsel conducted a reasonable investigation, the evidence that would have been discovered afforded a basis for showing why Mr. Guevara's and the victim's lives took different paths despite both having experienced the El Salvadoran civil war.

*Strickland* Court expressly rejected an "outcome determinative standard" requiring the defendant to show that counsel's deficient conduct "more likely than not altered the outcome" of the case. *Id.* at 693–94. Instead, "[t]he result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome." *Id*. Thus, the "reasonable probability" standard—a probability sufficient to undermine confidence in the outcome—is a less onerous burden than is the preponderance of the evidence standard. *Bouchillon v. Collins*, 907 F.2d 589, 595 (5th Cir. 1990) (the prejudice prong imposes "a lower burden of proof than the preponderance standard.").[15]

Several principles guide this Court's prejudice analysis of Mr. Guevara's full *Strickland* claim. First, when determining whether counsel's errors caused prejudice, a court must presume that the jury acted according to law rather than emotion. *Strickland*, 466 U.S. at 694. In other words, "[t]he assessment of prejudice should proceed on the assumption that the decisionmaker is reasonably, conscientiously, and impartially applying the standards that govern the decision." *Id*. at 695. Therefore, not only does one presume that the decisionmaker followed the law, the law itself, *i.e.*, "the standards that govern the [sentencing] decision," must provide the context for determining whether a probability sufficient to undermine confidence in the outcome exists.

---

[15] The Supreme Court emphasized this point in *Williams v. Taylor*, 529 U.S. 362 (2000), expressly noting that a state court's use of a preponderance of the evidence standard rather than the lesser reasonable probability standard would result in a decision that was contrary to federal law as determined by that Court. *Id*. at 405–06 ("If a state court were to reject a prisoner's claim of ineffective assistance of counsel on the grounds that the prisoner had not established by a preponderance of the evidence that the result of his criminal proceeding would have been different, that decision would be 'diametrically different,' 'opposite in character or nature,' and 'mutually opposed' to our clearly established precedent because we held in *Strickland* that the prisoner need only demonstrate a 'reasonable probability that . . . the result of the proceeding would have been different.'").

Second, the prejudice inquiry is a case-specific assessment of the effect trial counsel's deficient performance had on the reliability of a particular proceeding. In many death penalty states, sentencing laws require that the sentence in a capital case be determined by weighing aggravating factors against mitigating factors. If the jury determines that the mitigating factors outweigh the aggravating factors, the jury is instructed to return a verdict of life. If, however, the jury determines that the aggravating factors outweigh the mitigating factors, then the jury is instructed to return a verdict of death. In these states, "the question is whether there is a reasonable probability that, absent the errors, the sentence . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland*, 466 U.S. at 695.

A court reviewing an ineffective assistance of counsel claim in a Texas death penalty case, however, does not ask this precise question because the Texas capital sentencing scheme does not require the jurors to engage in a weighing analysis. Instead, Texas asks jurors to answer two "special issues." The special issues are fact questions that the jury must answer either "yes" or "no," and the jury's answers to these questions determine whether the court imposes a life or death sentence.

The first special issue is "whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society." Tex. Code Crim. Proc. art. 37.071, § 2(b)(1). The second special issue is "[w]hether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed." Acts 1991, 72nd Leg., ch. 838, § 1 (1991) (amended 2005). If the jury

answers the first special issue "yes" and the second special issue "no," the trial court must impose a sentence of death. For any other combination of answers—including the inability of the jury to unanimously agree on an answer for any question—the trial court must assess a sentence of life. Tex. Code Crim. Proc. art. 37.071, § 2(g).

The mitigation question is the most important question in Texas capital cases. It contains the constitutionally-required mechanism giving jurors broad discretion to consider and give effect to a defendant's proffered mitigating evidence, by asking jurors to answer the bottom-line question whether "sufficient mitigating circumstance[s]" warrant withholding the ultimate punishment for a defendant who they have already determined beyond a reasonable doubt poses a continuing threat to society.

In light of the Texas sentencing scheme, the existence of prejudice turns on whether there is a reasonable probability that, absent counsel's errors, one juror may have answered the mitigation or future dangerousness special issue differently or not at all. *Wiggins*, 539 U.S. at 537; *Lewis v. Dretke*, 355 F.3d 364, 369 (5th Cir. 2003) (relevant question is whether the evidence "would have affected the sentencing decision of at least one juror"). Prejudice ensues whenever the totality of the mitigating evidence "might well have influenced [a] jur[or]'s appraisal" of the accused's moral culpability. *Rompilla*, 545 U.S. at 393; *Wiggins*, 539 U.S. at 538; *Williams*, 529 U.S. at 398.

Third, "[m]itigating evidence unrelated to future dangerousness may alter the jury's selection of the death penalty, even if it does not undermine or rebut the prosecution's death-eligibility case." *Williams*, 529 U.S. at 398. This is especially true in Texas because the capital sentencing scheme poses the two separate questions to the jury, and a judge may not impose a death sentence unless the jury unanimously answers both in the State's favor. Thus, even if the

jury unanimously believes that the defendant will be a future danger to society, it still must answer the mitigation special issue and answer whether the mitigating evidence presented warrants life independently of the accused's future dangerousness.[16] *See Eldridge v. State*, 940 S.W.2d 646, 654 (Tex. Crim. App. 1996) ("The issue of future dangerousness is completely independent of the [mitigation] special issue[.]").

Fourth, in making the prejudice determination, a court must consider the totality of the evidence before the jury and then assess the effect the errors might have had on any of the fact findings made by the sentencer. As the *Strickland* Court observed:

> Some of the factual findings will have been unaffected by the errors, and factual findings that were affected will have been affected in different ways. Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect. ***Moreover, a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support.*** Taking the unaffected findings as a given, and taking due account of the effect of the errors on the remaining findings, a court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors.

*Id*. at 695–96 (emphasis added). Thus, a court reviewing how counsel's errors affected the punishment phase of a Texas capital sentencing proceeding must examine the relevant special issue (i.e., the "factual findings") to determine whether and to what extent it may have been affected in light of the evidence before the jury.

After having learned virtually nothing about Mr. Guevara's background, counsel presented no mitigating evidence at all at sentencing. At closing, Mr. Guerinot spoke to the jury

---

[16] Significantly, a Texas jury addresses this mitigation special issue only if it first unanimously finds that the defendant will pose a future danger. *See id*. at § 2(d)(2), (e)(1). Thus, in every case where the mitigation question is in issue, the jury will already have determined unanimously and beyond a reasonable doubt that the defendant poses a continuing threat of committing acts of violence in the future. The question whether the undiscovered mitigation evidence might make the defendant appear even more dangerous thus has no practical consequence.

for less than three minutes in rambling platitudes about the need "to stop the killing," at one point referencing "what goes on in the Middle East in Israel with the Arabs and the Jews" and at another point saying killing Mr. Guevara could be the answer to how to stop the killing. No facts about Mr. Guevara or his background were discussed, even though Texas's special issues are fact-based questions, and no argument was made with reference to those questions.

Had counsel conducted a reasonable investigation, mitigating evidence would have been discovered for Mr. Guevara's capital sentencing jury's consideration. A reasonable probability exists that evidence might well have influenced a juror's appraisal of Mr. Guevara's moral culpability.

### 1.     Mr. Guevara's background.

Mr. Guevara grew up in El Salvador, where he suffered a terrifying childhood. El Salvador is a country about the size of Massachusetts and is one of the most densely populated and poorest countries in the Western Hemisphere. *See* Affidavit of Richard C. Cervantes, Ph.D., at ¶ 35 (attached as Exhibit B to Initial State Writ). Indeed, it has the lowest per capita caloric intake of any country in the Western Hemisphere. *Id.* Less than one percent of the population owns forty percent of the land. *Id.* In 1979, the average daily wage was $1.95. *Id.* In El Salvador, ten percent of all babies die before reaching the age of one and there are fewer than three doctors per 10,000 people. *Id.*

Mr. Guevara was born to Maria and Guadalupe Guevara in the city of Santa Rosa de Lima on October 5, 1969, the third of five children. *See* Declaration of Gina T. Vitale, LMSW, CCFC, at 2 (attached as Exhibit A to Initial State Writ). Mr. Guevara's parents were also born and raised in El Salvador, both raised in impoverished conditions and without any formal education. *Id.* His parents were illiterate. *Id.* at 4. Like his siblings, Mr. Guevara was delivered

by a midwife in the family's home. Mr. Guevara's mother did not receive traditional prenatal care because none was available. *Id.* Mrs. Guevara suffered considerable stress during her pregnancy with Mr. Guevara. El Salvador at that time was at war with Honduras, and bombings occurred near where the Guevara family lived. *Id.* In addition, during the seventh month of pregnancy, Mrs. Guevara contracted the chicken pox. She became swollen and inflamed and ran high fevers until the eighth month of pregnancy, during which she experienced symptoms which led her to believe she might miscarry. There were no hospitals in the area, but Mrs. Guevara went to a small clinic in Santa Rosa de Lima. A doctor there told her that her baby had also been infected and he put her under treatment. *Id.* at 2-3.

Mr. Guevara was scheduled to be delivered by the midwife that had been following his mother's pregnancy; however, she was not available when Mrs. Guevara went into labor, and a substitute midwife had to deliver Mr. Guevara. *See* Affidavit of Antolin M. Llorente, Ph.D., at 2 (attached as Exhibit A to Subsequent State Writ). Mr. Guevara was born with the chicken pox. *Id.* Because of the rural environment in which the delivery occurred, he was not taken to the hospital after his delivery despite the difficulties. *Id.* Mr. Guevara had diarrhea and his skin was full of scabs, broken and bleeding. *See* Vitale Declaration at 3. His mother could not lay him down in bed or elsewhere, because his skin would stick to the surface and peel off. Instead, she laid him over leaves, a practice that lasted for at least three months. *Id.* Mr. Guevara's skin "peel[ed] like a reptile and . . . would become raw." *Id.* The midwife who assisted with Mr. Guevara's birth believed he would not survive. *See* Llorente Affidavit at 2.

Mr. Guevara was born into an impoverished environment. During his childhood, the family lived in a small home constructed from stones and wood. The home had one room and a kitchen. *See* Vitale Delcaration at 3. Mr. Guevara and his siblings slept either on the dirt floor or

in a hammock. For a bathroom the family used a hole in the ground with a cover on it. The home had no running water; the family carried water from a well which they shared with other families. Food was sufficient to keep them alive, but not plentiful. *Id.*

Mr. Guevara's father worked long hours at a corn flour mill. When he was at home, Mr. Guevara's father was abusive, scaring the children by talking loudly and throwing things. He was bad tempered and rough. When Ms. Guevara cooked food he did not like, he would throw the plate away. *Id.* at 4.

Developmental milestones were delayed in Mr. Guevara. He did not learn to walk until he was approximately two years old, and he did not learn to talk until he was approximately four years old. He did not learn to tie his shoes until after seven years old. *See* Llorente Affidavit at 2-3. As a young child, he did not play with other children, nor did he play alone, and he became very dependent upon his mother. *See* Vitale Declaration at 3. Concerned about her son, Ms. Guevara consulted a health professional at a local clinic when Mr. Guevara was six or seven years old. *See* Llorente Affidavit at 3.

At age seven, Mr. Guevara began school at La Escuela Del Llano in Santa Rosa de Lima. *See* Vitale Declaration at 4. At that time, the "first cycle" of schooling in El Salvador encompassed the years from kindergarten through third grade. During this cycle, all students were socially promoted. After the third grade, students were only promoted if they performed academically. *See* Llorente Affidavit at 15. Mr. Guevara's academic performance was poor, and he did not obtain any education beyond the third grade. During his schooling, he was observed to be "slow" and unable to learn. Because his parents were uneducated and illiterate, they could not provide Mr. Guevara any academic assistance. *See* Vitale Declaration at 4.

His formal education terminated by age nine, Mr. Guevara began working to help support the family. Mr. Guevara's father tried to teach him simple tasks like drying and grinding corn but he could not learn how to do so. *See* Llorente Affidavit at 3. When he was a teenager, his father approached friends and neighbors who might be able to hire Mr. Guevara as an apprentice so he could learn a trade. One individual, Rafael Antonio Ventura, was a garage owner and mechanic. He unsuccessfully attempted to train Mr. Guevara as a mechanic. Mr. Guevara was incapable of understanding what Ventura asked him to do. When Mr. Guevara performed a simple task incorrectly, Mr. Ventura explained again to him what needed to be done and had Mr. Guevara redo the task. Mr. Guevara frequently failed again. Other apprentices, younger than Mr. Guevara, could do more varied and advanced tasks than could Mr. Guevara. *Id.* at 3-4.

Mr. Guevara's father also placed Mr. Guevara with another mechanic, Mr. Asencio, with similar results. The mechanic had significant difficulties training Mr. Guevara, who exhibited problems understanding the work he was asked to do, including simple tasks. Mr. Guevara was forgetful, oftentimes appeared confused, could not take responsibility and "was not normal." As an apprentice, he was asked to assist finding specific tools, but Mr. Guevara frequently brought the wrong one. Mr. Asencio felt he was not capable of training Mr. Guevara. *Id.*

When Mr. Guevara was ten years old, a brutal civil war erupted in El Salvador after a military coup intended to protect El Salvador's unequal land distribution. *See* Cervantes Affidavit at ¶ 36. Approximately 30,000 people were killed between 1979 and 1986 by the government and its death squads and by guerilla forces. *Id.* at ¶ 37. Government forces and death squads attacked not just guerrillas, but any suspected collaborators and sympathizers. *Id.* Guerrilla forces concentrated on attacking electrical installations, bridges, crops, trucks and buses. Sabotage of the infrastructure and of productive capital produced an enormous loss of jobs

and economic migrants. *Id.* at ¶ 38. The vast influx of immigrants into the United States from El Salvador between 1980 to 1990 was a result of refugees fleeing the turmoil and violence associated with the war. *Id.* at ¶ 33. Santa Rosa de Lima, where the Guevaras lived, is situated in the North of La Unión Department in El Salvador.

> Northern La Unión experienced repeated guerrilla-military combat during the war owing largely to its location in a remote, rural, mountainous, and arid region of the country. The area's populace, largely peasant, was victimized by both sides— including forcible recruitment, rape, and pillage. Thousands fled the terror, the majority moving to Long Island and Houston.

Sarah Mahler, *Engendering Transnational Migration: A Case Study Of Salvadorans*, 42 American Behavioral Scientist 690 (1999).

Growing up in the civil war placed the Guevara children in a state of constant fear of being killed or taken away. Guerilla forces came in the middle of the night and with megaphones announced that the village was taken over and that anybody who looked outside would be killed. *See* Vitale Declaration at 4. The guerillas would steal whatever medication they could find from the clinic and then burn it down. *Id.* at 4-5. According to Mr. Guevara's brother Benjamin:



The corpse of a guerrilla fighter lies in the streets of Santa Rosa de Lima. April 30, 1983. © Claude Urraca/Sygma/Corbis

> On one side when the militaries would come to get you to fight for them if you resisted they would kill you because they would say you were an ally of the Guerilla and if you would go with them, you knew you would get killed anyway

31

since you did not have any training and did not even know how to hold a gun. On the other side when the guerilla would come to get you to fight with them, if you did not want to go, they would kill you right there, because they would say that you were on the military's side. As kids we were terrorized of being seen by either of the sides because they would take us away and if we resisted they would kill us. I have seen my friends dead in the streets and people burned alive. [Mr. Guevara] and I have seen the parents and brothers of my best friend, who had the shop where we went to learn mechanics, dead. Killed in front of us.

Id. at 5. Mr. Guevara's older sister Sonia Sorto recalls her experience of living in Santa Rosa de

Lima during the war:

Many times I really thought I was going insane. I would hear airplanes come and I would see the bombs falling on top of our head and exploding everywhere around us. I could not even eat due to the terror I felt. We would all hide under the beds in the floor and start crying.

We all had sleep problems and bedwetting up to about seven or eight years of age. I used to rub my belly button raw, until it started bleeding. I don't know why I did that, nerves probably. The most horrifying part for me was to go out to the street and see mountains of dead bodies. They would put one on top of the other forming a mountain and then burn it right there, sometimes there were people you knew burning. At the end there would be left over members and the dogs would eat them. …

When I heard what happened to the towers in New York I started shaking. It was like I was back in El Salvador. I have dreams too still of dead bodies falling on top of me. It's because anywhere we would see people dead hanging out of the windows and all kinds of terrible things.



Farabundo Marti National Liberation Front (FMLN) guerrillas during an attack at Santa Rosa de Lima on May 1, 1983. © Claude Urraca/Sygma/Corbis

Id. at 5, 7. Mr. Guevara's mother recalls:

We went through great tribulations; right here across from the house they bombed and burnt the hill. I did not know what to do; my children were small. We were told to throw the mattresses on the floor and cover with them. We had to turn off

>anything with alcohol and could not sleep at night. The soldiers would come drink
>from the well behind the house and they would sleep there at night. Then in the
>day the guerillas would come down and drink from the well. I saw lots of dead
>bodies. They would turn purple and then they would
>pick them up and burn them
>where the clinic used to be.

*Id*. at 6. Sonia Sorto cried and begged her mother to take her away, but "I had nowhere to take her, I would hide her under the bed that's all I could do." *Id* at 7.

As he grew older, Mr. Guevara's parents believed he had to leave because both the military and guerilla forces were abducting and conscripting young males his age into the war. As a result, Mr. Guevara, just fourteen years old, became one of the estimated one million war refugees to flee from El Salvador to the United States. Mahler at 690.

>As "illegal aliens," most [El Salvadoran war refugees who fled to the United
>States] could find only poorly paying jobs, and they lived on society's margins.
>Poverty, undocumented status, and the prolonged civil war precluded the vast
>majority from returning to El Salvador, and hundreds of thousands still lack the
>documents necessary for returning legally to visit relatives and friends.

*Id*. at 690-91.

Mr. Guevara fled to the Gulfton neighborhood of Houston. "Irrefutably, the physical landscape of Gulfton speaks of division and neglect." Susan Rogers, *Superneighborhood 27: A Brief History of Change*, 17 Places 36 (2005). In the 1980s, Gulfton became an American "gateway" for people immigrating to the United States, particularly from Central America. *Id*. "In parts of Central America, people don't say they are coming to Texas or Houston. They say they are coming to Gulfton." *Id*.

During Houston's economic oil boom in the 1960s and 70s, the Gulfton neighborhood was developed as "an apartment enclave for young professionals" to accommodate the influx of people attracted to Houston's then-thriving economy. Lisa Taaffe & Robert Fisher, *Public Life in*

*Gulfton: Multiple Publics and Models of Community Organization*, 4 J. Comm. Prac. 31, 34-35

(1997).

> When Houston's economy collapsed in 1982, many of these people left to find jobs elsewhere. The apartment complexes in Gulfton, which had relied precisely on the workers most likely to depart, found it difficult to keep their buildings fully occupied. Rents were reduced. Mile after mile of apartment complexes were put up for auction. Those which changed hands frequently slipped into decay.

*Id*. at 35. At this same time, Houston was experiencing a wave of foreign immigration from

countries like El Salvador, Mexico, and Vietnam. Rogers at 36. As rent prices dropped, these

immigrants began flooding into the Gulfton neighborhood. *Id*.

> These new residents would profoundly transform Gulfton. Between 1980 and 2000, and without the construction of one additional apartment complex, its population nearly doubled. The transition from a predominantly white singles community to a dense ethnic enclave was far from smooth, however. [The pre-existing subdivision of] Shenandoah barricaded its streets to separate itself from the greater [Gulfton] community; the area was renamed "Gulfton Ghetto"; and for a short time it was one of the ten most crime-ridden communities in Texas.

*Id*. (footnotes omitted).

Because Gulfton developed as a "purely short-term, relatively spontaneous speculative

process which focused on producing apartment complexes, nightclubs and warehouses," Taaffe

at 36, it was built without concern for supporting infrastructure like parks, recreation centers,

libraries, and sidewalks. Rogers at 38. "You could comfortably fit sixteen standard downtown

blocks in one superblock of Gulfton, but sidewalks are infrequent. And with the exception of the

park, the main public space is the street, meaning that children have few safe places to play,

teenagers lack proper space to hang out, and mothers struggle just getting around." *Id*. In

addition, Gulfton quickly became the densest neighborhood in Houston. By 2000, the census

reflected that more than 45,000 people lived in its three square miles, and some estimate the

actual number may have been closer to 70,000. *Id*. at 39.

Upon arriving in Gulfton, or "Las Americas" as it was also known to the immigrant community, Mr. Guevara lived with his older brother Benjamin, who had earlier fled from El Salvador to Houston to escape the war. *See* Cervantes Affidavit at ¶ 72. Without parents and not in school, Mr. Guevara, still a teenager, had no meaningful supervision or support in his life. *Id.* at ¶ 89. He struggled being away from his family, and missed his parents, especially his mother. *See* Vitale Declaration at 10-11 After a year, Mr. Guevara moved out of his brother's apartment and into an apartment with a person he had met in Gulfton, where he experienced even less supervision. *See* Cervantes Affidavit at ¶ 72. It was in Gulfton that Mr. Guevara met Nancy Gonzales, then 13 years old. *See* Vitale Declaration at 12. Mr. Guevara and Ms. Gonzales eventually had children together and, in 1994, moved to Texas City in an effort to escape the dangers presented by life in Gulfton. *Id.*

### 2. Mr. Guevara's mental health.

Mr. Guevara's childhood background would have prompted any reasonable attorney to inquire into Mr. Guevara's mental health. Information that Mr. Guevara obtained only a third grade education; that as a child "he could not learn;" that he was "slow;" that "he did not have intelligence;" that he "was not communicative at all;" and that he "did not want to play" would have prompted a reasonable attorney to retain a mental health expert to evaluate Mr. Guevara's cognitive functioning. Such an expert, after evaluation, would have formed an opinion that Mr. Guevara was a person with mental retardation, as Dr. Llorente did. *See* Llorente Affidavit at 11-16.

In addition, information that Mr. Guevara experienced the El Salvadoran civil war as a child and fled to the United States as a refugee to avoid juvenile conscription by the warring

parties would have prompted a reasonable attorney to retain a mental health expert to evaluate the impact of that war on Mr. Guevara's mental health.

> Individuals who have recently emigrated from areas of considerable social unrest and civil conflict may have elevated rates of Posttraumatic Stress Disorder. Such individuals may be especially reluctant to divulge experiences of torture and trauma due to their vulnerable political immigrant status. Specific assessments of traumatic experiences and concomitant symptoms are needed for such individuals.

American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 465 (4th ed., text revised 2000) [hereinafter DSM-IV-TR].

A study undertaken specifically about children who experienced the El Salvadoran war to better understand how mental illness flowing from such experiences can be better treated reflected that Salvadoran children who lived, as Mr. Guevara did, in rural areas where much of the violence during the war occurred "showed higher indices of depression and aggression" than children living in the urban population centers with less exposure to the war. *See* Joan Walton, *The Impact of War on the Mental Health of Children: A Salvadoran Study*, 21 Child Abuse & Neglect 737, 740 (1997).

With respect to such children, "[t]here was no doubt that these children experienced symptoms of posttraumatic stress," including (a) being extremely emotional; (b) confusing fantasy with reality; (c) high dependency; (d) low self-esteem; (e) poor concentration, attention; (f) poor memory; (g) psychosomatic illness; (h) nightmares or sleep problems; and (i) worries about bad memories. *Id*. at 745. Researchers discovered that children highly exposed to the El Salvadoran civil war were less able than other children to think about the future. *Id*. at 746. Moreover, "of many possible coping factors intrinsic to the child, the role of competence or intelligence clearly was the most important for the child to survive [the war experience] with better mental health." *Id*. at 747. In sum,

> [i]ntelligence, higher socioeconomic status, and higher education of parents were factors that cushioned the effects of war and were related to better mental health at 12 years of age. Children with the heaviest personal-social impact of the war showed difficulty in imagining the future. Teaching children coping skills and competence will help them deal with war trauma. Teaching survivors to envision and plan a future should be part of treatment plans.

*Id.*

A mental health expert asked to inquire into the impact of trauma on Mr. Guevara's mental health would have formed an opinion that Mr. Guevara, due to his exposure to the severe violence of the El Salvadoran civil war and his fleeing to the United States as a 14-year-old refugee, had post-traumatic stress disorder that affected his adolescent and young adult development. *See generally* Cervantes Affidavit. "The essential feature of Posttraumatic Stress Disorder is the development of characteristic symptoms following exposure to an extreme traumatic stressor involving direct personal experience of an event that involves actual or threatened death or serious injury, or other threat to one's physical integrity; or witnessing an event that involves death, injury, or a threat to the physical integrity of another person; or learning about unexpected or violent death, serious harm, or threat of death or injury experienced by a family member or other close associate." DSM-IV-TR at 463. A PTSD sufferer typically makes "deliberate efforts to avoid thoughts, feelings, or conversations about the traumatic event." *Id.* at 464.

The expert would have opined that Mr. Guevara's exposure to war trauma prohibited him from developing normal social and peer relations and that he consequently failed to develop the ability to distinguish between healthy versus unhealthy peer relations. *See* Cervantes Affidavit at ¶ 83, 86. The El Salvadoran war limited Mr. Guevara's peer relations and social development during the critical years between 12 and 14 years of age. *Id.* at 87. The lack of a peer group or

school involvement prohibited Mr. Guevara from transitioning to adult socialization in terms of attitude and behavior. *Id.*

The contrast between the portrait of Mr. Guevara that could have been painted during sentencing had counsel conducted a reasonable investigation and the portrait of Mr. Guevara that was painted—a blank canvas—is stark. The jury's decision that no mitigating circumstances existed that warranted a life sentence for Mr. Guevara was based on a complete absence of information about Mr. Guevara and his life. Trial counsel effectively conceded the issue. The information a reasonable investigation would have generated, however, would have armed counsel with an argument that "might well have influenced [a] jur[or]'s appraisal" of Mr. Guevara's moral culpability. *Rompilla*, 545 U.S. at 393.

Accordingly, Mr. Guevara's *Strickland* claim is substantial.

## III. The procedural default of Mr. Guevara's full *Strickland* claim is attributable to ineffective assistance of state habeas counsel.

### A. State habeas counsel failed to conduct a reasonable sentencing investigation.

State habeas counsel Robert Morrow was appointed to represent Mr. Guevara on June 22, 2001. *See* Exhibit E at 11 (Billing of Attorney Robert Morrow). Mr. Morrow filed the initial state habeas writ in the convicting court on December 23, 2002, six months after the Supreme Court decided *Atkins v. Virginia*, 536 U.S. 304 (June 20, 2002), prohibiting execution of persons with mental retardation. During the 18 months between Mr. Morrow's appointment and the filing of the initial writ, Mr. Morrow conducted no investigation into Mr. Guevara's possible mental retardation, despite the fact that counsel's investigation had revealed multiple red flags pointing to the possibility. This inadequate investigation led to Mr. Morrow's failure to include any allegations related to Mr. Guevara's mental retardation in the initial petition. Instead, Mr. Morrow conducted the investigation only after the initial state application was filed. As a result,

all allegations related to Mr. Guevara's mental retardation were filed in a subsequent application on September 12, 2005, which was dismissed as an abuse of the writ. This performance fell below the prevailing standard of care and prejudiced Mr. Guevara.

> **1.  State habeas counsel failed to investigate Mr. Guevara's mental retardation in a timely manner, despite significant indications that such an investigation was warranted.**

As noted above, Mr. Morrow was appointed to represent Mr. Guevara on June 22, 2001. To assist him in investigating and developing claims for Mr. Guevara's state habeas petition, Mr. Morrow hired mitigation specialists Gina Vitale and Edurne Imana.[17] *See* Exhibit E at 3. Ms. Vitale was hired as the lead mitigation specialist on the case and conducted the U.S.-based investigation. *See* Vitale Declaration at 1-2. Because Mr. Guevara was born in El Salvador and much of his family still resided there, Ms. Imana, who speaks Spanish, conducted the El Salvador-based investigation. *See id.* at 2 (noting that Ms. Vitale "[r]eviewed transcripts of interviews, conducted in Spanish and translated into English, by Edurne Imana, with family, former employers and neighbors in El Salvador regarding Mr. Guevara's childhood health and life experiences in his home country"). The work of both mitigation specialists was overseen and directed by Mr. Morrow.

During the 18 months between Mr. Morrow's appointment and the filing of the initial state habeas writ, both Mr. Morrow and Ms. Vitale interviewed Mr. Guevara, *see* Exhibit E at 3 (billing by Morrow for review of Vitale's interview with Mr. Guevara; *id.* at 4 (billing by Morrow for meeting with Mr. Guevara), and Ms. Vitale and Ms. Imana interviewed family members, friends, and neighbors both in the United States and El Salvador. Exhibit F (Billing of

---

[17] Although Mr. Morrow's billing indicates that he presented funding motions to the trial court on December 13, 2001, the billing makes clear he began directing Ms. Vitale's and Ms. Imana's before that date.

Mitigation Specialist Edurne Imana); Exhibit G (Billing of Mitigation Specialist Gina Vitale). As Ms. Vitale and Ms. Imana conducted interviews and generated reports, Mr. Morrow reviewed their work and directed their investigation.[18] At no point did Mr. Morrow direct either Ms. Vitale or Ms. Imana to investigate the possibility that Mr. Guevara is mentally retarded. And although Mr. Morrow hired Richard C. Cervantes, Ph.D., who opined that Mr. Guevara suffers from Post-Traumatic Stress Disorder and immigration trauma., Mr. Morrow did not retain an expert to administer an IQ test to Mr. Guevara or to conduct an assessment of his adaptive deficits, even after the Supreme Court handed down its decision in the *Atkins* case on June 20, 2002. *See* Cervantes Affidavit.[19]

There were numerous red flags raised in Ms. Vitale and Ms. Imana's work that should have caused a reasonable counsel to investigate Mr. Guevara's mental retardation. As discussed at length in Petitioner's Opposition to Respondent's Motion to Alter or Amend Judgment and Response to Court-Ordered Briefing, the leading authoritative texts on diagnosing mental retardation—the manuals published by the American Association on Intellectual and Developmental Disabilities (AAIDD), formerly known as the American Association on Mental

---

[18] Mr. Morrow's billing reflects numerous entries documenting his consultation with and direction of Ms. Vitale's and Ms. Imana's work. For instance, on November 1, 2001, Mr. Morrow billed an hour of his time for "[d]raft[ing] list of areas to investigate for G. Vitale re doctors & background." Exhibit E at 3. On November 16, 2001, Mr. Morrow billed another hour for "[d]evelop[ing] comprehensive 'to do' list and divid[ing] responsibilities." *Id.* Mr. Morrow also billed on multiple occasions for reviewing reports and interview notes generated by Ms. Vitale and Ms. Imana, as well as for phone conference with both. *Id.* at 3-5.

[19] In the discussion of his education and experience in his affidavit, Dr. Cervantes noted that he had experience in conducting psychological evaluations of patients suffering from mental retardation. Cervantes Affidavit at 2. The affidavit, however, makes clear that Dr. Cervantes did not conduct a mental retardation evaluation of Mr. Guevara in this case.

Retardation (AAMR),[20] and the American Psychiatric Association (APA)—recognize the existence of particular circumstances that put a person at risk of developing mental retardation. Docket Entry 41 at 23-29. The presence of these risk factors in Mr. Guevara's life history should have alerted counsel that further investigation was warranted. Indeed, Ms. Vitale's declaration, which was attached as Exhibit A to the initial writ and which summarizes Ms. Vitale's and Ms. Imana's work, is rife with such red flags.

For instance, biomedical and pregnancy-related issues constitute one category of risk factors for mental retardation. Within this category fall such problems as maternal illness and birth injury, *see* 2010 AAIDD Manual at 60; 2002 AAMR Manual at 127, as well as childhood infections and trauma, *see* DSM-IV-TR at 46. Ms. Vitale's declaration documented the existence of each of those risk factors. *See* Vitale Declaration at 2-3 (attesting to the facts that Mr. Guevara's mother received no prenatal care during her pregnancy with Mr. Guevara; that she experienced "lots of stress" due to the war with Honduras during her pregnancy; that she contracted chicken pox during the seventh month of her pregnancy and "started to have a natural tendency to loose [*sic*] the child and abort"; that she had very high fevers through the eighth month of her pregnancy; that Mr. Guevara was born with a horrific skin condition that caused his skin to peel off and prevented her from laying him on most surfaces; that he "had lots of diarrhea" as an infant; and that he contracted hepatitis when he was five years old).

Social and environmental risk factors include poverty, lack of adequate stimulation, and lack of access to prenatal care. *See* 2010 AAIDD Manual at 60; 2002 AAMR Manual at 126. As

---

[20] As in Docket Entry 41, the American Association on Intellectual and Developmental Disabilities' manual *Intellectual Disability: Definition, Classification, and Systems of Supports* (11th ed. 2010) will be referred to as the "2010 AAIDD Manual."  The American Association on Mental Retardation's manual *Mental Retardation: Definition, Classification, and Systems of Supports* (10th ed. 2002) will be referred to as the "2002 AAMR Manual."

noted above, Ms. Vitale's declaration documented that Mrs. Guevara did not receive prenatal care during her pregnancy. Vitale Declaration at 2. Her declaration similarly provided detail about the intense poverty in which Mr. Guevara was raised. *Id.* at 3-4 (noting that the family lived in a small home made of stones and wood with a dirt floor; that the children slept on the dirt floor or in a hammock; that the home had no running water; that the bathroom was a coverless hole in the ground; and that the Guevaras shared a well with other families).

The third category of risk factors documented in Ms. Vitale's declaration—behavioral risk factors—include child abuse and neglect and domestic violence, *see* 2010 AAIDD Manual at 60; 2002 AAMR Manual at 127, and deprivation of nurturance, *see* DSM-IV-TR at 46. The Vitale Declaration included information about domestic violence in the Guevara home. Speaking of Mr. Guevara's father, his mother reported that "he would sometimes scare the children talking loud and throwing things. . . . He is bad tempered and rough and has been like that his whole life. I would have to tell him not to be rough with the kids. An example is when I would cook and he did not like it and he would throw the plate away." Vitale Declaration at 4. She likewise documented the debilitating effect that exposure to the horrors of war had on Mr. Guevara and his siblings. *Id.* at 5-6.

Finally—and perhaps most importantly—Ms. Vitale provided ample evidence of educational risk factors, which include delayed diagnosis, inadequate early intervention services, inadequate special education services, and inadequate family support among the educational risk factors of developing mental retardation. 2010 AAIDD Manual at 60; 2002 AAMR Manual at 127. Ms. Vitale noted that "[f]amily believed[ ] 'he could not learn.'" Vitale Declaration at 4. She documented that other family members reported that "'he was a little slow . . . it was hard for him . . . he did not have intelligence.'" *Id.* She also noted Mrs. Guevara's report that she and

her husband were unable to help Mr. Guevara when he struggled in school because "'I don't know how to read but I know some letters and numbers, his father didn't help him because he is worse than me.'" *Id.* Finally, because Mr. Guevara left school at age nine, Ms. Vitale's declaration leaves no doubt that the risk factors of inadequate intervention and support were also present. *Id.*

In addition to the presence of risk factors for mental retardation, Ms. Vitale's declaration documented affirmative evidence of adaptive deficits. *See* Docket Entry 41 at 8-11 (explaining that the second diagnostic criterion for mental retardation requires a finding of significant deficits in adaptive behavior). The most significant such evidence is the information that Mr. Guevara's family members believed him to be slow and to have difficulty learning, constituting deficits in the conceptual domain of adaptive behavior. This evidence does not require a sophisticated understanding of the nuances of mental retardation; rather, it corresponds with even the most basic lay understanding of mental retardation. If none of the other evidence of risk factors struck counsel as significant, certainly information that family members believed Mr. Guevara to be slow and to have difficulty learning should have alerted him to the need to investigate the possibility that Mr. Guevara has mental retardation. In addition, Ms. Vitale's declaration detailed other deficits in the conceptual domain, Vitale Declaration at 3 ("Alex was extremely reserved and timid, he was not communicative at all and did not want to play."), as well as deficits in both the social and practical domains, *id.* ("Alex was extremely introverted . . . he always wanted to be around me, he would sit in the kitchen with his face between his hands and watch me doing things."); *id.* at 13-14 (documenting work history at a series of menial labor jobs).

###### 2. The mental retardation investigation that counsel eventually conducted could and should have been carried out before the initial application was filed.

Nine months after counsel filed Mr. Guevara's initial state habeas application, Dr. Antolin M. Llorente conducted a mental retardation evaluation of Mr. Guevara at Mr. Morrow's behest and formed an opinion that he is mentally retarded. *See* Llorente Affidavit at 1. There was no impediment to counsel retaining Dr. Llorente before the initial application was filed.[21] Indeed, there can be little question that reasonable counsel would have done so, given that the Supreme Court decided *Atkins* six months before the application was filed and that ample evidence had been uncovered indicating that a mental retardation investigation was warranted.

Perhaps there is no better indication of the fact that reasonable counsel would have been alerted to the need to investigate the mental retardation claim before filing the initial application than the fact that counsel repeatedly relied on Ms. Vitale's and Ms. Imana's work when he belatedly raised allegations related to Mr. Guevara's mental retardation.  Mr. Morrow attached Ms. Vitale's declaration as an exhibit in support of the subsequent state habeas application he filed, and he cited it repeatedly in the body of the application. Subsequent Application for Art. 11.071 Writ of Habeas Corpus at 20 (citing Vitale Declaration for the assertion that Mr. Guevara's "job history is one of a series of menial labor jobs, sometimes more than one at a time" and that he "did poorly in school and was 'a little slow'"); *id.* at 35 (citing Vitale Declaration for the assertions that Mr. Guevara's family "considered him 'slow,' that his mother had contracted chicken pox while pregnant with him, and that he had only gone through the

---

[21] The version of Texas Code of Criminal Procedure Article 11.071, § 3(d) that governed during the relevant time period provided that "[c]ounsel may incur expenses for habeas corpus investigation, including expenses for experts, without prior approval by the convicting court. On presentation of a claim for reimbursement, which may be presented ex parte, the court shall order reimbursement of counsel for expenses, if the expenses are reasonably necessary and reasonably incurred."

equivalent of the fourth grade"). Counsel, moreover, provided the declaration to Dr. Llorente, who considered it in his own affidavit. *See* Llorente Affidavit at 2-4.

State habeas counsel's failure to extend his investigation to and make allegations regarding Mr. Guevara's mental retardation in relevant claims in the initial application cannot be considered a strategic decision. Counsel eventually did conduct the investigation and found allegations of mental retardation relevant to claims that he belatedly presented. Counsel should have conducted that investigation in a timely manner and raised those allegations in the initial application.

### 3. Counsel's failure to investigate fell below prevailing professional norms.

Counsel's failure to investigate Mr. Guevara's mental retardation in a timely manner fell below the professional norms that prevailed during the period from June 22, 2001, when he was appointed, through December 23, 2002, when he filed the initial application. This Court can ascertain the duties of capital habeas counsel from evidence reflecting the contemporaneous standard of care, including state and federal bar guidelines and training publications. *See, e.g.*, *Padilla v. Kentucky*, 130 S.Ct. 1473, 1482 (2010) (looking to, *inter alia*, the American Bar Association Guidelines and state and city bar publications to establish prevailing norms of criminal defense practice). Those sources make clear that Mr. Morrow's performance was deficient.

One year after the 1995 passage of Texas Code of Criminal Procedure Article 11.071 overhauled capital habeas corpus proceedings in Texas, the State Bar of Texas published the third edition of the Texas Criminal Appellate Manual. Exhibit H (Excerpt, Texas Criminal

Appellate Manual 1996, 3d ed.).[22] One of the chapters in that manual was a primer for defense counsel litigating capital habeas corpus cases. *Id.* That chapter confirms that, as early as 1996, the prevailing standard of care in capital habeas corpus representation compelled counsel to conduct extensive investigation into all potentially meritorious claims, including those involving a client's mental deficits, and to stay abreast of legal developments to ensure that all such claims were presented in state court.

The manual repeatedly emphasized the paramount importance of conducting an exhaustive investigation. *See, e.g.*, *id.* at 4 ("Investigation for a writ can be as intensive as investigation in preparation for trial. This must be so particularly where habeas counsel believes that trial counsel may have rendered ineffective assistance of counsel."); *id.* at 33 ("You should strive to know more about your client and his or her history than any other lawyer has known, and perhaps more than his own family has known, to ensure that you are aware of and can use all beneficial information that might come from that knowledge"). Of critical importance, the manual makes specific reference to the need to investigate all indications of mental deficiencies—even before *Atkins* rendered mental retardation an absolute bar to execution. For example, in its discussion of "examples of issues that could be raised," the manual includes "claims of ineffective assistance of counsel for failing to develop and present mitigation evidence of *mental defects* or diseases during the punishment phase of trial." *Id.* at 29 (emphasis added). Similarly, the manual instructs attorneys to "[i]nterview your client's family members. . . . They will certainly have things to tell you about your client's background that you can get nowhere else that could contribute substantially to the development of claims concerning mental disorders, *mental limitations*, or drug abuse." *Id.* at 33-34 (emphasis added). *See also id.* at 33

---

[22] The introduction to the manual, an unnumbered page, describes its publication history.

("Knowing your client's history also give you perspective on mental limitations or disorders that may have contributed to the offense, to a confession, or to the client's inability to understand what was happening at the trial.").

The manual likewise makes abundantly clear that it is the duty of habeas counsel to stay abreast of legal developments and raise all potentially meritorious allegations. The manual cautions that "[t]he law relevant to habeas litigation continues to develop in state and federal court" and that counsel must "try to stay near the cutting edge." *Id.* at 5. It also states in no uncertain terms that "[h]abeas counsel should make sure that all federal constitutional claims that are arguably meritorious be included so that they are preserved for federal habeas proceedings." *Id.* at 7.

Indeed, given the vigorous argument made by counsel in the subsequent state habeas application that trial counsel's failure to discover Mr. Guevara's mental retardation fell below the applicable standard of care, there can be little doubt that Mr. Morrow's similar failure fell below that standard:

> Applicant's trial attorneys completely failed to uncover this [*Atkins*] evidence. They did not have their client properly tested. This fell short of a reasonable standard of professional conduct. If the trial attorneys had investigated Applicant's background they would have discovered that his family had always considered him "slow," that his mother had contracted chicken pox while pregnant with him, and that he had only gone through the equivalent of the fourth grade in school. (Vitale at 3, 4, 6, and 7) Applicant could not read or communicate well. If his attorneys had investigated his background, they would have realized that they should have their client tested. If they had done so, they would have discovered this additional mitigation evidence.
>
> Even without the investigation, when Applicant functions in the impaired level of intelligence in so many areas, including verbal memory, it should have been apparent to his attorneys that he needed to have his intelligence tested. They did not do so. . . .
>
> This case demonstrates the far-reaching consequences of failure to investigate. Applicant's attorneys knew enough of his background that they should have investigated it further. If they had, they would have been alerted that their client

might have diminished mental capacities, which in turn would have led them to have him tested and evaluated by a qualified psychologist [for mental retardation].

Subsequent Application for Art. 11.071 Writ of Habeas Corpus at 34-35.

**B.    State habeas counsel's failure to conduct a reasonable sentencing investigation prejudiced Mr. Guevara.**

Counsel's deficient performance unquestionably prejudiced Mr. Guevara. His failure to conduct an adequate investigation and raise allegations of mental retardation in the initial application caused the Court of Criminal Appeals to dismiss claims related to those allegations and, in turn, caused this Court to hold that Mr. Guevara's full *Strickland* claim that included such allegations was procedurally defaulted.

After counsel filed the subsequent habeas application in the trial court on September 12, 2005, the trial court forwarded the application to the Court of Criminal Appeals, pursuant to Texas Code of Criminal Procedure Article 11.071, § 5(b). On May 23, 2007, the Court of Criminal Appeals dismissed the subsequent application as an abuse of the writ. *Ex parte Guevara*, 2007 Tex. Crim. App. Unpub. LEXIS 940 (2007). After being denied relief in the Court of Criminal Appeals, this Court appointed Mr. Guevara new counsel in these proceedings and Mr. Guevara filed a federal habeas corpus application on May 21, 2008. Docket Entry 1. This application raised all of the allegations from both the initial and subsequent habeas applications that Mr. Morrow filed in state court. On September 23, 2001, this Court issued its Memorandum and Order, ordering further briefing on issues related to the stand-alone *Atkins* claim and denying all other claims for relief. Docket Entry 36. With regard to the full *Strickland* claim that included allegations that trial counsel's unreasonable investigation caused them to fail to discover evidence of Mr. Guevara's mental retardation, this Court held that "a valid procedural bar forecloses review on the merits" and thus declined to consider it. Docket Entry 36

48

at 23 n.15. Because of counsel's inadequacies, no court has ever considered the merits of Mr.

Guevara's full *Strickland* claim.

> **C.     To the extent the Court believes there are factual issues in dispute as to whether counsel's inadequacies constitute cause, this Court should hold an evidentiary hearing to resolve those issues.**

If the Court believes that the record gives rise to factual issues in dispute as to whether

state habeas counsel's representation creates cause for procedural default, this Court should hold

an evidentiary hearing to resolve those issues. Both the Supreme Court and the Fifth Circuit have

made clear that district courts have the authority to hold evidentiary hearings to resolve factual

disputes relevant to cause. In *Barrientes v. Johnson*, for example, the Fifth Circuit remanded the

case to the district court specifically to hold an evidentiary hearing on the issue of cause:

> At the beginning of our examination of cause and prejudice we noted that the district court has never addressed these issues. . . . We determine that the issue of cause cannot be adequately resolved on the record before us. . . .We find it necessary to remand this case to the district court with instructions to conduct an evidentiary hearing on the issue of cause.

221 F.3d 741, 768-69 (5th Cir. 2000). *See also Bernard v. Collins*, 13 F.3d 871, 878 (5th Cir.

1994) ("[T]he district court's determination that [petitioner's] claim constituted an abuse of the

writ because he could not show 'cause and prejudice' for his failure to raise this claim in his

earlier petition seems premature in the absence of an evidentiary hearing or other appropriate

proceeding.").  Similarly, in *Jenkins v. Anderson*, the Supreme Court noted that "application of

the 'cause'-and-'prejudice' standard may turn on factual findings that should be made by a

district court." 447 U.S. 231, 235, n.1 (1980).

## IV.     The Court's power to grant relief on Mr. Guevara's full *Strickland* claim is not limited by Section 2254(d).

In reviewing Mr. Guevara's partial *Strickland* claim as presented in his initial state

habeas application, this Court applied Section 2254(d) and determined that the state court's

decision did not involve an unreasonable application of federal law and was not based on an unreasonable determination of facts. Docket Entry 36 at 38. Review of Mr. Guevara's full *Strickland* claim, however, is not circumscribed by 28 U.S.C. § 2254(d), because it has never been adjudicated on the merits by the state court.

As described above, Mr. Guevara's partial, incompletely developed *Strickland* claim was presented to the state court in his initial state habeas application. Mr. Guevara subsequently presented his expanded *Strickland* claim in a subsequent state habeas application that was dismissed by the state court pursuant to a state procedural rule. Mr. Guevara then presented his expanded *Strickland* claim to this Court in his federal habeas corpus petition.

Additional allegations in support of an exhausted claim render the claim unexhausted only if they fundamentally alter it, i.e., effectively make the claim a new or different one. *Morris v. Dretke*, 413 F.3d 484, 491 (5th Cir. 2005). Nevertheless, this Court found the expanded *Strickland* claim to be procedurally defaulted. *See* Docket Entry 36 at 23 n.15 (holding that "a valid procedural bar forecloses review on the merits" of Mr. Guevara's expanded *Strickland* claim). In so doing, the Court necessarily determined that the new allegations in the expanded claim fundamentally altered and rendered it a different, unexhausted claim from the partial claim presented to and adjudicated on the merits by the state court in Mr. Guevara's initial state habeas application.[23]

Section 2254(d) applies only to claims "adjudicated on the merits" by the state court. In holding Mr. Guevara's expanded *Strickland* claim to be procedurally defaulted, the court necessarily held that the state court did not adjudicate its merits. *Id.* (observing that the state

---

[23] Mr. Guevara does not waive an argument on appeal that his expanded *Strickland* claim is not procedurally defaulted because it did not fundamentally alter the partial, incompletely developed *Strickland* claim presented in his initial state habeas application.

court did not pass on the merits of Mr. Guevara's full *Strickland* claim in dismissing it). Accordingly, Section 2254(d) has no application to a claim, like the instant one, that has been procedurally defaulted but for which cause for default exists.[24]

## V.   The Court should hold an evidentiary hearing to resolve the merits of Mr. Guevara's full *Strickland* claim.

After the Court has found that cause for procedural default exists, it may hold an evidentiary hearing to resolve factual disputes material to Mr. Guevara's full *Strickland* claim related to trial counsel's failure to conduct a reasonable sentencing investigation. *See, e.g.*, *Richards v. Quarterman*, 566 F.3d 553, 562-63 (5th Cir. 2009). Moreover, because Mr. Guevara can establish cause for any default of his full *Strickland* claim related to trial counsel's failure to conduct a reasonable sentencing investigation, 28 U.S.C. § 2254(e)(2) would not preclude such a hearing. *See Dowthitt v. Johnson*, 230 F.3d 733, 758 (5th Cir. (Supreme Court has "associated the 'failure to develop' standard [in Section 2254(e)(2)] with the cause inquiry for procedural default").

### CONCLUSION

For the foregoing reasons, the Court should (1) find that cause and prejudice exist to excuse the procedural default found by this Court of Mr. Guevara's full *Strickland* claim; (2) review Mr. Guevara's full *Strickland* claim free from the strictures imposed by 28 U.S.C. § 2254(d); (3) hold an evidentiary hearing, if necessary, on Mr. Guevara's full *Strickland* claim related to his trial counsel's failure to conduct a reasonable sentencing investigation; and (4) grant Mr. Guevara relief on his full *Strickland* claim.

---

[24] That the state court adjudicated on the merits a similar, but fundamentally different, claim, does not permit the application of Section 2254(d) to the fundamentally altered—and hence different—claim.

Respectfully submitted,


/s/ Laura Ferry

Thomas S. Berg
Texas Bar No. 02189200
600 Travis Street, Suite 1900
Houston, TX  77208-1508
Tel. (713) 236-1900
Fax (713) 228-0321

Laura Ferry
Texas Bar No. 24069715
TEXAS DEFENDER SERVICE
510 S. Congress Ave., Suite 403
Austin, TX  78704
Tel. (512) 320-8300
Fax (512) 477-2153

**CERTIFICATE OF SERVICE**

I hereby certify that on July 9, 2012, I electronically filed the foregoing motion with the Clerk of the Court for the U.S. District Court, Southern District of Texas.  The ECF system sent a "Notice of Electronic Filing" to counsel for Respondent:

KATHERINE D. HAYES
Assistant Attorney General
P.O. Box 12548, Capitol Station
Austin, TX  78711
Katherine.hayes@oag.state.tx.us

<u>/s/ Laura Ferry</u>
Laura Ferry