# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| GILMAR ALEXANDER GUEVARA, | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| VS. | § | CIVIL CASE NO. 08-1604 |
| | § | |
| RICK THALER, Director, Texas Department | § | |
| of Criminal Justice, Correctional | § | |
| Institutions Division, | § | |
| | § | |
| Respondent. | § | |

## MEMORANDUM AND ORDER

Gilmar Alexander Guevara ("Guevara"), a Texas inmate incarcerated under a capital conviction and death sentence, seeks federal habeas corpus relief. Guevara raised several claims, including that he is mentally retarded and cannot be executed under *Atkins v. Virginia*, 536 U.S. 304 (2002). This court has previously denied all of Guevara's habeas claims except this *Atkins* claim. (Docket Entry No. 36). The court ordered the parties to provide additional briefing on the *Atkins* claim after finding that no state-imposed procedural bar prevented federal review. The respondent, Rick Thaler, Director of the Texas Department of Criminal Justice (TDCJ), has moved under FED. R. CIV. P. Rule 59(e) to alter or amend the order on the procedural-bar issue. (Docket Entry No. 37). The petitioner, Guevara, has filed a response. (Docket Entry No. 41). Both parties have provided additional briefing on the merits of Guevara's *Atkins* claim.

For the reasons discussed below, the court denies the respondent's Rule 59(e) motion and proceeds to the merits of Guevara's *Atkins* claim. A careful examination of that claim leads to the conclusion that the state court's decision to deny relief was not unreasonable. The motion for relief is denied, and this court will not issue a certificate of appealability. The reasons for these rulings

are explained in detail below.

## I.    Background

In its earlier opinion, this court reviewed the facts leading up to Guevara's 2000 capital conviction and death sentence. (Docket Entry No. 36 at 1-3). The facts set out below are those giving rise to the unresolved issues addressed in this opinion.

During Guevara's direct appeal, the Supreme Court decided *Atkins*, which held that the Eighth Amendment bars the execution of a mentally retarded offender. To obtain a ruling that he cannot constitutionally be executed under *Atkins*, Guevara must show (1) substantial limitations in intellectual functioning, (2) significant limitations in adaptive skill areas, and (3) manifestation of those deficiencies before age 18. *See Atkins*, 536 U.S. at 309 n.3; *Ex parte Briseño*, 135 S.W.3d 1, 7 (Tex. Crim. App. 2004).

The procedural issues in this case arose because Guevara did not include an *Atkins* claim in the state habeas application he filed on December 23, 2002. Three years later, but before the Texas Court of Criminal Appeals had ruled on that action, Guevara filed a "Subsequent Application for Art. 11.071 Writ of Habeas Corpus" in the state district court. Guevara asserted three new claims based on *Atkins*. Guevara based his claims on two sources: (1) a report provided by psychologist Dr. Antolin M. Llorente; and (2) a declaration prepared by mitigation investigator Gina T. Vitale, which summarized statements made by several individuals who knew Guevara both in his native El Salvador and in the United States. Guevara's substantive claim of mental retardation rested heavily on Dr. Llorente's report. Guevara's counsel had asked Dr. Llorente "for [a] neuropsychological examination in an attempt to assess his present level of neuropsychological and cognitive functioning" and for a "rule-out of mental retardation." Dr. Llorente's assessment focused on

2

psychological tests of Guevara, interviews of Guevara's friends and family members, and Vitale's declaration. Dr. Llorente provided the following opinion:

> With regard to the requested rule-out of mental retardation by the referral source, Mr. Guevara's impaired intellect, in conjunction with his history of adaptive delays, and the fact that his impairments had an early onset (before the age of 18 years), does not permit a rule-out of mental retardation. In fact, it is my opinion, with a reasonable degree of psychological certainty, that Mr. Guevara suffers from mental retardation[.]

(Docket Entry No. 1, Affidavit of Antolin M. Llorente dated July 21, 2005).

Guevara faced procedural problems in obtaining the Texas state court's consideration of his *Atkins* claim. Texas law encourages the inclusion of all habeas claims in one pleading, generally treating any amendment as a successive habeas action. *See* TEX. CODE CRIM. PRO. art. 11.071 § 5(f). The Texas Court of Criminal Appeals may authorize the filing of a successive habeas action only after an inmate complies with the Texas abuse-of-the-writ doctrine, codified at TEX. CODE CRIM. PRO. art. 11.071 § 5(a). Under § 5(a), an inmate may proceed with a successive habeas action only if he shows applicable new law or facts (§ 5(a)(1)); actual innocence of his conviction (§ 5(a)(2)); or actual innocence of the death penalty (§ 5(a)(3)). Guevara argued that he met the statutory exceptions, in particular, that his mental retardation made him actually innocent of his death sentence under TEX. CODE CRIM. PRO. art. 11.071 § 5(a)(3).[1]

The state district court forwarded Guevara's successive habeas application to the Texas Court of Criminal Appeals. *See* TEX. CODE CRIM. PRO. art. 11 .071 § 5(b) (requiring a state district court

---

[1]      Section 5(a)(3) specifically requires an inmate to show "by clear and convincing evidence, but for a violation of the United States Constitution no rational juror would have answered in the state's favor one or more of the special issues that were submitted to the jury in the applicant's trial[.]" TEX. CODE CRIM. PRO. art. 11.071 § 5(a)(3).

3

to send any subsequent habeas application to the Court of Criminal Appeals). The state district court included findings of fact and conclusions of law recommending that the Court of Criminal Appeals deny the claims in Guevara's initial habeas application.

The Harris County District Attorney's Office had already filed in the Court of Criminal Appeals a "Motion to Dismiss Applicant's Subsequent Application for a Writ of Habeas Corpus." The district attorney made two arguments: the court should dismiss the *Atkins* claim on procedural grounds because Guevara failed to include it in his initial habeas application; and the court should dismiss the *Atkins* claim on the merits, with no need for additional factual development.[2] The district attorney argued that Vitale's declaration, which Guevara had "attached as an exhibit in his . . . subsequent writ application and also presented as an exhibit in his initial state application," "belie[d] [his] claim of mental retardation."

When Guevara filed his successive state habeas application, Texas had not yet conclusively decided how *Atkins* claims fit into the § 5(a)(3) context. During the pendency of Guevara's successive habeas application, the Court of Criminal Appeals decided *Ex parte Blue*, 230 S.W.3d 151 (Tex. Crim. App. 2007), which held that successive habeas review for an *Atkins* claim becomes available only after an inmate makes a "*threshold* showing of evidence that would be at least *sufficient* to support an ultimate conclusion, by clear and convincing evidence, that *no rational factfinder would fail to find mental retardation*." *Id.* at 163 (emphasis added); *see also Ex parte Sorto*, 2011 WL 1533377 (Tex. Crim. App. Apr. 20, 2011) (unpublished); *see also Ex parte Woods*,

---

[2]     The district attorney did not ask the Court of Criminal Appeals to make a threshold assessment of Guevara's *Atkins* claim for procedural purposes, but instead to find that he had not met the *Atkins* requirements.

296 S.W.3d 587, 606 (Tex. Crim. App. 2009).[3]  Under *Blue*, an inmate must produce "clear and convincing evidence that no rational factfinder would fail to find him mentally retarded" if his threshold evidence proved true. *Blue*, 230 S.W.3d at 163.

Soon after deciding *Blue*, the Court of Criminal Appeals issued a brief order dismissing Guevara's successive habeas application.  The order stated:

> This Court has also reviewed the record with respect to the application which was forwarded to this Court as a subsequent writ. On January 13, 2006, the trial court entered an order finding that said application was filed after the time period specified under Texas Code of Criminal Procedure, Article 11.071 § 4(a) or 4(b). We agree with the trial court's determination.  Further, *we find that the application fails to meet one of the exceptions provided for in Section 5 of Article 11.071 and, thus, dismiss this subsequent application as an abuse of the writ. See Ex parte Blue*, S.W.3d, AP-75,254 (Tex. Crim. App. March 7, 2007).

*Ex parte Guevara*, 2007 WL 1493152, at *1 (Tex. Crim. App. 2007) (emphasis added) (unpublished).

Guevara raised his *Atkins* claim again in his federal habeas petition.  This court ordered additional briefing on  whether a dismissal under § 5(a)(3) is a procedure-based or a merits-based dismissal. (Docket Entry No. 29).  On September 23, 2011, this court entered a memorandum and order denying Guevara's other grounds for relief and finding that no adequate and independent

---

[3]     "In other words, the [Court of Criminal Appeals] makes a threshold determination of whether the facts and evidence contained in the successive habeas application, if true, would make a clear and convincing showing that the applicant is actually innocent of the death penalty[,]" which in this circumstance involves mental retardation. *Rocha v. Thaler*, 626 F.3d 815, 822 (5th Cir. 2010). The Fifth Circuit uses a less stringent standard in deciding whether an inmate has made a prima facie case necessary to allow a successive *federal* habeas application. Under federal standards, a prima facie case of mental retardation "is 'simply a sufficient showing of possible merit to warrant a fuller [exploration] by the district court.'" *In re Hearn*, 418 F.3d 444, 445 (5th Cir. 2005) (quoting *In re Morris*, 328 F.3d 739, 740 (5th Cir. 2003)); *see also In re Henderson*, 462 F.3d 413, 415 (5th Cir. 2006). This court's focus is on whether Guevara met the Texas "standards for an *Atkins* claim[.]" *Wiley v. Epps*, 625 F.3d 199, 213 (5th Cir. 2010).

procedural bar foreclosed federal-court consideration of the *Atkins* claim.  (Docket Entry No. 36).

The court  directed the parties to brief the remaining issues, including what deference should be

given to the summary dismissal by the Texas Court of Criminal Appeals of Guevara's successive

state habeas application under the Anti-Terrorism and Effective Death Penalty Act ("AEDPA").

The respondent moved under Rule 59(e) of the Federal Rules of Civil Procedure to alter or

amend this court's ruling that it could review Guevara's *Atkins* claim on the merits.  The respondent

also filed a supplement to that motion.  (Docket Entry Nos. 37, 39).  Guevara has filed a response,

to which the respondent has replied.  (Docket Entry Nos. 41, 42).[4]  The respondent's motion and

Guevara's *Atkins* claim are analyzed below.

## II.    The Rule 59(e) Motion

The respondent's Rule 59(e) motion to alter or amend argues that the court misapplied

procedural default by finding that § 5(a)(3) did not bar federal habeas review of Guevara's *Atkins*

claim.  A Rule 59(e) motion "must clearly establish either a manifest error of law or fact or must

present newly discovered evidence" that was not available before the judgment issued.  *Schiller v.*

---

[4]        The parties have also provided briefing on the Supreme Court's recent holding in *Martinez v. Ryan*, ___ U.S. ___, 132 S. Ct. 1309 (2012).  (Docket Nos. 45-47).  In *Martinez*, the Supreme Court carved out a narrow exception for the default of ineffective-assistance-of-counsel claims that had not been presented in state court because the inmate's state habeas counsel performed deficiently.  Guevara argues that under *Martinez*, this court should forgive the default of claims that were found procedurally barred in the previous memorandum and order.  The Fifth Circuit has recently held that *Martinez* does not apply to federal habeas cases arising from Texas convictions.  *See Foster v. Thaler*, No. 12-70026 (5th Cir. Sept. 21, 2012) (unpublished); *Newbury v. Thaler*, 2012 WL 3032718, at *1 (5th Cir. July 26, 2012) (unpublished); *Ayestas v. Thaler*, 2012 WL 2849487, at *1 (5th Cir. July 11, 2012) (unpublished); *Gates v. Thaler*, 2012 WL 2305855, at *6 (5th Cir. June 19, 2012) (unpublished); *Ibarra v. Thaler*, 687 F.3d 222, 227 (5th Cir. 2012).  Guevara points out that the Supreme Court has recently stayed the execution of a Texas inmate raising a *Martinez* issue, *Balentine v. Thaler*, ___ S. Ct. ___, 2012 WL 3599235 (Aug. 22, 2012).  But Fifth Circuit precedent "remains binding until the Supreme Court provides contrary guidance."  *Neville v. Johnson*, 440 F.3d 221, 222 (5th Cir. 2006); *see also Foster*, No. 12-70026 (refusing to stay an execution based on the Supreme Court's stay in *Balentine*).

*Physicians Resource Group Inc.*, 342 F.3d 563, 567 (5th Cir. 2003) (internal quotations omitted). The respondent does not show that this court clearly erred in its analysis of the interplay between the procedural-bar doctrine and § 5(a)(3). The respondent's brief in support of the motion to alter or amend reasserts many of the arguments raised earlier. But Rule 59 cannot be used "for rehashing evidence, legal theories, or arguments" that were raised earlier. *Templet v. HydroChem Inc.*, 367 F.3d 473, 479 (5th Cir. 2004). The respondent's pleadings and brief do not show manifest error, but rather disagreement about a difficult area of the law.

For a state procedural rule to preclude federal review, the state rule must be independent of federal law. *See Dretke v. Haley*, 541 U.S. 386, 392 (2004); *Lambrix v. Singletary*, 520 U.S. 518, 523 (1997); *Coleman v. Thompson*, 501 U.S. 722, 729 (1991). Initially, the Fifth Circuit reserved judgment on whether a dismissal under § 5(a) was a procedure-based or a merits-based decision. *See Moreno v. Dretke*, 450 F.3d 158, 165 n.3 (5th Cir. 2006). The Fifth Circuit subsequently held that a dismissal under § 5(a)(1) was a procedure-based decision if the claim had been previously available, but was a merits-based decision if the state courts had to consider whether the inmate made a *prima facie* showing of retardation. *See Rocha v. Thaler*, 626 F.3d 815, 837 (5th Cir. 2010); *Balentine v. Thaler*, 626 F.3d 842, 854 (5th Cir. 2010). In cases not involving an *Atkins* claim, the Fifth Circuit has held that § 5(a)(3) is independent of federal law, primarily because of the "lack of overlap between a gateway claim of actual innocence and an underlying constitutional claim for habeas relief." *Rocha*, 626 F.3d at 825. The Fifth Circuit, however, has not yet decided whether the relationship between an *Atkins* claim and an inmate's actual-innocence argument means that the Texas habeas court's inquiry implicates federal law.

This court held that, by using a threshold assessment of the inmate's *Atkins* claim in the

§ 5(a) review, the Court of Criminal Appeals "steps beyond a procedural determination," making its review "at a minimum 'interwoven' with the constitutional prohibition against executing the mentally retarded." *Rivera v. Thaler*, 505 F.3d 349, 359-60 (5th Cir. 2007).[5]

The Texas Court of Criminal Appeals issued a brief order in this case that did not explain its reasoning except by a citation to *Blue v. Thaler. See Guevara*, 2007 WL 1493152, at *1. In the federal habeas action that followed the state court's *Blue* decision, the State accepted that the Texas Court of Criminal Appeals had intertwined the analysis of federal law in the § 5(a)(3) inquiry. *See Blue v. Thaler*, 665 F.3d 647, 654 (5th Cir. 2011). In its decision in *Blue*, the Texas Court of Criminal Appeals had discussed at length how *Atkins* claims fit into the § 5(a)(3) actual-innocence framework. On federal habeas review in *Blue*, the federal district court stated that this "detailed and extensive discussion" made "it appear that the Court of Criminal Appeals [had] intertwined the merits of [the inmate's] *Atkins* claim into its procedural ruling." *Blue v. Thaler*, 2010 WL 8742423, *8 (S.D. Tex. 2010). On appeal to the Fifth Circuit, the State of Texas "did not re-urge procedural default in its response to [his] motion for a [Certificate of Appealability]." The Fifth Circuit concluded that the State had "accept[ed] that the [Court of Criminal Appeals] decided the merits of [the] *Atkins* claim." *Blue*, 665 F.3d at 654. The Fifth Circuit applied § 2254(d)(2) deference to the state court's rejection of Blue's *Atkins* claim. Such deference applies only when a state court has

---

[5]     The respondent asserts that the Court of Criminal Appeals has used language after *Blue* specifying that it had dismissed an *Atkins* claim without considering the merits. *See Ex Parte Garcia*, 2011 WL 5189081, at *1 (Tex. Crim. App. 2011); *see also Ex parte Hernandez*, 2012 WL 243526, at *1 (Tex. Crim. App. 2012). As an initial matter, it is not clear whether the inmate in *Garcia* relied on § 5(a)(1) or on § 5(a)(3). Nevertheless, *Garcia* does not change this court's analysis of how the Texas Court of Criminal Appeals applied § 5(a)(3). Guevara correctly observes that the although Court of Criminal Appeals "has proven itself perfectly capable of such unambiguous pronouncements," it did not make such a pronouncement in this case. (Docket Entry No. 41 at 6).

8

"adjudicate[d] [the claim] on the merits." 28 U.S.C. § 2254(d).  If the Fifth Circuit had thought that no procedural bar impeded federal review, but that the Texas courts had not addressed the merits of Blue's claim, the Fifth Circuit would have engaged in *de novo* review. The Fifth Circuit's application of AEDPA deference in *Blue* supports the conclusion that § 5(a)(3) is not independent from federal law, but rather weaves a federal-law inquiry into its procedural framework.

In the present case, the dismissal order the Court of Criminal Appeals issued does not indicate the basis for its decision, other than its citation to *Blue*.  Based on the applicable precedents, this court assumes that the Court of Criminal Appeals "decided the merits of [the] *Atkins* claim." *Blue*, 665 F.3d at 654.  That would not be surprising, given that the district attorney's motion had asked the Court of Criminal Appeals to hold that Guevara's "claim of mental retardation is without merit."  As in *Blue*, the respondent has failed to show that the Court of Criminal Appeals did not base its decision on federal law.

The motion to reconsider is denied.  Before turning to the merits of Guevara's *Atkins* claim, however, this court must consider whether Texas provided Guevara a sufficient opportunity to develop his claim, which is required for AEDPA deference.

## III.    AEDPA Deference

The Fifth Circuit has held that "if a state court dismisses a prima facie valid *Atkins* claim without having afforded the petitioner an adequate opportunity to develop the claim, it has run afoul of the Due Process Clause[.]"  *Blue*, 665 F.3d at 657.[6]  That due-process violation has two effects

---

[6]       "This rule stems from the fact that *Atkins* created and protects a significant substantive liberty interest, a liberty interest that entitles the petitioner to a set of core procedural due process protections: the opportunity to develop and be heard on his claim that he is ineligible for the death penalty." *Blue*, 665 F.3d at 656-57 (footnote omitted).

on the federal habeas process. First, summarily dismissing a prima facie *Atkins* claim "constitutes an unreasonable application of clearly established federal law that is sufficient to deprive the state court's decision of AEDPA deference." *Id.*; *see also Wiley v. Epps*, 625 F.3d 199, 207 (5th Cir. 2010); *Rivera*, 505 F.3d at 358. In that circumstance, federal review should proceed *de novo*. Second, if "Texas closed its gate" on a prima facie *Atkins* claim, a federal court must allow the inmate to develop the factual basis for that claim. *Blue*, 665 F.3d at 657. The application of AEDPA deference and the availability of additional factual development in federal court "turns entirely on whether [the procedurally barred *Atkins* claim] made a prima facie showing of mental retardation." *Id.* at 657; *Hines v. Thaler*, 456 F. App'x 357, 364 (5th Cir. 2011) (an inmate must show he has "satisfied the specific state law requirements for a prima facie case of mental retardation[.]"). This court directed the parties to analyze "whether Guevara advanced a prima facie *Atkins* claim [in state court and] whether the state court's adjudication of his claim merits AEDPA deference[.]" (Docket Entry No. 36 at 19).

A Texas inmate presents a prima facie *Atkins* claim by showing: "'(1) significantly subaverage general intellectual functioning,' defined as an IQ of about 70 or below; '(2) accompanied by related limitations in adaptive functioning; (3) the onset of which occurs prior to the age of 18.'" *Blue*, 665 F.3d at 657-58 (quoting *Briseño*, 135 S.W.3d at 7). For inmates such as Guevara, who omitted an available *Atkins* claim from their initial state habeas application, the Texas Court of Criminal Appeals requires a "threshold showing of evidence" that is "sufficient to support an ultimate conclusion, by clear and convincing evidence, that no rational factfinder would fail to find mental retardation." *Blue*, 230 S.W.3d at 163; *see also Blue*, 665 F.3d at 658-59 (looking to how Texas applied *Atkins* to decide if an inmate had made a prima facie showing of mental

10

retardation). The Court of Criminal Appeals dismissed Guevara's successive petition without taking additional evidence or holding a hearing. Based on the record, this court concludes that the evidence Guevara put before the state court did not make a prima facie showing and therefore no additional fact development or hearing is required.

### A.      The Evidence Presented in State Court

Guevara's *Atkins* claim relied heavily on Dr. Llorente's report. Dr. Llorente measured Guevara's intellectual capacity through testing instruments and his own clinical impressions. Dr. Llorente did not administer any test to assess Guevara's adaptive behavior. Instead, Dr. Llorente based his evaluation of the *Atkins* second prong on various records, his examination of Guevara, and his telephone interview of three individuals. Dr. Llorente also relied on Vitale's declaration that Guevara had attached to his successive habeas application.[7] From that review, and from his own observations, Dr. Llorente diagnosed deficits he described as mental retardation. Dr. Llorente assumed that these deficits were present before Guevara reached the age of 18.

### B.      Intellectual Functioning

To qualify for a diagnosis of mental retardation, an individual must first show significantly substantial limitations in intellectual functioning. "General intellectual functioning . . . is obtained

---

[7]       The Vitale declaration provided background information about Guevara's life in El Salvador, including his childhood illnesses, the poverty his family lived in, and his relationship with his family. The declaration also described his difficulties in adjusting to life once he immigrated to the United States as a teenager, and the character he displayed as an adult. Vitale based her description in part on her review of transcripts of interviews another investigator conducted in El Salvador. Vitale presented the information in a narrative. Guevara used this narrative to support his ineffective-assistance-of-trial counsel claim, complaining about the absence of important mitigating evidence from his punishment hearing. This court identified evidentiary concerns presented by Vitale's hearsay-laden declaration, (Docket Entry No. 36 at 24), but her declaration is relevant to Guevara's *Atkins* claim because the respondent has indicated that he "will assume arguendo the statements are accurate," and because Dr. Llorente relied on those statements to support his diagnosis of mental retardation.

by assessment with a standardized, individually administered intelligence test[.]" *Ex parte Hearn*, 310 S.W.3d 424, 428 n.7 (Tex. Crim. App. 2010). Organizations such as the American Association on Intellectual and Developmental Disabilities ("AAIDD") (formerly known as the American Association on Mental Retardation) consider a full-scale IQ score "of about 70 or below" as the key indicator of intellectual ability. *Atkins*, 536 U.S. at 309 n.5. Because IQ tests typically have a standard error of measurement (a "confidence interval" or "confidence band") of five points, a base IQ score of 75 or below can result in a mental-retardation diagnosis. *See Clark v. Quarterman*, 457 F.3d 441, 445 (5th Cir. 2006).

Psychologists use several instruments to gauge cognitive ability, including IQ tests. The Court of Criminal Appeals has observed that "IQ tests differ in content and accuracy." *Briseño*, 135 S.3d at 7 n.24. The Texas courts require a full-scale IQ score from a test recognized by the AAIDD to measure intellectual functioning under the first prong of *Atkins*. *See Maldonado v. Thaler*, 625 F.3d 229, 240 (5th Cir. 2010); *Hearn*, 310 S.W.3d at 431; *Blue*, 665 F.3d at 658. Scores from testing instruments not endorsed by the AAIDD or a practitioner's clinical impressions are relevant if accompanied by a qualifying full-scale IQ score. *See Hearn*, 310 S.W.3d at 431. To meet the *Blue* standard, Guevara needed "evidence of an IQ score that . . . if true, would establish significant sub-average general intellectual functioning by clear and convincing evidence." *Blue*, 230 S.W.3d at 166. s

Dr. Llorente administered numerous tests to Guevara, including tests to assess intellectual functioning. Dr. Llorente's report states that he administered parts of the Weschler Memory Scale - Third Edition ("WAIS-III"), a "gold standard" measure of IQ. *See Maldonado*, 625 F.3d at 236; *Thomas v. Quarterman*, 335 F. App'x 386, 391 (5th Cir. 2009). But Dr. Llorente only administered

the "logical memory" and "digit span" subtests[8] and did not derive a full-scale IQ score from the incomplete WAIS-II testing or rely on that testing to assess Guevara's cognitive functioning.

Dr. Llorente cited the results of two testing instruments he used to measure Guevara's intellectual functioning: selected subtests from the Woodcock-Muñoz Pruebas de Habilidad Cognitiva-Revisada ("WMPHC-R" or "Bateria-R"); and the Test of Nonverbal Intelligence-Second Edition ("TONI-2") (Spanish Instructions). Without elaboration, Dr. Llorente's report stated that he considered the empirical scores on these two tests to be "estimates" of Guevara's cognitive functioning. Dr. Llorente reported a "Broad Cognitive Ability score of 60±5 (.4th %ile)" on one section of the WMPHC-R, concluding that "[t]his score placed his performance within the very poor or mentally deficient range of intellectual skills." On the other sections of the test, however, Guevara received scores of 60, 91, 67, 70, 67, 70, and 83. Dr. Llorente stated that Guevara's scores on the WMPHC-R were "marked by significant variability. The subtest scores ranged from the impaired range to the low end of the average range." Dr. Llorente stated that Guevara's results were similar to those "sometimes seen in individuals suffering from organic brain disorders including mental retardation."

Dr. Llorente also administered the TONI-2,[9] "a less stringent test of non-verbal intellect."

---

[8]      Dr. Llorente did not explain why he only administered a portion of the WAIS-III, though Guevara's English proficiency may have impeded full use of the test.

[9]      One court described the TONI-2 test as follows:

**Test of Non-Verbal Intelligence-2** (TONI-2) – a language-free measure of abstract problem solving ability which may be used with individuals ages five through eighty-five years old. It tests a non-verbal IQ. Test items are presented in an easel-style picture book, and six training items precede the fifty-five actual items on both forms of the test. The examiner will pantomime or act out instructions, and the examinee points or makes some other meaningful response to indicate his or her choice. Problem types include simple matching, analogies,

(continued...)

This test resulted in what Dr. Llorente described as a "Borderline range" score of "77±2." Dr. Llorente described this score as "consistent with [Guevara's] score on the WMPHC-R." Dr. Llorente relied on those results to find, "with a reasonable degree of psychological certainty, that Mr. Guevara suffers from mental retardation[.]"

It is not clear that the Texas courts consider WMPHC-R scores adequate to meet the first prong of *Atkins*. The WMPHC-R is the "Spanish language version of the Woodcock-Johnson Test of Cognitive Abilities." *Maldonado*, 625 F.3d at 240. The Fifth Circuit has observed that the AAIDD has not cited that test "as an appropriate test for assessing the intellectual functioning aspect of a mental retardation diagnosis." *Id.* For that reason, state courts have disregarded the Woodcock-Johnson/WMPHC-R results in assessing the *Atkins* first prong. *See id.; but see Hearn*, 310 S.W.3d at 429 (apparently relying on Woodcock-Johnson test results as a valid measure of full-scale IQ).

Even assuming that Guevara's WMPHC-R scores were a valid measure of his full-scale IQ, the scores do not support the conclusion Dr. Llorente's conclusion. Guevara's WMPHC-R scores covered a broad range, a result that Dr. Llorente explained may indicate a profile "sometimes seen in individuals suffering from organic brain disorders including mental retardation." Dr. Llorente also found that Guevara suffered from posttraumatic stress disorder and "frontal lobe systems dysfunction." The Court of Criminal Appeals has been unwilling to find a prima facie case of mental retardation when "there are other possible explanations for" the alleged cognitive impairments. *Blue*, 230 S.W.3d at 165.

---

[9]       (...continued)
classification, intersections, and progressions.

*Simpson v. Quarterman*, 593 F.Supp.2d 922, 943 (E.D. Tex. 2009).

Dr. Llorente found that Guevara's TONI score "was consistent with his score on the WMPHC-R." Federal and state courts have found that because TONI scores do not measure general intelligence, they are insufficient to meet the *Atkins* first prong. *See Maldonado*, 625 F.3d at 240-41; *Moore v. Quarterman*, 342 F. App'x 65, 81 n.27 (5th Cir. 2009); *Hall v. Quarterman*, 534 F.3d 365, 376 (5th Cir. 2008); *Hernandez v. Thaler*, 2012 WL 394597, at *15 (W.D. Tex. 2012); *Maldonado v. Thaler*, 662 F.Supp.2d 684, 721-22 (S.D. Tex. 2009); *Hall v. State*, 160 S.W.3d 24, 30-33 (Tex. Crim. App. 2004). Even if the TONI score was a valid measure of general intellect, Guevara's score of 77 was above the "upper-limit IQ-score cutoff point" and did not support a diagnosis of mental retardation under Texas law. *Blue*, 665 F.3d at 658 ("[U]nder Texas law, the lack of a full-scale IQ score of 75 or lower is fatal to an *Atkins* claim.").

In summary, Guevara relied on one test that, even if considered a valid measure of general intelligence by the state courts, was marked by inconsistency in scoring, and on a second test that is not a valid measure of general intelligence and resulted in a score inconsistent with a mental-retardation diagnosis. Guevara did not provide the Texas courts evidence that, if true, was "sufficient to support an ultimate conclusion, by clear and convincing evidence, that no rational factfinder would fail to find mental retardation." *Blue*, 230 S.W.3d at 163 (emphasis added). Guevara did not make the prima facie showing necessary to require the state court to allow him additional factual development.

## C.    Significant Limitations in Adaptive Skill Areas

Guevara also failed to present sufficient evidence of significant limitations in adaptive skill areas. "[C]linical definitions of mental retardation require not only subaverage intellectual functioning, but also significant limitations in adaptive skills." *Atkins*, 536 U.S. at 318. These are

limitations "in an individual's effectiveness in meeting the standards of maturation, learning, personal independence, and/or social responsibility that are expected for his or her age level and cultural group[.]'" *Maldonado*, 625 F.3d at 241 (quotation omitted). These limitations affect "how effectively individuals cope with common life demands and how well they meet the standards of personal independence expected of someone in their particular age group, sociocultural background, and community setting." *Wiley*, 625 F.3d at 216 (quotation omitted). Psychologists divide the adaptive-limitations inquiry into subcategories of deficiencies such as "conceptual, social, and practical adaptive skills." *Briseño*, 135 S.W.3d at 8.[10]

"The assessment of adaptive functioning deficits is no easy task." *Wiley*, 625 F.3d at 217. Accordingly, psychologists prefer that "adaptive deficits . . . be 'determined by clinical assessment and, usually, standardized scales[.]'" *Maldonado*, 625 F.3d at 241 (quoting *Briseño*, 135 S.W.3d at 7, n.25). While other sources of information, such as lay accounts of an individual's aptitude, educational history, and vocational records, contribute to the adaptive-functioning analysis, the Court of Criminal Appeals prefers that an inmate rely on "available standardized scales for assessing adaptive deficits." *Blue*, 230 S.W.3d at 165; *cf. Ex parte Sosa*, 364 S.W.3d 889, 893 n.17 (Tex. Crim App. 2012) (noting, however, that *Briseño* does not "require a quantitative measurement of adaptive behavior").

In the present case, "the state court . . . was faced with only limited evidence about [Guevara's] adaptive skills, no formal adaptive testing by his experts, and lay evidence that was contrary to his claims." *Maldonado*, 625 F.3d at 244. As the respondent notes, Dr. Llorente's report

---

[10]     Because "determining deficits in adaptive behavior (the second element) [is] highly subjective," the Texas Court of Criminal Appeals considers factors such as the ability to plan and to answer questions. *Chester v. Thaler*, 666 F.3d 340, 346 (5th Cir. 2011).

16

"never identifies the actual domain of adaptive behavior skills – conceptual, social, or practical skills – in which he believes Guevara has significant limitations as would support the expert's clinical impression of mental retardation." (Docket Entry No. 17 at 42). Dr. Llorente's report "did not comport with the very criteria which he set forth for assessing adaptive limitations." (Docket Entry No. 17 at 43). And although Dr. Llorente derived much information about Guevara's adaptive abilities from Vitale's declaration, that declaration and Dr. Llorente's report painted markedly different pictures of Guevara's abilities.

Dr. Llorente did not assess Guevara using the standard instruments for measuring adaptive deficits. Instead, he primarily based his opinion on: (1) telephone interviews with Guevara's mother and two former employers; (2) his own observations of Guevara; and (3) his review of unspecified "declarations of relevant witnesses," presumably those on which Vitale based her declaration. From that review, Dr. Llorente identified "a clear pattern of poor adaptive behaviors." Dr. Llorente specifically mentioned: (1) delays in developmental milestones, such as not walking until age two; (2) academic failures, including "dropp[ing] out of school because he could not learn"; (3) problems with "understanding simple instructions" and forgetting things; (4) inability to "learn simple mechanic tasks," "follow basic instructions" at work; and "learn . . . a trade"; and (5) "dependen[cy] o[n] other individuals to function in society," apparently because of his "extremely poor judgment, impulsive behaviors, disregulation of emotional behavior and inability to solve his problems in a rational and logical way." Vitale's declaration, which Guevara attached to his successive habeas application, conflicted with Dr. Llorente's conclusions on a number of points.

Dr. Llorente attributed Guevara's childhood developmental delays to mental retardation. Vitale reported that the developmental delays resulted from the fact that Guevara had been

"extremely ill throughout his childhood" and required "constant care and supervision by his mother" to the point that he could not "develop appropriate peer relationships" and became "extremely introverted." Dr. Llorente reported that Guevara performed poorly in school and dropped out because he "could not learn." Vitale reported that while Guevara's family considered him to be "a little slow . . . he did not have intelligence," he "had good grades" and simply "did not like to study much." Contrary to what Dr. Llorente stated, Vitale reported that it was not mental retardation that led Guevara to stop attending school in El Salvador. Instead, "he wanted . . . to learn a trade" and "was forced to leave school and begin working to help support the family." (Docket Entry No. 1, Declaration of Gina T. Vitale, dated Dec. 12, 2002).

Dr. Llorente described Guevara as unable to master even simple skills. Vitale reported that he was "very adept at welding" and "an excellent worker." Dr. Llorente said that Guevara was unable to "learn simple mechanic tasks." Vitale reported otherwise; after coming to this country, Guevara worked for two years in an auto body shop and "was very good at what he did." He was also trained as a "line chef" at a restaurant and worked there for several years. After he was fired because of his immigration status, he worked at a different restaurant until it was destroyed by a hurricane. After that, Guevara had a temporary job repairing damage at his apartment complex. The owner "was so pleased with Guevara's work" that he hired him to work with the "head maintenance man." Guevara learned "many new skills, including air conditioning repair." Vitale saw Guevara as driven to improve his job skills. She reported that Guevara "often went out of his way to request additional training seeking to improve his skills and position"; that people described him as "a good worker" with whom they "never had any problems of any kind"; and that he was not dependent on others to function, but "work[ed] several jobs at a time, supporting his family in Houston, saving to

18

move his family to a better neighborhood, and sending what little was left home to El Salvador." (Docket Entry No. 1, Declaration of Gina T. Vitale, dated Dec. 12, 2002).

Dr. Llorente recognized that Vitale's information conflicted with what he assumed in forming his opinion, particularly with regard to work skills. Dr. Llorente opined that "despite the fact that several sources of information in the past may have indicated that Mr. Guevara was either a good student or worker, they were referring to his demeanor and characteristics, a set of factors not to be confused with the quality of his work from a products standpoint." The record does not support Dr. Llorente's statement that Vitale's sources of information described Guevara's "demeanor and characteristics" rather than the "quality of his work." The state court record includes evidence showing that Guevara could learn new skills, perform them to the satisfaction of his employers, seek to better himself, and independently provide for his nuclear and extended family. Dr. Llorente failed to acknowledge the sources of information that described Guevara's work skills in a manner inconsistent with mental retardation.

In addition to the contradictory evidence from Vitale's declaration, Guevara's successive habeas application was before the Court of Criminal Appeals contemporaneously with, and not isolated from, his initial habeas action. *See Woods*, 296 S.W.3d at 606 (noting that "prior evidence" is clearly "relevant to a determination of whether [the] applicant's current pleading meets the requirements of Article 11.071 § 5(a)(3)"). The district attorney's brief emphasized the lower court's findings in Guevara's initial habeas action. The lower state court had observed that Guevara's brother "answered . . . negatively" when trial counsel asked him "whether [Guevara] showed any sign of mental retardation" or "was diagnosed with mental retardation." State Habeas Record at

459.[11]  The state habeas court findings show that Guevara did not have problems communicating with his attorneys and understood the events of trial.  He made efforts to guide defense strategy. State Habeas Record at 462-63, 465-66.  Guevara's state habeas claims relied on several letters he sent before trial.  These letters, while neither sophisticated nor complex, did not show cognitive impairment.  Clerk's Record at 145-52.[12]

Under Article 11.071, a Texas state habeas court considers all record evidence in deciding whether an inmate has made a prima facie showing of mental retardation.  *See Ex parte Campbell*, 226 S.W.3d 418, 423 (Tex. Crim. App. 2007) (reviewing the evidence under § 5(a)(1)).  The Court of Criminal Appeals had before it a broad range of information about Guevara.  Much of that information was inconsistent with a diagnosis of mental retardation.  The evidence before the state

---

[11]     Relying on the record Guevara had developed to show that trial counsel should have presented more mitigating evidence, the district attorney argued:

> [Guevara's] family and friends did not regard him as mentally retarded until it became beneficial to do so in his subsequent application for writ of habeas corpus. [His] repeated offenses show that he is able to formulate plans and carry them through.  The reports of [his] relative and friends . . . show that he was able to care for his family, make rational decisions, and talk with others coherently and rationally, including being able to give good, appropriate advice.  [He] cared for his family emotionally and financially and responded to the violence in southwest Houston by moving his family to a better environment.  Finally, [he] employed a sophisticated thought process to recognize and understand why he did not fit in with gang members.

Respondent's Motion to Dismiss Applicant's Subsequent Application for Writ of Habeas Corpus, at 20-21.

[12]     Guevara now states that "[i]t is likely based upon the hand writing of those letters, that Mr. Guevara did not even write them himself, especially when comparing the penmanship with the signature on the letters." (Docket Entry No. 1 at 72).  Before he raised a claim that would call his mental functioning into question, however, his state habeas application read: "Applicant Alex Guevara wrote several letters to the trial court . . . ." State Habeas Record at 40.  Guevara did not give the Court of Criminal Appeals any reason to question whether he had written the letters when it considered whether he had presented prima facie evidence of mental retardation.

court submitted in support of Guevara's ineffective-assistance-of-counsel claim conflicted with a diagnosis of mental retardation. With such contradictory evidence about Guevara's adaptive abilities, the Court of Criminal Appeals had ample record support for finding that he had not made a "*threshold* showing of evidence that would be at least *sufficient* to support an ultimate conclusion, by clear and convincing evidence," that he suffered adaptive deficits. *Blue*, 230 S.W.3d at 163 (emphasis added).

### D.     Conclusion of Prima Facie Review

Guevara presented some evidence that would support a psychological inquiry into possible mental retardation. His evidence, however, was tentative and inconsistent with other information in the record. Dr. Llorente's review, initially intended to "rule-out of mental retardation," was not sufficient to make a prima facie case of mental retardation under the standards established by the Court of Criminal Appeals. Guevara has not shown that the Texas courts deprived him of his due process rights by not authorizing additional inquiry into his *Atkins* claim. Because Guevara received the process he was due, this court need not authorize additional factual inquiry or hold an evidentiary hearing. The AEDPA deferential standard applies.

### IV.     Review of the Merits

Whether Guevara is mentally retarded "is a question of fact, reviewed under 28 U.S.C. § 2254(d)(2)." *Hines*, 456 F. App'x at 364. Relief is not available to Guevara under § 2254(d)(2) unless he shows that the state-court adjudication of his *Atkins* claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). To make that showing, Guevara cannot merely demonstrate "that a state court's decision was incorrect or erroneous." Instead, he "must show that

the decision was objectively unreasonable, a substantially higher threshold." *Blue*, 665 F.3d at 654-55 (quotation omitted).

Guevara's state-court evidence supporting the first *Atkins* prong was weak and inconclusive. Guevara did not submit scores from "gold standard" measures of intellectual assessment. He relied instead on two tests that did not conclusively show significantly substantial limitations in intellectual functioning. Guevara also made an inconclusive showing of adaptive deficits. Dr. Llorente based his adaptive-deficit review on limited information, largely consisting of interviews he conducted by telephone. The record evidence, including evidence submitted in connection with Guevara's other state habeas claims, was inconsistent with the information Dr. Llorente cited, yet Dr. Llorente appeared to give this other evidence no weight in his analysis.

The record showed that Guevara was intellectually slow, did not like to study, and performed poorly in school. But the record also showed that he left school in El Salvador for reasons other than cognitive functioning. Vitale's declaration describing Guevara's experience after he immigrated to the United States as a teenager was based on interviews conducted with individuals who possessed more recent information about him. The declaration does not hint at significant mental impairment after Guevara immigrated here. Instead, it describes how Guevara left an unhealthy and dangerous environment to better his life in the United States where, aside from his criminal activity, he did not show the impulsivity or impaired judgment that is often associated with mental retardation. *See Atkins*, 536 U.S. at 306 (recognizing that mentally retarded offenders have "disabilities in areas of reasoning, judgment, and control of their impulses"). In the section of his petition addressing mitigating evidence, Guevara concedes that he "has not shown to be mentally retarded, but he suffers from both Post Traumatic Stress Disorder and immigrant trauma, both of which hindered his

development to normal adulthood with an understanding of the consequences for his actions." (Docket Entry No. 1 at 45).

Dr. Llorente's report provides the only support for a finding of mental retardation. That report relies on assumptions that are contradicted by record evidence. Given the evidence about Guevara's intellectual capabilities, work performance and history, and absence of significant adapative limitations, the Court of Criminal Appeals was not unreasonable in finding that Guevara had not shown that he was mentally retarded. Under AEDPA's deferential standards, this court finds that Guevara has not shown that his *Atkins* claim entitles him to habeas relief.[13]

## V.       Certificate of Appealability

The AEDPA bars appellate review of a habeas petition unless the district or circuit courts certify specific issues for appeal. *See* 28 U.S.C. § 2253(c); FED.R.APP.P. Rule 22(b). Although Guevara has not yet requested that this court grant him a Certificate of Appealability ("COA"), a court may consider the issue on its own. *See Alexander v. Johnson*, 211 F.3d 895, 898 (5th Cir. 2000).

A court may only issue a COA when "[a petitioner] has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2); *see also Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Settled precedent forecloses relief on Guevara's *Atkins* claim. Under the appropriate standard, Guevara has not shown that this court should certify any issue for appellate consideration. This court will not certify any issue for review by the Fifth Circuit.

---

[13]       For the same reasons that Guevara has not presented a viable mental retardation claim, his alleged mental retardation would not amount to a fundamental miscarriage of justice which would overcome the procedural bar of any claim.

## VI.   Conclusion

This court denies the respondent's motion for reconsideration, denies the remaining claim in Guevara's federal habeas petition, and dismisses this case.  A certificate of appealability will not issue.

SIGNED on _Splember 25, 2012_, at Houston, Texas.

Lee H. Rosenthal
United States District Judge